# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Benjamin Reetz, individually and as the representative of a class of similarly situated persons, and on behalf of the Lowe's 401(k) Plan,

                Plaintiff,

v.

Lowe's Companies, Inc., Administrative Committee of Lowe's Companies, Inc., Pat Belanger, Robin Bornkamp, Lance Cook, Matthew Eurey, David Green, Bob Ihrie, Mark Imhoff, Terry Johnson, Angela Kirby, Janice Little, Tiffany Mason, Colleen Penhall, Stacey Ryan, Kristie Shugart, Brandon Sink, Gregor Teusch, Jennifer Weber, John and Jane Does 1-20, and Aon Hewitt Investment Consulting, Inc.,

                Defendants.

Case No. 5:18-cv-00075-KDB-DCK

**FIRST AMENDED COMPLAINT**

**CLASS ACTION**

## NATURE OF THE ACTION

1.    Plaintiff Benjamin Reetz ("Plaintiff"), individually and as the representative of the class defined herein and the Lowe's 401(k) Plan ("Plan"), brings this action against Lowe's Companies, Inc. ("Lowe's Corp."), the Administrative Committee of Lowe's Companies, Inc. ("Administrative Committee"), Pat Belanger, Robin Bornkamp, Lance Cook, Matthew Eurey, David Green, Bob Ihrie, Mark Imhoff, Terry Johnson, Angela Kirby, Janice Little, Tiffany Mason, Colleen Penhall, Stacey Ryan, Kristie Shugart, Brandon Sink, Gregor Teusch, Jennifer Weber, and John and Jane Does 1-20 (collectively, "Lowe's"), as well as Aon Hewitt Investment Consulting, Inc. ("Hewitt") (together with Lowe's, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"). As described herein, Lowe's imprudently selected and retained the Hewitt Growth Fund for the Plan, in consultation with Hewitt (which served as the Plan's fiduciary investment consultant), despite the fact that (1) the

1

Hewitt Growth Fund was a new and largely untested fund at the time it was added to the Plan; (2) the Hewitt Growth Fund was underperforming its benchmark at the time it was added to the Plan and continued to underperform after it was added to the Plan; and (3) the Hewitt Growth Fund was not utilized by fiduciaries of any similarly-sized plans and was generally unpopular in the marketplace. To make matters worse, Defendants placed over $1 billion of the Plan's assets into this new, underperforming, and unpopular fund, and disturbed participants' investment choices by transferring assets from eight existing funds in the Plan (which were generally performing well) and putting them in the Hewitt Growth Fund, which replaced these existing funds in the Plan's investment lineup. Prior to this $1 billion investment by the Plan, the Hewitt Growth Fund had struggled to attract capital from other investors and had only $350 million in total assets, such that the Plan's investment resulted in a four-fold increase in the size of this fund. Hewitt had a conflict of interest in recommending this proprietary fund for the Plan, and improperly did so to further its own financial interests instead of the interests of the Plan's participants. Lowe's should have recognized this conflict of interest, and should have recognized (as other 401(k) plan fiduciaries did) that the Hewitt Growth Fund was inappropriate for the Plan. By causing the Plan to include and retain this fund, Defendants breached their fiduciary duties under Section 404 of ERISA (29 U.S.C. § 1104) and caused the Plan to suffer millions of dollars in investment losses.[1] Plaintiff brings this action to recover these losses, disgorge the profits that Hewitt received on account of its fiduciary breaches, and obtain equitable relief and other appropriate relief as provided by Sections 409 and 502 of ERISA (29 U.S.C. §§ 1109, 1132).

## PRELIMINARY STATEMENT

2.      As its name implies, Aon Hewitt Investment Consulting Inc. provides investment

---

[1] In addition to breaching its fiduciary duties, Lowe's also breached its duty to monitor Hewitt.

2

consulting services to institutional clients, including 401(k) plans such as the Plan. In this role, Hewitt provides advice regarding, among other things, "investment lineup analysis, investment policy development, manager searches, and ongoing performance reporting and evaluation."[2]

3.    As an investment consultant, Hewitt serves in a fiduciary capacity and is obligated to provide investment analysis and make investment recommendations in an independent and unbiased manner, and exercise the high standard of care that applies to fiduciaries under ERISA. Indeed, Hewitt specifically markets itself as providing "independent" and objective investment advice.[3]

4.    However, Hewitt has not been content to merely provide consulting advice to its retirement plan clients. In an effort to expand beyond its core consulting business, Hewitt recently began offering its own line of investment products (referred to herein as the "Hewitt Funds"), which it introduced to the 401(k) plan marketplace in the fourth quarter of 2013.

5.    In connection with the launch of the Hewitt Funds, Hewitt attempted to leverage its existing consulting client base to attract investors. The overwhelming majority of 401(k) plan sponsors that it advised did not fall for the sales pitch, and rejected Hewitt Funds for their plans through their own fiduciary screening process. However, Lowe's was not as discerning, and began offering three Hewitt Funds in the Plan in 2015 (the Hewitt Growth Fund, Hewitt Income Fund, and Hewitt Inflation Fund).

6.    Of those three funds, Defendants placed their biggest bet on the Hewitt Growth

---

[2]  http://www.aon.com/human-capital-consulting/retirement/investment-consulting/about-us/our-clients/defined-contribution-plans.jsp (last visited April 20, 2018).
[3]  *See, e.g.,*  http://www.aon.com/human-capital-consulting/retirement/investment-consulting/ ("We provide independent advice");  http://www.aon.com/human-capital-consulting/retirement/investment-consulting/core-services/manager-evaluation-search.jsp  ("We provide ourselves on our independence and objectivity").

Fund by far. Specifically, Defendants replaced eight existing funds in the Plan with the Hewitt Growth Fund, and simultaneously transferred all of the Plan's assets in those existing funds — over $1 billion in total— into the Growth Fund. This transfer of assets constituted approximately half of the Plan's total asset base in pooled investment vehicles (*i.e.*, assets other than Lowe's Corp. stock). No other single fund in the Plan was entrusted with remotely the same amount of assets as the Hewitt Growth Fund.[4]

7.     It was extraordinarily irresponsible for Defendants to make such a large gamble on the Hewitt Growth Fund. At the time Defendants put the Plan's assets into this incipient fund, the Hewitt Growth Fund had less than two years of performance history. As a general rule, "fiduciaries of other retirement plans generally require a longer performance history of three or more years before considering an investment for a retirement plan."[5]

8.     Moreover, the limited performance data that was available for the Growth Fund was anything but encouraging. In fact, at the time the Growth Fund was added to the Plan, it reported **negative** returns (-0.67%) from its inception in Q4 2013 through Q3 2015. By contrast, over the same period, the eight funds it replaced had a weighted average return of 7.30%.

9.     Given the limited—and negative—performance history of the Hewitt Growth Fund, and Hewitt's limited experience as an investment manager, the Hewitt Growth Fund was exceedingly unpopular in the marketplace. At the time the Growth Fund was added to the Plan in 2015, it was included in only two other retirement plans in the entire country (out of more than

---

[4] By contrast, Defendants mapped only $45 million in assets from one existing fund into the Hewitt Income Fund, and did not map any assets into the Hewitt Inflation Fund (which was added to the Plan but did not replace any existing options).

[5] *See* Expert Report of Marcia Wagner, *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-cv-01614 (C.D. Cal.), Dkt. No. 160-9.

4

648,000), representing 0.0003% of all such plans, and was not included in any similarly-sized retirement plans with at least $1 billion in total assets.

10. The Hewitt Growth Fund was such a failure in the marketplace that the Plan's $1 billion investment constituted nearly three-quarters of all amounts invested in the Hewitt Growth Fund from all sources as of the end of 2015. The total amount invested by all other investors in this fund at year-end 2015 was only about $350 million **combined.**

11. Given the Hewitt Growth Fund's limited track record, poor performance history, and unpopularity in the 401(k) plan marketplace, prudent retirement plan fiduciaries would not have included—and did not include—this fund in their plan lineup, and certainly would not have invested $1 billion in plan assets in this fund.

12. In recommending the Hewitt Growth Fund for inclusion in the Plan, Hewitt put its own business interests ahead of the interests of Plan participants and beneficiaries, in violation of ERISA. Given Hewitt's conflict of interest in recommending this fund, Lowe's should have closely scrutinized Hewitt's recommendation, and rejected the Hewitt Growth Fund for the Plan as other fiduciaries did for their plans. By failing to do so, and allowing substantial Plan assets to be transferred into this fund, Lowe's also violated its fiduciary duties and failed to meet the applicable standard of care.

13. Since the Hewitt Growth Fund was added to the Plan in 2015, it has continued to perform poorly. In fact, the fund has performed so poorly that the Plan already has suffered over $100 million in investment losses, based on a comparison of the returns of the Hewitt Growth Fund to the eight funds it replaced (weighted to reflect the Plan's investment in each fund). Yet, Defendants have stubbornly continued to retain this fund in the Plan, in breach of their ongoing duty to monitor the Plan's investments and remove imprudent ones. *See Tibble v. Edison Int'l*, 135

S.Ct. 1823, 1828 (2015) ("[A] trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.")

14.     Plaintiff brings this action under ERISA to remedy these fiduciary breaches, recover the Plan's losses, disgorge the profits that Hewitt received on account of its disloyal conduct, prevent further mismanagement of the Plan, and obtain other appropriate relief.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

16.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## PARTIES

17.     Plaintiff Benjamin Reetz resides in Tacoma, Washington. Plaintiff Reetz is a current participant in the Plan, and has been a participant throughout the proposed class period. All of Plaintiff Reetz's Plan assets are invested in the Hewitt Growth Fund, and Plaintiff Reetz has suffered investment losses as a result of Defendants' fiduciary breaches and unlawful conduct as alleged in this Complaint.

18.     Defendant Lowe's Corp. is one of the nation's largest home improvement retailers, and is headquartered in Mooresville, North Carolina. Lowe's Corp. is the Plan sponsor within the meaning of 29 U.S.C. § 1002(16)(B), and exercises discretionary authority or discretionary control with respect to administration of the Plan and management and disposition of Plan assets. Lowe's Corp. is therefore a fiduciary under 29 U.S.C. § 1002(21)(A). Lowe's Corp. has delegated certain functions to the Administrative Committee. However, Lowe's Corp. retains ultimate decision-

6

making authority with respect to the Plan, and appoints and has the authority to remove members of the Administrative Committee through its Board of Directors.

19.     Defendant Administrative Committee is a committee of Lowe's employees appointed and overseen by the Lowe's Corp. Board of Directors. The Administrative Committee is responsible for selecting and monitoring the Plan's investment options and for making any necessary changes to the Plan's investment menu, subject to the ultimate oversight and discretion of Lowe's Corp. In performance of its duties, the Administrative Committee exercises discretionary authority or discretionary control with respect to administration of the Plan and management and disposition of Plan assets. Accordingly, the Administrative Committee is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A).

20.     Pat Belanger, Robin Bornkamp, Lance Cook, Matthew Eurey, David Green, Bob Ihrie, Mark Imhoff, Terry Johnson, Angela Kirby, Janice Little, Tiffany Mason, Colleen Penhall, Stacey Ryan, Kristie Shugart, Brandon Sink, Gregor Teusch, and Jennifer Weber are members of the Administrative Committee, or were members of the Administrative Committee during the putative class period.

21.     Defendant John and Jane Does 1-20 (the "Doe Defendants") are members of the Administrative Committee. The identities of the Doe Defendants are not currently known to Plaintiff.

22.     Defendant Hewitt is a registered investment adviser headquartered in Chicago, Illinois. Hewitt was formerly known as Hewitt EnnisKnupp, Inc., and is the successor by merger to Ennis Knupp & Associates, Inc., Hewitt Investment Group LLC, and Aon Investment Consulting Inc. Hewitt provided investment advisory services to the Plan dating back to at least 2009, and continues to provide investment advisory services to the Plan, relating to the selection

7

and monitoring of the Plan's investment options, and the removal, replacement, and retention of those investment options (subject to the ultimate discretion and approval of Lowe's). As the Plan's investment consultant, Hewitt rendered advice to the Plan on a regular basis in exchange for consulting fees, pursuant to a mutual agreement acknowledging that Hewitt would provide individualized advice to the Plan regarding investment policies and strategy along with portfolio composition that would serve as the primary basis for investment decisions with respect to Plan assets. Hewitt also received investment management fees and/or other fees in connection with the Plan's investment in the Hewitt Growth Fund. Hewitt is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A) because Hewitt exercised discretionary authority or control respecting disposition of Plan assets and rendered investment advice for a fee with respect to Plan assets.

23. Each Defendant identified above is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to breach their fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of such breaches.

## THE PLAN

24. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Lowe's Corp. and its subsidiaries, including Plaintiff. The Plan is a qualified plan under 26 U.S.C. § 401, and is of the type commonly referred to as a "401(k) plan."

25. As of the end of 2016 (the most recent calendar year for which Plan information is available through the Plan's Form 5500 filings with the Department of Labor), the Plan had more than 262,000 participants and more than $5.2 billion in assets, consisting of approximately $2.65 billion in Lowe's Corp. stock and approximately $2.61 billion in pooled investment vehicles.

8

26. Among the pooled investments, the amount invested in the Hewitt Growth Fund as of year-end 2016 was $1,082,100,276. This was more than six times the amount invested in the next largest fund ($177,093,609), a target date fund from Vanguard.[6]

27. The Hewitt Funds and Vanguard target-date funds are the only pooled investment options in the Plan, other than a low-yielding capital preservation option.

## ERISA FIDUCIARY DUTIES

28. ERISA recognizes "that the continued well-being and security of millions of employees and their dependents are directly affected by [retirement] plans." 29 U.S.C. § 1001(a). Thus, "[t]he principal object of the statute is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (citation omitted). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators" and "ERISA was designed to prevent these abuses." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (citing extensive legislative history).

29. To protect plan participants, ERISA incorporates the twin fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). These fiduciary duties are the "highest known to law." *Tatum v. RJR Pens. Invest. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation and quotation marks omitted).

30. The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative

---

[6] This Vanguard fund is one of a series of Vanguard target-date funds in the Plan.

investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

31.     Therefore, a plan fiduciary cannot, consistent with the duty of loyalty, take into account its own business interests when making investment or administrative decisions concerning the plan. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

32.     The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that a prudent person would utilize in managing a similar plan." 29 U.S.C. § 1104(a)(1)(B). This is not a lay person standard, but instead "requires expertise in a variety of areas, such as investments." Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017), at 2, *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

33.     The duty of prudence applies to the initial selection of a plan's investment options, and also entails a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

34.     When deciding whether to add, retain, or remove a plan investment option, the duty of prudence requires a "thorough and impartial investigation and analysis." *Tatum v. R.J. Reynolds Tobacco, Co.*, 926 F. Supp. 2d 648, 674 (M.D.N.C. 2013), *aff'd in relevant part, vacated and rev'd on other grounds sub nom, Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 (4th Cir. 2014).

35.     Although a retirement plan sponsor (such as Lowe's Corp.) and plan committee (such as the Administrative Committee) may seek input from an investment consultant (such as Hewitt) with regard to the plan's investment options, this does not absolve the sponsor and

10

committee of their fiduciary duties. In such a case, both the sponsor/committee and the consultant share these fiduciaries duties with respect to the Plan under 29 U.S.C. § 1104(a).

**DEFENDANTS' MISMANAGEMENT OF THE PLAN**

**I.  HEWITT'S DEVELOPMENT AND SELF-SERVING PROMOTION OF ITS OWN FUNDS**

36.     In 2011, Hewitt was the largest investment consultant in the world.[7] Hewitt owed its top position in 2011 to the 2010 merger of three previously unaffiliated firms: EnnisKnupp, Hewitt Associates, and Aon Investment Consulting.[8] At the time of the merger, industry observers and plan sponsors questioned whether the combined firm could deliver the same independent, unbiased investment advice associated with its predecessor firms.[9] As the facts of this case demonstrate, these concerns turned out to be prescient.

37.     Following the merger, Hewitt aggressively pursued new product development, in an effort to expand its business. Among the products that Hewitt developed was a set of proprietary collective investment trusts that were marketed to defined contribution plans. These proprietary funds were an entirely new venture for Hewitt, as it had never previously developed its own set of funds for defined contribution plans and historically had limited its role to advising clients regarding funds offered by other companies.

---

[7] Tim Jenkinson, et al., *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 J. Fin. 2333, 2334 (Oct. 2016) ("*Picking Winners*") (citing PENSIONS & INVESTMENTS, *Consultants Directory 2011* (Nov. 28, 2011), *available at* http://researchcenter.pionline.com/rankings/consultant/specialreports/aua?year=2011.

[8] *See* PENSIONS & INVESTMENTS, *Consultants Directory 2009* (Nov. 30, 2009), *available at* http://researchcenter.pionline.com/rankings/consultant/specialreports/aua?year=2009.

[9] *See* William P. Barrett*, Is "Conflict-Free" EnnisKnupp Selling Its Soul*, FORBES (Aug. 23, 2010), *available at* https://www.forbes.com/2010/08/23/ennisknupp-aon-hewitt-pension-consultant-personal-finance-conflict-of-interest.html#58b01f001160; William P. Barrett, *EnnisKupp Drinks the Kool-Aid*, Forbes (Sept. 2, 2010), *available at* https://www.forbes.com/sites/williampbarrett/2010/09/02/ennisknupp-ends-decades-of-conflict-free-pension-advice/#45bc59b56d0e ("*Drinks the Kool-Aid*"); Douglas Appell, *Hewitt EnnisKnupp still suffers merger pains*, Pensions & Investments (Apr. 2, 2012), *available at* http://www.pionline.com/article/20120402/PRINT/304029984/hewitt-ennisknupp-still-suffers-merger-pains ("*Merger Pains*").

11

38.     Although Hewitt continues to market itself as an honest broker that provides "independent" and objective advice to its consulting clients, *see supra* at ¶ 3 & n.3, it has allowed its own self-interest to seep into that advice.  Specifically, Hewitt has recommended the Hewitt Funds to its consulting clients, in an effort to leverage its existing business relationships, without regard to the merit of the Hewitt Funds and without giving proper consideration to whether existing or alternative options are better suited for the plans it advises.

39.     It is reasonable to infer that Hewitt made a similar recommendation to Lowe's.  As an investment consultant to the Plan, Hewitt regularly consulted with Lowe's regarding the investment options in the Plan, and within two years of the launch of the Hewitt Funds, those investment options were substantially overhauled, three Hewitt Funds were added to the Plan (effective October 1, 2015), and over $1 billion was transferred into the Hewitt Growth Fund.   As discussed below, very few plan sponsors adopted Hewitt Funds for their plans, and those that did were Hewitt clients.

## II.     DEFENDANTS' IMPRUDENT ADOPTION OF THE HEWITT GROWTH FUND AND TRANSFER OF OVER $1 BILLION IN PLAN ASSETS INTO THE FUND

40.     The Plan's investment in two of the Hewitt Funds was relatively modest and did not involve major changes to the Plan lineup.  *See supra* at n.4. However, with respect to the third fund—the Hewitt Growth Fund—Defendants caused the Plan to make a massive investment that fundamentally changed the character of the Plan.

41.     When the Hewitt Growth Fund was added to the Plan, Lowe's eliminated eight existing funds from the Plan's investment menu and transferred all of those funds' assets to the Growth Fund. This represented a staggering transfer of over $1 billion of Plan assets, constituting nearly half of all of the Plan's assets in pooled investment products.

12

42.     A prudent fiduciary acting in the best interest of Plan participants would not have undertaken this restructuring and transferred the Plan's assets from these previously-existing funds into the Hewitt Growth Fund.

### *The Removed Funds*

43.     The eight funds that were removed from the Plan in favor of the Growth Fund were the Vanguard Institutional Index Fund, T. Rowe Price Institutional Mid-Cap Equity Growth Fund, American Funds New Economy Fund, Eagle Small Cap Growth Fund, T. Rowe Price Small-Cap Value Fund, American Funds EuroPacific Growth Fund, Diamond Hill Value Account, and T. Rowe Price Mid-Cap Value Fund Account (collectively, the "Removed Funds").

44.     The Removed Funds constituted a diversified set of investment options that allowed participants to choose between large cap, mid cap, small cap, and international stocks, while further offering "growth" and "value" style options within the large, mid, and small cap asset classes. Taken together, the Removed Funds allowed participants to customize their asset allocation and risk profile depending upon their investment timeframe, financial goals, risk tolerance, and individualized assessments of which asset classes offered the best potential for investment success.

45.     Each of these options had a strong long-term track record of performance. The Plan's holdings in each fund as of the end of 2014 (the last calendar year before they were replaced), and the performance of each fund (in absolute terms and in relation to their benchmark) are shown below:

| Removed Investment Option | Total Assets Under Management (Before 2015 Plan change) | Launch Date | Plan Assets Held (as of Q4 2014) | Performance as of Q3 2015 (10-year) | Benchmark | Benchmark Performance as of Q3 2015 (10-year) |
|---|---|---|---|---|---|---|
| Vanguard Institutional Index Fund | $195 billion (as of Q2 2015) | July 1990 | $170 million | 6.80% | S&P 500 TR USD | 6.80% |

13

| | | | | | | |
|---|---|---|---|---|---|---|
| T. Rowe Price Institutional Mid-Cap Equity Growth Fund | $31 billion (as of Q2 2015) | July 1996 | $260 million | 10.33% | Russell Mid Cap Growth TR USD | 8.09% |
| American Funds New Economy Fund | $16 billion (as of 5/31/2015) | December 1983 | $101 million | 8.73% | S&P 500 TR USD | 8.09% |
| Eagle Small Cap Growth Fund | $4 billion (as of 4/30/15) | May 1993 | $81 million | 8.43% | Russell 2000 Growth TR USD | 7.67% |

| T. Rowe Price Small-Cap Value | $9 billion (as of Q2 2015) | June 1988 | $46 million | 6.67% | Russell 2000 Value TR USD | 5.35% |
|---|---|---|---|---|---|---|
| American Funds Europacific Growth Fund | $120 billion (as of Q3 2015) | April 1984 | $127 million | 5.24% | MSCI ACWI Ex USA NR USD | 3.03% |
| Diamond Hill Value Account | $7 billion (as of Q4 2014) | June 2001 | $197 million | 7.69% | Russell 1000 TR USD | 6.95% |
| T. Rowe Price Mid-Cap Value Account | $15 billion (as of Q4 2014) | June 1996 | $175 million | 8.96% | Russell Mid Cap Value TR USD | 7.42% |

46. As reflected by this chart, the Removed Funds were established funds with positive long-term performance histories managed by experienced asset managers such as Vanguard, T. Rowe Price, and American Funds with decades of experience managing pooled investment products for retirement plans, with published, GIPS compliant[10] performance histories documenting the success of each of these products as well as their managers. At the time the Removed Funds were removed, they were meeting or exceeding their long-term benchmarks. There was no compelling reason to remove any of these funds from the Plan, and even if there were, the Hewitt Growth Fund was not a prudent replacement.

47. Moreover, the Removed Funds had a variety of different investment strategies (value, growth, etc.) and invested different asset classes (small cap, mid cap, etc.) in different

---

[10] The Global Investment Performance Standards (GIPS) are a well-recognized and respected series of performance tracking and reporting standards designed to ensure fair and accurate representation of historical investment performance by asset managers that has been verified by a third party. Investopedia, *A Guide to Global Investment Performance Standards*, available at https://www.investopedia.com/articles/07/gips.asp (last accessed Apr. 26, 2018). A prudent fiduciary would not rely upon an asset manager's self-reported performance history if it was not GIPS compliant.

markets (domestic and international). As a result, they were not susceptible to replacement by a single fund.

### *The Hewitt Growth Fund*

48.     The Hewitt Growth Fund was inferior to the package of funds it replaced, and should not have been selected to replace the Removed Funds for several reasons.

49.     Unlike the Removed Funds, the Hewitt Growth Fund did not have a long-term  (or even a medium-term) track record, as it was launched less than two years before it was adopted by the Plan.  This alone should have disqualified it from consideration, as prudent fiduciaries generally will require a performance history of three or more years before considering an investment for a retirement plan. *See supra* at ¶ 7 & n.5. The lack of performance history was particularly problematic given the novelty and complexity of the strategy employed by the Hewitt Growth Fund, which required predictions about relative performance of various asset classes, identifying inefficiently priced asset classes, all while overseeing an array of investment managers. A prudent fiduciary would never include an option employing such a difficult strategy without a lengthy track record of success in accomplishing these complex tasks.

50.     Moreover, over the course of its limited history, the Hewitt Growth Fund had performed poorly. At the time it was added to the Plan, it reported negative returns (-0.67%) from its inception in Q4 2013 through Q3 2015.[11]  The Hewitt Growth Fund also was underperforming both of its stated benchmarks, the Russell Mid Cap and MSCI ACWI indexes, by -8.16% and -2.61%, respectively, as of Q3 2015.

51.     To make matters worse, the Hewitt Growth Fund mismatched many of the funds it replaced.  The Removed Funds represented discrete asset classes and investment styles, and

---

[11] By contrast, over the same period, the Removed Funds had a weighted average return of 7.30%.

participants made active choices to invest in these funds. By replacing the eight Removed Funds with a one-size-fits-all option from Hewitt, and transferring participants' assets from the Removed Funds into the Hewitt Growth Fund, Defendants disturbed participants' investment choices and left them no other options in their existing investment styles. After the menu change, the Plan did not offer participants a pooled investment product that invested 100% of its assets in equities. The new menu stripped Plan participants of their ability customize their asset allocation and risk profile based upon their particular financial situation and risk tolerance.[12]

52.     The unpopularity of the Hewitt Growth Fund should have been another red flag. No other jumbo plan in the country (out of 786 with $1 billion in assets or more) included the Hewitt Growth Fund in its investment lineup, and only two plans of any size (out of more than 648,000 total) had adopted the Hewitt Growth Fund by the end of 2015. Thus, the Hewitt Growth Fund had a zero percent market penetration rate in the relevant jumbo plan market, and a miniscule 0.00003% penetration rate in the overall retirement plan marketplace.

53.     Finally, the Plan's stake in the Hewitt Growth Fund was out of proportion to any other investor. As of the end of 2015, total amount invested by all other investors in the Hewitt Growth Fund was only about $350 million. Thus, the Plan's holdings in the Hewitt Growth Fund (over $1 billion) were approximately three times the holdings of all other investors combined when this fund was added to the Plan. Prudent fiduciaries generally choose funds with much larger asset

---

[12] The Hewitt Growth Fund invested in a mix of U.S. stocks, non-U.S. stocks, real estate, commodities, and high yield bonds. Hewitt did not invest in these asset classes according to fixed percentages, widely varying the Fund's asset allocation over time as Hewitt saw fit. For example, the allocation to high yield bonds has varied between 0.01% and 16.39%; the allocation to real estate and commodities has varied from a high of 28.23% to a low of 9.40%; and the allocation to foreign stocks has varied from 28.71% to 48.65%.

bases, and are loathe to taking anything approaching such a large stake in a fund (as a percentage of the fund's assets).

54.     Based on these facts, it is reasonable to infer that the process that led to the selection of the Hewitt Growth Fund for the Plan, and the transfer of over $1 billion in assets to that fund from the Removed Funds, was imprudent and tainted by Hewitt's self-interest. Lowe's should have recognized that Hewitt had a conflict of interest in recommending this fund for the Plan, vigorously scrutinized the fund, and declined to adopt the fund or transfer assets into the fund. Both Hewitt and Lowe's are jointly responsible for the selection of this fund for the Plan, and breached their fiduciary duties by including this fund in the Plan and transferring such a large amount of Plan assets into this fund.

### III.     Defendants' Imprudent Retention of the Hewitt Growth Fund in the Plan

55.     Since the Hewitt Growth Fund was added to the Plan, it has remained unpopular and has continued to underperform.[13]

56.     The Lowe's 401(k) Plan remains the only jumbo plan in the country (with at least $1 billion in assets) that has adopted the Hewitt Growth Fund.  Moreover, despite Hewitt's efforts to market this fund to its consulting clients, the Hewitt Growth Fund has gained almost no additional traction in the overall fiduciary marketplace.[14]

---

[13] This underperformance should have come as no surprise, given the experimental nature of the funds, their weak performance history leading up to their inclusion in the Plan, and Hewitt's overall lack of experience as a fund manager. Although Hewitt did have experience evaluating other fund managers as an investment consultant, that experience was distinct, and did not suggest that Hewitt would be a successful fund manager in its own right any more than picking players for a fantasy football league would suggest that one could make a great quarterback.

[14] The most recent Form 5500 filing for the Hewitt Growth Fund reflects that only four additional plans have adopted the Hewitt Growth Fund, bringing the total to six plans (other than the Lowe's Plan) out of approximately 648,000 plans.

18

57. The fund also has continued to perform abysmally. From Q4 2015 until Q1 2018, the Growth Fund continued to underperform its benchmarks. The Hewitt Growth Fund returned 11.99% (annualized) from Q4 2015 through Q1 2018, while the Russell Mid Cap and MSCI ACWI indexes (the fund's benchmarks) each returned 14.11% during the same period.

58. The Hewitt Growth Fund also has continued to underperform the Removed Funds. From Q4 2015 through Q1 2018 the returns for every one of the Removed Funds exceeded the 11.99% return for Hewitt Growth Fund, as reflected by the chart below:

| Removed Investment Option | Performance Q4 2015 – Q1 2018 (annualized) |
| --- | --- |
| Vanguard Institutional Index Fund | 15.96%, |
| T. Rowe Price Institutional Mid-Cap Equity Growth Fund | 16.93% |
| American Funds New Economy Fund | 19.10% |
| Eagle Small Cap Growth Fund | 15.96% |
| T. Rowe Price Small-Cap Value | 17.13% |
| American Funds Europacific Growth Fund | 13.70% |
| Diamond Hill Value Account | 15.29% |
| T. Rowe Price Mid-Cap Value Account | 16.05% |

Five of the eight Removed Funds beat their benchmarks individually over this period, and the funds' collective weighted return of 16.15% also outperformed their weighted benchmark.

59. In spite of the Hewitt Growth Fund's continued underperformance and unpopularity, Defendants have continued to retain the Hewitt Growth Fund in the Plan. Defendants have not replaced the fund or transferred the Plan's assets in the fund to a more appropriate investment. This constitutes a separate and continuing breach of Defendants' fiduciary obligations

19

under ERISA. In the face of such unambiguous and objective data, prudent and unbiased fiduciaries would not continue to hold the Hewitt Growth Fund.

## IV. Losses to the Plan and Wrongful Profits to Hewitt

60. As a result of Defendants' imprudent selection and retention of the Hewitt Growth Fund, and transfer of over $1 billion in Plan assets into that fund, the Plan has suffered massive investment losses. If Defendants had not replaced the Removed Funds with the Hewitt Growth Fund, the Plan would have over $100 million more in assets than it does today. Defendants are jointly and severally liable to the Plan for these losses pursuant to 29 U.S.C. § 1109.

61. While the Plan's retention of the Hewitt Growth Fund has been harmful to the Plan, it has been profitable for Hewitt. Hewitt has received substantial additional fees as a result of the Plan's $1 billion investment in this fund. In addition, Hewitt was able to leverage the Plan's investment in the Hewitt Growth Fund to prop up its other incipient funds, as the Growth Fund is a "fund of funds" that invests in other underlying Hewitt Funds.

62. In addition to restoring the Plan's losses, Hewitt is obligated to disgorge the profits that it received on account of its fiduciary breaches pursuant to 29 U.S.C. §§ 1109 and 1132(a)(3).

## V. PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' FIDUCIARY MISCONDUCT

63. Plaintiff did not have knowledge of all material facts (including, among other things, Hewitt's inexperience as a manager of funds for defined contribution plans; the importance of Hewitt's incipient funds to its new business strategy; Hewitt's conflicted role in recommending its own funds for the Plan as a supposedly "independent" investment consultant; the relative unpopularity of the Hewitt Growth Fund in the retirement plan marketplace and the investment marketplace overall; the disproportionate size of the Plan's investment in the Hewitt Growth Fund relative to other investors; the Plan's unique status as the only jumbo plan in the country with

20

assets invested in the Hewitt Growth Fund; and the relative performance of the Removed Funds in relation to the Hewitt Growth Fund after they were removed from the Plan) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed. Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making and monitoring processes with respect to the Plan, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## CLASS ACTION ALLEGATIONS

64.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiff seeks certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

65.     Plaintiff asserts his claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[15]

> All participants and beneficiaries of the Lowe's 401(k) Plan whose Plan account balances were invested in the Hewitt Growth Fund at any time on or after October 1, 2015, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

66.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. During the putative class period, the Plan had over a quarter million participants. A substantial portion of these class members are or were invested in the Hewitt Growth Fund.

---

[15] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

21

67.     Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff participated in the Plan, was invested in the Hewitt Growth Fund, and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistent with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions with respect to the Hewitt Growth Fund affected all Class members similarly.

68.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA class action litigation. Plaintiff does not have any conflict of interest with any Class members that would impair or impede his ability to represent other Class members.

69.     Commonality: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a) Whether Defendants are fiduciaries of the Plan, and the scope of their fiduciary duties;

b) Whether the Plan's fiduciaries breached their fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

c) Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein under 29 U.S.C. § 1105;

d) Whether Lowe's Corp. breached its duty to monitor other Plan fiduciaries;

e) The proper form of equitable and injunctive relief; and

f) The proper measure of monetary relief.

70. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

71. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of the Hewitt Growth Fund from the Plan or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of Plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

72. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all Class members. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

23

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104**

73.     Plaintiff repeats and re-alleges Paragraphs 1 through 71 of the Complaint as though fully set forth herein.

74.     Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21) and/or § 1102(a)(1).

75.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants in their administration of the Plan and their selection and monitoring of Plan investments. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

76.     These fiduciary duties are continuing in nature, and apply to both the selection of investments for the Plan and the subsequent monitoring, retention, removal, and replacement of those investment options. *Tibble*, 135 S. Ct. at 1828.

77.     Defendants breached their fiduciary duties by selecting the Hewitt Growth Fund for the Plan, transferring over $1 billion in assets into that fund from the Removed Funds, and

24

retaining the Hewitt Growth Fund. This was neither prudent nor in the interest of Plan participants and beneficiaries.

78.     A prudent fiduciary acting solely in the interest of Plan participants and beneficiaries would not have selected the Hewitt Growth Fund, or mapped Plan assets into that fund, given the fund's (1) limited track record; (2) poor performance history; (3) unpopularity among other retirement plan fiduciaries; and (4) lack of investment from other investors; and (5) other undesirable attributes.

79.     A prudent fiduciary acting solely in the interest of Plan participants and beneficiaries also would not have replaced the Removed Funds with the Hewitt Growth Fund, and transferred the assets in the Removed Funds to the Hewitt Growth Fund, given the overall superiority of the Removed Funds to the Hewitt Growth Fund, and the differences in investment styles and other characteristics between the Removed Funds and the Hewitt Growth Fund.

80.     Defendants compounded their fiduciary breaches, and committed separate and independent fiduciary breaches, by failing to appropriately monitor the Hewitt Growth Fund and retaining the Hewitt Growth Fund in the Plan despite its continuing underperformance, unpopularity, and undesirability.

81.     The process that led to the selection and retention of the Hewitt Growth Fund, and the transfer of Plan assets into that fund, was imprudent and tainted by Hewitt's self-interest. Lowe's failed to properly take account of Hewitt's conflicted role in recommending this fund for the Plan and failed to take proper steps to mitigate such conflict. This conflict was exacerbated by the fact that Hewitt also advised Lowe's on executive compensation. A scrupulous and independent investigation (as required under these circumstances) would have revealed that the Hewitt Growth Fund was not an appropriate investment for the Plan. Indeed, even a basic

investigation consistent with the ordinary standard of care would have revealed that the Hewitt Growth Fund was not an appropriate investment option, as no fiduciaries of similarly-sized plans included this fund in their plans.

82. Defendants' fiduciary breaches resulted in significant losses to the Plan. Each Defendant is personally liable, and Defendants are jointly and severally liable, for these losses under 29 U.S.C. §§ 1109(a) and 1132(a)(2).

83. Defendants' fiduciary breaches also resulted in wrongful profits to Hewitt, which Hewitt is obligated to disgorge to the under 29 U.S.C. §§ 1109(a), 1132 (a)(2), and 1132(a)(3).

84. In addition, Defendants are liable for injunctive relief, equitable relief, and other appropriate relief, as provided by 29 U.S.C. §§ 1109(a), 1132 (a)(2), and 1132(a)(3), and reasonable attorneys' fees and expenses as provided by 29 U.S.C. § 1132(g).

85. Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit breaches by failing to lawfully discharge each Defendant's own duties; and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, in addition to being directly liable for the foregoing breaches, each Defendant is also derivatively liable to the Plan for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

86. Plaintiff repeats and re-alleges Paragraphs 1 through 84 of the Complaint as though fully set forth herein.

87. Lowe's Corp., the Administrative Committee, the members of the Administrative Committee, and Hewitt were all fiduciaries of the Plan during the relevant period.

26

88. Lowe's Corp. appointed the members of Administrative Committee through its Board of Directors, and also had the authority to remove those Administrative Committee Members.

89. Lowe's Corp. also appointed Hewitt as the Plan's investment consultant (either directly or through the Administrative Committee), and had the authority to remove Hewitt as an investment consultant to the Plan.

90. Given its overall responsibility for the Plan as Plan sponsor, and its authority to appoint and remove the other fiduciaries of the Plan, Lowe's Corp. had a duty to monitor the performance of the other fiduciaries to ensure that they were performing their duties properly and in accordance with ERISA.

91. As a monitoring fiduciary, Lowe's Corp. also had a duty to take prompt and effective action to protect the Plan and its participants and beneficiaries in the event that the monitored fiduciaries failed to properly and lawfully perform their fiduciary obligations.

92. Lowe's Corp. breached its fiduciary monitoring duties by, among other things:

   a) Failing to appropriately monitor and evaluate the performance of the other Plan fiduciaries or have a system in place for doing so;

   b) Failing to monitor the process by which the Hewitt Growth Fund was selected and retained for the Plan, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

   c) Failing to remove fiduciaries whose performance was inadequate; and

   d) Ignoring Hewitt's conflicts of interest and granting Hewitt carte blanche to make self-interested investment recommendations.

27

93.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in investment losses.

94.     Lowe's Corp. is liable for these losses and other appropriate relief as provided by 29 U.S.C. §§ 1109 and 1132, on account of its failure to appropriately monitor to the Plan's fiduciaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Benjamin Reetz, individually, as the Class representative, and on behalf of the Plan, prays for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A declaration that Defendants have breached their fiduciary duties under ERISA;

D.  A declaration that Lowe's Corp. breached its fiduciary duty to monitor its appointed fiduciaries;

E.  An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F.  An accounting of profits earned by Hewitt and a subsequent order requiring Hewitt to disgorge all profits resulting from its fiduciary breaches or otherwise received from, or in respect of, the Plan;

G.  An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

28

H. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust or a surcharge against Hewitt to prevent its unjust enrichment from unlawful transactions involving the Plan;

I. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including modification of the Plan's investment lineup and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

J. An award of pre-judgment interest;

K. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

L. An award of such other and further relief as the Court deems equitable and just.


Dated: March 23, 2020

**NICHOLS KASTER, PLLP**

/s/ Kai H. Richter
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon McDonough, MN Bar No. 0393259*
Chloe A. Raimey, MN Bar No. 0398257*
Mark Thomson, MN Bar No. 0398260*
       *admitted pro hac vice*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
bmcdonough@nka.com
craimey@nka.com

mthomson@nka.com

**THARRINGTON SMITH, L.L.P.**

F. Hill Allen, N.C. Bar No. 18884
Post Office Box 1151
150 Fayetteville Street, Suite 1800
Raleigh, N.C. 27602-1151
Telephone: (919) 821 4711
Fax: (919) 829-1583
Email: hallen@tharringtonsmith.com

*Attorneys for Plaintiff*

ATTORNEYS FOR PLAINTIFF