# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:18-CV-00075-KDB-DCK

| | |
|---|---|
| **BENJAMIN REETZ, individually and as the representative of a class of similarly situated persons,**<br><br>**Plaintiff,**<br><br>v.<br><br>**LOWE'S COMPANIES, INC.; ADMINISTRATIVE COMMITTEE OF LOWE'S COMPANIES, INC. AND AON HEWITT INVESTMENT CONSULTING, INC.,**<br><br>**Defendants.** | **MEMORANDUM OF DECISION AND ORDER** |

In this certified class action, Plaintiff Benjamin Reetz, a former employee of Defendant Lowe's Companies, Inc. ("Lowe's") alleges that Lowe's, the Administrative Committee of Lowe's Companies, Inc. (the "Committee") and investment advisor Aon Hewitt Investment Consulting, Inc. ("Aon") breached their fiduciary duties to the Lowe's 401(k) Retirement Plan (the "Plan"). Broadly stated, Plaintiff claims that Defendants violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., by limiting the menu of investment choices available to Plan participants and moving over a billion dollars in Plan assets to one of Aon's own investment funds, resulting in a substantial loss of investment gains in the retirement accounts of the current and former Lowe's employees in the class.

1

Plaintiff's claims against Lowe's and the Committee were resolved through a class action settlement, which the Court approved on September 9, 2021.[1] (Doc. No. 261). The settlement did not end the dispute between the Class and Aon, which proceeded to a five-day bench trial held from June 29, 2021 to July 2, 2021. During the trial, the Parties collectively presented live testimony from ten lay and expert witnesses, offered testimony by deposition designations, and moved into evidence more than a thousand exhibits (although a much smaller number were actually used or referenced at trial). In addition, counsel presented opening and closing statements to the Court. Finally, at the end of the trial, the Court agreed to receive post-trial proposed findings of fact and conclusions of law from the Parties, which were filed on August 31, 2021 and span over 300 pages. (*See* Doc. Nos. 259, 260).

The Court has carefully reviewed and considered all the testimonial and documentary evidence presented by the Parties as well as the arguments and submissions of their counsel. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now makes the following findings of fact, states its conclusions of law and enters Judgment in this action. As described below, the Court finds that Aon did not breach its fiduciary duty as an investment advisor to the Plan in proposing and encouraging Lowe's to change the Plan's investment structure and menu of

---

[1] Under the terms of the settlement, to which there was no objection, Lowe's agreed to pay for a $12,500,000 Qualified Settlement Fund, which, after deducting any attorneys' fees and costs, administrative expenses, and class representative service award approved by the Court, will be distributed to Settlement Class members. In addition, Lowe's has agreed to conduct an RFP process to consider engaging a new delegated fiduciary investment manager for the Plan as well as alternative investment options and strategies. In exchange for this relief, the Settlement Class released the Lowe's Defendants and affiliated persons and entities from the claims described in the Settlement and agreed to a "Bar Order" which precludes the Parties from asserting claims against each other and others and also provides that any judgment entered against Aon in the trial of the Plaintiff's unsettled claims against Aon will be subject to a judgment reduction credit based on what the Court ultimately determines to be the "proportionate share of fault" of Aon and the settling Defendants. (*See* Doc. No. 253 at 5-7; Doc. No. 231).
.

investment options nor did it violate ERISA in its efforts to "cross-sell" its delegated fiduciary services, which Lowe's – a large, sophisticated corporation – independently decided to engage. Also, the Court concludes that although the Aon Growth Fund that Aon selected as the Plan's delegated fiduciary investment manager did not generate as much investment gains as other investment options that, in hindsight, would have fared better, it did not breach its fiduciary duty to the Plan in selecting and maintaining the Aon Growth Fund as the primary actively managed "equity" investment option in the Plan. Accordingly, the Court will enter Judgment in favor of Aon on Plaintiff's claims.

## I.     FINDINGS OF FACT

### A.     This Action, the Plan and the Parties

1.      Plaintiff filed this class action lawsuit on April 18, 2018, (Doc. No. 1), and subsequently filed a First Amended Complaint ("FAC") on March 23, 2020, which remains the operative complaint in this action. (Doc. No. 84).

2.      The FAC asserted claims under ERISA against Aon, Lowe's and the Committee in connection with the management of the Lowe's 401(k) Retirement Plan during the class period. Specifically, the FAC asserted the following claims against the Defendants:

> Count 1 - Breach of the duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A)-(B) (both claims were originally asserted against all Defendants, but the breach of loyalty claim ultimately was pursued only against Aon); and

> Count 2 - Failure to monitor fiduciaries (asserted only against Lowe's and the Committee).

3.      The claims against Lowe's and the Committee have been resolved via the class action settlement described above. (Doc. No. 261).

3

4.     On October 28, 2020, the Parties stipulated to class certification. (Doc. No. 94).

On November 5, 2020, the Court issued an Order preliminarily granting the Parties' stipulation

regarding certification of the following class:

> All participants and beneficiaries of the Lowe's 401(k) Plan whose Plan account
> balances were invested in the [Aon] Growth Fund at any time on or after October
> 1, 2015, excluding Defendants, any of their directors, and any officers or
> employees of Defendants with responsibility for the Plan's investment or
> administrative functions.

(Doc. No. 97). Pursuant to that Order, the class was automatically certified when the Parties

timely informed the Court that no objections were received. (*See* Doc. Nos. 97, 181).

5.     On February 12, 2021, the Court issued an Order denying the Parties' cross-

motions for partial summary judgment, (Doc. No. 198), and the matter was thereafter tried to

the Court as previously discussed.

6.     At trial Plaintiff called three lay witnesses and three experts. For a substantial

portion of his case, Plaintiff examined Jacob Punnoose, who served as one of Aon's two primary

fiduciary consultants to Lowe's during the relevant period. Plaintiff's second witness was David

Green, a Lowe's employee who is the current chairman of the Defendant Committee and has

served on the Committee since 2011. Plaintiff's final lay witness was the Plaintiff Reetz.

7.     Plaintiff's first expert witness was Eric Dyson, a former Navy officer and

experienced investment professional who offered opinions on Aon's fiduciary processes and

conduct. Next, Plaintiff called Marcia Wagner, a lawyer who regularly gives legal advice related

to retirement plans, who also offered opinions on Aon's fiduciary conduct. Finally, Plaintiff

presented testimony from Dr. Brian Becker on the measure of its alleged damages.

8.     Aon called three lay witnesses and one expert witness. Aon's first witness was

Brian Abshire, Aon's second primary consultant on the Lowe's account. Aon's other fact

witnesses were Aon executives Brian Ward and Matthew Clink, who offered testimony about Aon's business and its handling of the Plan participants' retirement assets after Aon became a delegated fiduciary investment manager for the Plan. Aon's expert witness was John Chalmers, a professor of finance, who offered his opinion on the economic reasonableness of Aon's investment funds into which the Plan assets were invested.

9.     Lowe's is one of the nation's largest home improvement retailers, and is headquartered in Mooresville, North Carolina. (Doc. No. 224 at ¶ 3). Lowe's 401(k) Retirement Plan was adopted effective February 1, 1984. (Doc. No. 224 at ¶ 9). The Plan is a qualified plan under 26 U.S.C. § 401, and is of the type commonly referred to as a "401(k) plan" or "defined contribution plan." The Plan covers all eligible current and former employees of Lowe's and its subsidiaries. Since the end of 2013, the Plan's assets have totaled between approximately $4.5 billion and $6.6 billion, with approximately half of all Plan assets invested in Lowe's company stock at all times. (*See* Doc. No. 224-01; Joint Exhibit ("JX") 115-119, Schedule A, H). There are currently over 260,000 participants in the Plan. (JX119, Schedule H).  By both assets and participant count, the Plan is among the largest in the country. (*Id.*).

10.     From 2009 through October 1, 2015, the Plan's investment menu consisted of 12 investment options, which included Lowe's company stock, a series of target date funds, a stable value fund, a fixed income fund, and eight equity options. As discussed below, the Plan's eight equity options were later replaced by the Aon Growth Fund as part of a Plan investment menu restructuring that was recommended and ultimately implemented by Aon.

11.     Lowe's is the "Plan Sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). Lowe's administers the Plan through the Administrative Committee of Lowe's

5

Companies, Inc., and has the power to appoint and remove the members of that committee. (*Id.*).

12.    The members of the defendant Committee are appointed by the Lowe's Board of Directors. (*Id.*). The responsibilities of the Committee, including various responsibilities relating to Plan investment options, are set forth in the Plan Document, the Committee Charter, and the Investment Policy Statements ("IPS") for the Plan.[2] The Plan Document and Charter permit the Committee to delegate these responsibilities to others. Specifically, the Plan Document and Committee Charter permit the Committee to engage consultants, such as an investment advisor under section 3(21) of ERISA, and also allow the Committee to delegate fiduciary authority for making investment decisions to another party, such as an investment manager under section 3(38) of ERISA. (JX211, 212).

13.    Plaintiff Reetz, the appointed representative for the certified class, is a former Lowe's employee and was a participant in the Plan from July 2007 until December 2019. (Doc. No. 224 at ¶ 11). Prior to the time that the Aon Growth Fund was included in the Plan's investment lineup, he invested his Plan assets in two of the Plan's equity funds, which he chose with the help of a fellow employee (who had no particular expertise in investing) who he met only while filling out his investment paperwork. When the Plan began offering the Aon Growth Fund, all of his Plan assets were transferred to the Aon Growth Fund. Plaintiff Reetz's Plan assets remained invested in the Aon Growth Fund until he withdrew his assets from the Plan in December 2019.

---

[2] There were several versions of the IPS that were applicable to the Plan between 2010 and the present. The first IPS was in effect between July 2010 and September 10, 2015. The second IPS was in effect between September 10, 2015 and September 21, 2017. The third IPS has been in effect since September 22, 2017. (Doc. No. 224 at ¶ 5, n.1).

6

14.     Aon is an investment services firm founded in 1974 and headquartered in Chicago, IL.[3] (Doc. No. 224 at ¶ 6; Transcript ("Tr.") IV (Clink) at 1021; AX542 at AX0542.0001; *see* AX769).

15.     For more than 40 years, Aon and its corporate predecessors have provided investment advisory and investment consulting services to a variety of institutional clients, including pension funds, endowments, foundations, and defined contribution plans. (Tr. IV (Clink) at 1021, 1046-47). As of 2019, Aon 's investment consulting business had approximately $2.54 trillion in total client assets under advisement. (Tr. III (Ward) at 726; AX542 at AX0542.0002).

16.     Aon 's investment consulting clients include large public retirement plans such as the Thrift Savings Plan, the defined contribution plan for federal government employees, as well as the plans of large public corporations, such as American Airlines and Molson Coors Brewing Company.  (Tr. III (Abshire) at 843; Tr. IV (Clink) at 1021-22, 1032-33).

17.     Aon offers retirement services for both defined benefit[4] and defined contribution plans.[5]  ( Tr. III (Ward) at 722; Tr. IV (Clink) at 1019-21).

---

[3] In 2010, Aon plc acquired Ennis Knupp & Associates, Inc. and Hewitt Investment Group, LLC. (Doc. No. 224 at ¶ 7; Tr. III (Ward) at 714, 718-19; AX542 at AX0542.0001; AX769). These entities were merged with Aon Consulting to operate as Hewitt Ennis Knupp, Inc. (Tr. I (Punnoose) at 46; Tr. III (Ward) at 718-19; AX542 at AX0542.0001; AX769). In January 2015, the business changed its legal business name to Aon Hewitt Investment Consulting, Inc. (Doc. No. 224 at ¶ 7; AX542 at AX0542.0001; AX769; *see* Tr. III (Ward) at 717-19). In March 2020, the firm began operating as Aon Investments USA, Inc. (Doc. No. 224 at ¶ 7; AX542 at AX0542.0001; AX769; *see* Tr. III (Ward) at 717-19).

[4] A defined benefit plan guarantees the participant a fixed level of retirement income—typically a monthly payment—and the employer is responsible for making sure that the plan has enough assets to meet those obligations. (*See* Tr. I (Punnoose) at 45-46; Tr. IV (Abshire) at 1013; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-40 (1999); 29 U.S.C. § 1002(35)).

[5] A defined contribution plan, of which a 401(k) plan is one type, promises the participant at retirement the value of an individual account, which is largely a function of the amounts

18. Aon's retirement services include advice on investment policy planning and asset allocation, advice on selection of investment managers and plan structures, manager performance monitoring, and delegated fiduciary services where Aon serves as the primary investment decision maker rather than the advisor. (Tr. III (Ward) at 722; Tr. IV (Clink) at 1019-20, 1022-23, 1046-47; Tr. V (Clink) at 1165; see PX74 at 4-6).

19. For defined benefit plans, Aon's investment consulting services have historically included assisting named fiduciary clients in constructing multi-asset portfolios to meet a plan's current and future benefit obligations. (Tr. IV (Clink) at 1022-23; Tr. V (Clink) at 1167-68). This includes providing advice about the proper allocation of plan assets across multiple asset classes (such as equities, fixed income, real estate, and alternatives) and the selection and retention of investment managers. (Tr. IV (Clink) at 1023-24, 1046-47; Tr. V (Clink) at 1167-68). Asset allocation is the primary driver of an investment portfolio's long-term expected returns. (Tr. III (Ward) at 836; Tr. IV (Clink) at 1023; Tr. V (Clink) at 1169).

20. Aon has historically built its asset allocation advice for defined benefit clients on a range of "model portfolios" developed by its asset allocation professionals. (Tr. IV (Clink) at 1023-24). These model portfolios—of which there are roughly a dozen—provide the optimum asset allocation for a wide variety of desired risk/return expectations, based on Aon's capital market expectations. (Tr. IV (Clink) at 1019, 1023-28; see Tr. III (Ward) at 733 (model portfolios are built prospectively)).

21. Aon's investment consulting services for defined contribution plans have historically consisted of a subset of the services provided to defined benefits plans, taking into

---

contributed to that account by the participant and/or the participant's employer and the performance of the investment options in which those contributions are invested, less any fees. (*See* Tr. I (Punnoose) at 45-46; Tr. IV (Abshire) at 1013; 29 U.S.C. § 1002(34)).

account the nature of defined contribution plans. (Tr. IV (Clink) at 1022-23; Tr. V (Clink) at 1167-68). In particular, Aon's investment consulting services have included assisting named plan fiduciaries in constructing a lineup of investment options from which plan participants can construct their own investment portfolios. (Tr. IV (Clink) at 1025).

22. Aon has also advised defined contribution plan clients in the construction and maintenance of their own custom and white label funds, such as custom target date funds, over which the plan retains discretionary control. (Tr. IV (Clink) at 1050-51; Tr. V (Clink) at 1160-61). This work has included advising clients on both appropriate asset allocation and the selection and monitoring of investment managers for their custom funds. (Tr. IV (Clink) at 1050-51; Tr. V (Clink) at 1160-61). Also, since at least 2010, Aon has taken on delegations of discretionary authority from defined contribution clients to manage custom target date funds. (Tr. IV (Clink) at 1020; Tr. V (Clink) at 1160).

23. To meet its obligations to retirement plans, Aon relies on a large force of professionals, including a number of specialized teams with backgrounds in investment management, economics, and actuarial science. (Tr. IV (Clink) at 1026-28; AX780; see AX542 at AX0542.0001 (reporting 347 U.S. professionals dedicated to providing consulting services as of December 31, 2019)).

B. **Aon's Delegated Fiduciary Investment Services and Funds**

24. Decision-making responsibility for defined contribution plans has commonly rested with lay fiduciary committees, whose members have been officers or other employees of the plan sponsor rather than investment professionals. (*See* Tr. II (Wagner) at 445; *see also* Tr. III (Green) at 329-30; Tr. III (Ward) at 721-22). For example, it is common for lay fiduciary committees to meet no more than four times per year. (Tr. III (Ward) at 721; *see also* Tr. I

9

(Punnoose) at 89 (testifying, with respect to a Lowe's, to a "six-month gap between committee meetings" between December 18, 2013 and June 20, 2014)).

25.     Therefore, for investment expertise, such committees have typically looked to investment consulting firms such as Aon to provide information and advice as to investment structure and individual investment options.  (*See* Tr. II (Wagner) at 445-46; Tr. III (Ward) at 726; *see also* Tr. II (Green) at 332-33).

26.     Also, it is not uncommon for a lay corporate fiduciary committee to take several meetings, and many months, to first note a concern with an investment option, revisit the option at a later meeting, commission the investment consultant to investigate alternatives, and then make a removal or substitution decision.  (Tr. III (Ward) at 721-22).

27.     These circumstances have led Plan sponsors and their lay fiduciary committees to consider outsourcing to investment professionals fiduciary decision-making responsibility for selecting and deciding whether to retain investment options and in turn companies like Aon to develop "delegated fiduciary" offerings. (Tr. III (Ward) at 719-22; Tr. IV (Clink) at 1019-20; *see* AX542 at AX0542.0002).

28.     Initially, in 2009, Aon developed its delegated fiduciary program only for its defined benefit clients.  (Tr. III (Ward) at 722). Around the same time, Aon created the Aon Hewitt Group Trust ("Group Trust"), a pooled investment vehicle in which Aon determined the appropriate allocation of assets and selected investment managers to invest money simultaneously on behalf of multiple client plans.  (Tr. III (Ward) at 722-23). Notably, all of the managers who picked securities for the portfolios in the Group Trust were third parties unaffiliated with Aon. (Tr. III (Ward) at 723; Tr. IV (Clink) at 1062; see, e.g., JX153 at JX0153.0003-10).

29.     The Group Trust structure allowed Aon to aggregate assets from multiple client plans and negotiate lower fees with the underlying managers, lowering costs for all of the participating plans. (Tr. III (Ward) at 723-24). Also, the Group Trust structure helped Aon ensure consistency of implementation across delegated clients with similar mandates, with all clients getting equal, simultaneous access to Aon's so-called "best thinking" in portfolio construction, including the same third-party managers and asset allocations across those managers.  (Tr. III (Ward) at 723-24).

30.     In 2013, Aon expanded its delegated fiduciary services to defined contribution clients. In launching its new delegated investment management services, Aon was attempting to enter a crowded and competitive market. Major players in the retirement industry such as Mercer, Willis Towers Watson, and Northern Trust had been offering delegated fiduciary services to defined contribution ("DC") plans for decades. (Pearlman Deposition (Doc. No. 235-01) at 18:6–22:10, 30:16–31:17, 43:14–19). And many more firms had begun offering these services before Aon entered the field in late 2013. (*Id.* at 76:1–77:18).

31.      Aon saw its entry into the market for delegated fiduciary services as a competitive necessity. An email to Aon executives stated, "As we all know, DC is the future of retirement investing and it's absolutely vital that we build scale faster than our competitors." (JX274 at JX0274.0001).  Aon foresaw severe consequences if it did not succeed at forcing itself into the delegated fiduciary market, predicting that "if Mercer and [Willis Towers Watson] get in-roads into delegated DC with [Aon's] clients, they can effectively undercut our actuarial fees to get that business as well." (*Id.* at JX0274.0002). Consequently, Aon declared that delegated services was "a key growth strategy" for Aon's business, (PX240 at 14), and that Aon

11

"expect[ed] much of [its] growth will be driven by Delegated opportunities, and importantly, conversions from [consulting] mandates." (PX354 at 1).

32.     As it did with the Group Trust for defined benefit plans, when Aon started its delegated fiduciary services offering for defined contribution plans, it created the Aon Hewitt Collective Investment Trust ("AHCIT"), which consists of several institutional trusts with common investment mandates that can be implemented across multiple plans.  (Tr. III (Ward) at 722, 724-25; Tr. IV (Clink) at 1063; *see* AX542 at AX0542.0002).

33.     In 2013 and 2014, the strategies offered through the AHCIT included a target date fund suite, various asset-class funds, and three "objective-based" funds (i.e., funds with a stated, common objective):  the Aon Hewitt Growth Fund ("Growth Fund"), the Aon Hewitt Income Fund, and the Aon Hewitt Inflation Strategy Fund.  (Tr. III (Ward) at 753; Tr. IV (Clink) at 1064; Tr. V (Clink) at 1160-62; JX191; JX228 at JX0228.0022).

34.     Aon serves as "manager of managers" for the AHCIT funds, selecting the underlying third-party asset managers and implementing asset allocation strategies developed by its internal experts.  (Tr. IV (Clink) at 1046-47, 1065-66, 1068, 1086; Tr. V (Clink) at 1137, 1173).  Like the Group Trust, the AHCIT provides a vehicle for Aon to implement its strategies on behalf of client plans seeking the same kinds of investment solutions while pooling client assets together to lower fees.  (Tr. IV (Clink) at 1063, 1065-67, 1086; Tr. V (Clink) at 1142-43; *see* Kelly Dep. (Doc. No. 235-2) at 29).  In multi-asset class solutions, the AHCIT allows Aon to expand access to potentially favorable asset classes, such as real estate, not typically available to defined contribution plans.  (Tr. IV (Clink) at 1063, 1065-67, 1086, 1088; Tr. V (Clink) at 1142, 1152).

12

35.     In the absence of a "pooled" investment fund such as the Collective Trust, Aon could have created plan-specific custom or "white label" funds for its clients who had plan assets large enough to allow that choice of implementation.  (Tr. III (Ward) at 746, 839; Tr. IV (Clink) at 1049-50, 1063, 1086, 1093, 1100). However, even for plans with asset levels that would have allowed them access to custom or white label options, the AHCIT presented an opportunity to lower plan costs by consolidating assets across multiple plans looking to implement the same strategy.  (Tr. III (Ward) at 723-24, 750-51; Tr. IV (Clink) at 1063, 1100-01; Tr. V (Clink) at 1174; *see also* Tr. III (Dyson) at 667 (agreeing that additional purchasing power is a potential advantage of using CITs rather than separate plan accounts)).

36.     As with the Group Trust, the sub-managers who make the ultimate investment decisions (i.e., deciding which securities to buy) within the AHCIT funds are all third parties unaffiliated with Aon.  (Tr. III (Ward) at 725; Tr. IV (Clink) at 1062).

37.     As of March 31, 2020, Aon had 182 clients that had delegated fiduciary decision making to Aon, representing $120.3 billion in assets under management.  (AX542 at AX0542.0002; *see* Tr. III (Ward) at 725-26). Of those clients, 39 were defined contribution clients, representing nearly $35.4 billion in assets under management.  (AX542 at AX0542.0002).

C.     **Lowe's and Aon's Relationship with Respect to the Plan and its Assets**

38.     Aon's predecessor, Hewitt Associates ("Hewitt"), entered into an Investment Consulting Agreement with Lowe's, effective October 2008. (*See generally* JX218). Hewitt (and later its successor, Aon) served as the Plan's investment consultant from October 2008 until October 2016. In this capacity, Aon acted as an ERISA 3(21) fiduciary—that is, Aon provided

13

advice with respect to the Plan's IPS and investments, but the Committee retained ultimate authority to make investment decisions.

39.     In December 2014, Aon was selected as the delegated investment manager – which is also commonly referred to as a "delegated fiduciary" – for a substantial portion of the Plan's investment lineup. Aon began in this role on October 1, 2015 and continues to be the Plan's delegated investment manager. Prior to assuming this new role, Aon entered into an Investment Management Agreement with Lowe's, which was fully executed on May 4, 2015. (*See generally* JX219). Under the Investment Management Agreement, Aon was delegated authority under section 3(38) of ERISA to select and monitor certain Plan investment options. (*Id*. at JX0219.0012–0013). Aon acknowledged in the Investment Management Agreement that it was a fiduciary under ERISA with respect to all Plan assets under its control. (*Id.* at JX0219.0005 (Section 8)).

40.     In addition to serving as the delegated investment manager for the Plan, Aon also serves as the investment manager for the funds in the AHCIT (discussed above). The Aon Growth Fund is one of several funds comprising the AHCIT, and it is only offered through the AHCIT to customers who have hired Aon as a delegated fiduciary. (*See* JX132 at JX0312.000427). The inception date for the Aon Growth Fund was October 1, 2013, and the AHCIT was incepted on the same date. (Doc. No. 224 at *¶ 15*).  As noted, Aon selects for the Aon Growth Fund which asset classes to invest in, how to weight each asset class selected for the fund, and which underlying fund managers to select for each asset class. (*See generally* JX132).

41.     As the delegated fiduciary to the Plan, Aon selected the Aon Growth Fund as the "objective based "Growth" investment for the Plan. (Doc. No. 224 at ¶ 13). In the process, all

14

of the assets in the Plan's eight existing equity funds were "mapped" and ultimately transferred (absent participant direction to the contrary) to the Aon Growth Fund, totaling $1,092,509,078.25.31. Aon has chosen to retain the Aon Growth Fund in the Plan to the present. (*Id*. at ¶ 20).

**D. General Description of Plaintiff's Claims of Breach of Fiduciary Duty**

42. Plaintiff alleges that Aon breached its fiduciary duty as both an investment consultant and a delegated fiduciary. According to Plaintiff, Aon breached its fiduciary duties as a consultant by recommending that Lowe's significantly reduce the number of investment choices given to Plan participants to simplify the investment menu and make it more likely that participants made good, diversified investments. Plaintiff contends that not only was that recommendation imprudent because the then current Plan investment lineup was doing fine and few large retirement plans had such limited investment options, but it was also a breach of Aon's duty of loyalty because Plaintiff made the recommendation as part of a self-serving (and ultimately successful) "cross-selling" effort to be engaged by Lowe's as a delegated fiduciary, which promised far higher fees for Aon.

43. Plaintiff claims that Aon breached its fiduciary duties as a delegated fiduciary by selecting the Aon Growth Fund as the Plan's "Growth" investment option. After the restructuring of the Plan investment menu, the "Growth" option represented the Plan's only actively managed "equity" investment choice (outside of balanced "target date" funds that also included fixed income investments). Plaintiff argues that at the time the Aon Growth Fund was selected it had a track record that was too short (less than 3 years) and failed even to meet its own "custom benchmark" in addition to comparing unfavorably to the returns of "peer" investment funds. However, according to Plaintiff, the Aon Growth Fund was forced on Plan

participants so Aon could help itself by "seeding" the Aon Growth Fund with over a billion dollars in Plan assets.

44.     Finally, Plaintiff asserts that Aon also breached its fiduciary duty as a delegated fiduciary by keeping the Aon Growth Fund as the single "Growth" investment option even as the fund continued to underperform its custom benchmark and its peer funds over its first three and five year periods.

45.     The facts and legal conclusions for each of these contentions are discussed in detail below.

### E.     Aon's Recommendation to Change the Structure of the Plan's Investment Menu

46.     The Investment Consulting Agreement between Lowe's and Aon required Aon to review the Plan's "investment manager structure, including the number and type of options, industry trends, and current investment managers."  (JX218 at JX0218.0009).

47.     As of September 2012, the Plan's investment lineup consisted of eight equity mutual funds (the Vanguard Institutional Index Fund, T. Rowe Price Institutional Mid-Cap Equity Growth Fund, American Funds New Economy Fund, Eagle Small Cap Growth Fund, T. Rowe Price Small-Cap Value Fund, EuroPacific Growth Fund, American Century Value Fund, and T. Rowe Price Mid-Cap Value Fund Account); a bond fund; a Lowe's company stock fund; a target date fund suite; and a stable value option.  (Tr. III (Abshire) at 849; *see* JX193 at JX0193.0005).

48.     Investment reviews from this period show that the Plan's investment options, which Aon consultants had helped select and/or monitor, were generally performing well compared to their benchmarks.  (Tr. III (Abshire) at 844-45; *see, e.g*., JX193; JX194; JX195; JX196; JX197; JX198; JX199; JX200; JX201; JX202; *see also* JX-2 (December 2012

16

Committee meeting minutes stating: "Overall, all investment options were performing acceptably well."). The Committee was pleased with the lineup at the time and with the quality of service that Aon provided in its consulting role.  (Tr. II (Green) at 373-74).

49.     In November 2012, Lowe's, as the Plan sponsor, decided to stop automatic enrollment of employees in the Plan.  (JX2 at JX0002.0001; Tr. III (Abshire) at 846-47; *see also* AX-41).  "Automatic enrollment" allows a plan sponsor to enroll employees into the company's retirement plan immediately upon joining the company so that employees are enrolled unless they affirmatively opt out. (Tr. III (Abshire) at 846). Automatic enrollment typically increases participation in retirement plans, because most participants do not choose to opt out once enrolled.  (Tr. III (Abshire) at 846-47).  Lowe's as the Plan sponsor—rather than the Committee—made the decision to stop automatic enrollment, and Aon was not asked for its opinion or advice on the issue.  (Tr. III (Abshire) at 847).

50.     Typically, two individuals served as the Lowe's Committee's primary Aon investment consulting contacts, and both consultants attended the Committee meetings.  (Tr. I (Punnoose) at 46, 50; Tr. III (Abshire) at 843; *see also* JX1; JX2; JX3; JX4; JX5; JX6; JX7; JX8; JX9; JX10; JX11; JX12; JX13; JX14; JX210).

51.     From the fall of 2008 until mid-2012, Aon investment consultants Rob Van Den Brink and Jacob Punnoose served as the investment consulting team for Lowe's.  (Tr. I (Punnoose) at 46; Tr. III (Abshire) at 842; JX210 at JX0210.0017-30).  In 2012, Punnoose transitioned off the Lowe's team to focus on other client accounts.  (Tr. I (Punnoose) at 49, 99; Tr. III (Abshire) at 843-44).

52.     Punnoose was replaced on the Lowe's account working alongside Mr. Van Den Brink with Brian Abshire, who had worked on the Lowe's team as an analyst since 2010.  (Tr. I (Punnoose) at 46, 49-50; Tr. III (Abshire) at 842-44).

53.     At the Committee's December 6, 2012 meeting, the Committee and the Aon consultants Van Den Brink and Abshire discussed the cessation of automatic enrollment, among other issues concerning the Plan.  (Tr. III (Abshire) at 846, 848; JX2; JX193 at JX0193.0005). The Committee was frustrated by the negative impact that stopping automatic enrollment would likely have on the Plan and wanted to identify ways to help participants achieve adequate retirement income, including by focusing on diversification.  (Tr. III (Abshire) at 846-48; *see* JX-2 at JX0002.001 (minutes reflecting that "Chairman Marshall Croom and Mr. Randy Moon underscored the Committee's … continued commitment to expanding 401(k) Plan participant education, particularly on the importance of investment diversification and especially in the context of sunsetting automatic enrollment")).  So, during this meeting, the Committee told the Aon consultants that it wanted to learn more about plan design and specifically asked for ideas about potential new investment structures for the Plan to facilitate participant engagement in ways other than automatic enrollment, such as a streamlined structure with fewer options and more intuitive names.  (Tr. III (Abshire) at 848, 853).

54.     In response to this request, Van Den Brink and Abshire compiled a presentation covering four broad topics drawn from Aon's internal research that they thought might be beneficial for the Plan and its participants.  (Tr. III (Abshire) at 853-55; AX491). Abshire commonly prepared similar presentations about industry trends for his other consulting clients, and he shared white papers with them where he considered them relevant based on the type of plan and the types of issues they were considering.  (Tr. III (Abshire) at 856-57).

55.     The consultants presented a "deck" (written package of slides and text) entitled "Defined Contribution Investment Trends and Research" at the June 2013 Committee meeting. (Tr. III (Abshire) at 853-54; JX225). The first section of the presentation, entitled "The Real Deal 2012," was derived from an annual Aon report addressing retirement income adequacy for large retirement plans.  (JX225 at JX0225.0003-17; *see* AX-491; Tr. III (Abshire) at 854-55). This section of the presentation reported that large company employees with access only to defined contribution plans—as opposed to those whose employers also offered a defined benefit option—were "projected to have a larger [retirement savings] shortfall, on average, due to lower total employer-provided benefits." (AX491 at AX0491.0006).

56.     The third section of the consultants' June 2013 presentation, under the heading "Improving DC Plan Investment Governance," highlighted research and recommendations reported in an Aon white paper entitled "Improving DC Plan Investment Governance: A Call to Action," published in May 2013.  (Tr. III (Abshire) at 855; JX225 at JX0225.0026-32; *see* AX-645). In "A Call to Action," Aon reported the results of a study of 10,000 defined contribution plan participant portfolios.  (Tr. III (Abshire) at 855; Tr. IV (Clink) at 1060; AX645).

57.     That study concluded that as more employers chose to offer defined contribution plans as their primary retirement benefit, several negative trends had emerged, including "sub-optimal plan designs, inadequate attention to poor participant decision making, and inefficient investment option structures."  (AX645 at AX0645.0002; Tr. III (Abshire) at 857-58; *see* Tr. IV (Clink) at 1059-60). Specifically, the white paper observed that "the vast majority" of participants lack the "knowledge, interest, or time to maximize success," resulting in poorly diversified participant portfolios that fail to maximize expected returns for a given level of risk.

19

(AX645 at AX0645.0009-10; *see* Tr. III (Abshire) at 857-58; *see also* Tr. IV (Clink) at 1059-60).

58.     Based on this research and Aon's experience (including at Lowe's), Aon suggested that investment menus with too many choices may contribute to these problems with the composition of participant portfolios, which in turn contribute to inadequate savings at retirement. (Tr. III (Abshire) at 854-58; Tr. IV (Abshire) at 874; Tr. IV (Clink) at 1052, 1061; AX645 at AX0645.0010-14).

59.     As to the Lowe's Plan in particular, the Aon consulting team had come to believe that the Plan participant population as a whole was not very investment savvy or engaged, and that participants were generally not doing a very good job of diversifying their Plan account portfolios. (Tr. III (Abshire) at 847-50, 853). More specifically, Mr. Abshire had seen a pattern of excessive allocation to equities relative to fixed income that appeared to be driven by the fact that there were several more equity funds in the Plan's lineup than there were fixed income options. (Tr. III (Abshire) at 850-52). Mr. Abshire had also identified other patterns in the allocation of assets in the Plan—such as the lopsided allocations to domestic versus international equities, and to growth versus value styles—that suggested many participants may be allocating their accounts without a thoughtful strategy. (Tr. III (Abshire) at 850-52).

60.     The Lowe's Committee had similar observations. The lone Lowe's Committee witness, David Green, testified that, as a group, the Plan's participants were not investing appropriately and did not appear to understand investment industry terminology. (Tr. II (Green) at 374-75).

61.     The "A Call to Action" paper proposed that plans would "benefit from narrowing their investment option structure" to "focus on growth, income, inflation protection, and capital

20

preservation strategies, augmented with customized target date funds." (AX645 at AX0645.0010; *see* Tr. III (Abshire) at 859-60). Aon suggested that this streamlined core menu focused on objective-based funds would "reduc[e] the number of investment options participants must navigate," but the multi-asset structure of those funds would allow for "broadening the underlying investments to improve diversification" and "projected retirement income results." (AX645 at AX0645.0010, AX0645.0013). In this way, the new structure could "mitigate key risks while maintaining simplicity and manageability." (AX645 at AX0645.0010, AX0645.0013).

62. Although Aon believed that industry best practices would evolve towards this objective-based model, it recognized that many plans might not be ready to make such a big change to their investment structure all at once. (Tr. III (Abshire) at 876-78). The white paper therefore also described as an alternative investment structure an "Asset Class Menu" of seven funds across major asset categories that might similarly help participants achieve "more diversified, efficient, and intuitive asset allocation" while maintaining a slightly larger range of choices across familiar asset classes. (AX645 at AX0645.0014-15; Tr. III (Abshire) at 860, 876-78).

63. The white paper noted that, "for those participants who prefer additional investment choices," plan sponsors could offer a self-directed brokerage window alongside either of these streamlined menus. (AX645 at AX0645.0014; Tr. III (Abshire) at 861). As an additional alternative to menu simplification, "A Call to Action" suggested that plan sponsors could continue to offer a more traditional, broad-choice menu while providing participants access to professional advice in allocating their accounts through a so-called "managed account" offering. (AX645 at AX0645.0011). However, managed account services come with significant

additional fees for participants, and these extra fees can effectively erase any increased returns from improved investment decisions. (*See* Tr. III (Dyson) at 603-04).

64. Aon's June 2013 "Trends and Research" presentation to the Committee highlighted the white paper's broad recommendations regarding simplification of investment menus, target date funds, and automatic features. (Tr. III (Abshire) at 857-58; JX225 at JX0225.0026-32). The presentation identified "Plain Language Problems" facing defined contribution retirement plans—Inadequate Savings, Poor Diversification and High Cost, and Not Enough Return—and proposed solutions for each of them. (JX225 at JX0225.0029; Tr. III (Abshire) at 857-58). Also, like the white paper, the consultants' presentation featured "Opportunities to Consider" alongside or instead of changes to plan investment structure, including automatic enrollment and re-enrollment. (JX225 at JX0225.0032; Tr. III (Abshire) at 858).[6]

65. The June 2013 presentation identified the types of strategies that might be used in an Asset Class Menu (e.g., "Large Cap," "Small Cap," "Non-US Equity"), but it did not identify any particular investment options to fill those roles. (Tr. III (Abshire) at 883-84; Tr. IV (Abshire) at 981-82; JX225). The presentation likewise identified "Growth," "Income," "Capital Preservation," and "Inflation" mandates as components of an Objectives Menu, but it

---

[6] The Committee was, however, opposed to redirecting participant balances to a default option (for Lowe's it would have been the "target date" funds) through re-enrollment. (Tr. III (Abshire) at 859; see also Tr. II (Green) at 385 (the Committee felt re-enrollment "would be very difficult on our participants and a lot of them wouldn't understand it")). The Committee also communicated its lack of interest in a brokerage window, citing concerns that Plan participants might misuse a brokerage window for day trading or otherwise make imprudent investment choices through it. (Tr. III (Abshire) at 862).

22

did not point to any particular investment options that fit those descriptions. (JX225 at JX0225.0031).

66. As discussed more below, Plaintiff argues that Aon's June 2013 presentation and the consultants' suggestions that Lowe's consider simplifying the Plan's investment menu as described in Aon's "white paper" was nothing more than the first step of a premediated sales and marketing effort to sell Aon's delegated fiduciary services. While the Court acknowledges that Aon's sales department saw these types of discussions as helpful to its potential sale of delegated fiduciary services, the Court finds that Abshire testified credibly that he did not intend to use the June 2013 presentation or "A Call to Action" as an opportunity to sell additional Aon products or services to Lowe's and did not discuss the June 2013 presentation with anyone in sales. (Tr. III (Abshire) at 861, 863).

67. Rather, Abshire presented this information in the belief that consideration of these structural changes to the Plan would be in the best interest of Plan participants (as he has done with his other consulting clients, many of whom have also adopted one or more of the suggestions captured in the June 2013 presentation to the Committee, including some type of investment menu restructuring). (Tr. III (Abshire) at 863).

68. Following the June 2013 presentation, in July 2013, Lowe's director of financial security benefits Melanie Ellis, who worked with the Committee, emailed Van Den Brink, Abshire, and Punnoose (who was rejoining the Lowe's account as lead consultant because Van Den Brink was departing), writing: "Since we have not really looked at our 401(k) plan design holistically in quite some time, I think we are due. I would like to start from the ground up and lay out what the ideal plan for our employees would look like. I would appreciate your assistance

23

in pulling this information together and presenting it." (AX245 at AX0245.0002; Tr. III (Abshire) at 869-70, Tr. I (Punnoose) at 50; JX210 at 15).

69.     Although Punnoose was technically the senior consultant on the Lowe's account after Mr. Van Den Brink's departure, in practice he and Mr. Abshire operated as co-leads when interfacing with the Lowe's Committee, as Mr. Abshire had been working directly with the Committee during Punnoose's absence from the account. (Tr. I (Punnoose) at 50; Tr. III (Abshire) at 870; JX210 at JX0210.0016).

70.     Following Ms. Ellis's email, Abshire, Punnoose, and Aon research team member Rob Austin discussed next steps with members of the Committee. On an August 21, 2013 call with the Aon team, Committee members confirmed that they wanted to take a "fresh look at overall plan design" in light of the Plan sponsor's decision to "drop[] auto-enrollment," which had "led to questions from [Lowe's] Audit Committee." (JX210 at JX0210.0016; *see* Tr. I (Punnoose) at 50-51, 94-95, 134-35; Tr. III (Abshire) at 871-72; JX2).

71.     During an October 2013 follow-up call, Committee members told the consultants that the Plan participation rate had fallen to the "70% range" since "dropping auto enrollment," and the Committee was "skeptical that [an] educational campaign would have much impact in raising [the] participation rate." (JX210 at JX0210.0016).

72.     In response to the Committee's requests, in November 2013, Aon presented to the Committee's Investment Subcommittee on "DC Plan Structure," outlining the potential benefits and considerations for three possible menus: a "Traditional" structure, which was essentially the status quo for the Lowe's Plan lineup; an "Alternative" structure, akin to the "asset class menu" described in "A Call to Action"; and an "Emerging" structure, the principal feature of which would be objective-based investment options, as well as target date funds and

24

a stable value fund. (Tr. I (Punnoose) at 55-56; Tr. III (Abshire) at 872-74; JX210 at JX0210.0014-15; JX-226).

73. Aon's November 2013 presentation identified the Alternative structure as the "recommended" approach for the Lowe's Plan. (JX226 at JX0226.0002). The Alternative structure reduced the number of investment options and used fund naming conventions that were easier to understand, but not to the same degree as the Emerging structure. For example, the Alternative structure presented to the Committee included active and passive U.S. and non-U.S. equity options, but it eliminated distinctions between "value" and "growth" styles within those asset classes. (Tr. IV (Abshire) at 872, 876-78, 883-84; JX226 at JX0226.0016).

74. As with the June 2013 presentation, Abshire credibly testified that Aon's business interests with respect to delegated fiduciary services played no role in forming this recommendation nor did he have any discussions about whether it would be in Aon's interest to recommend the Alternative structure when deciding on that approach. (Tr. IV (Abshire) at 878).

75. At the November 2013 meeting, the Subcommittee was "very receptive to the idea of migrating [the] current core lineup structure" to a menu like the proposed Alternative structure. (JX210 at JX0210.0015; *see* Tr. IV (Abshire) at 882-83).

76. The November 2013 presentation did not suggest that Lowe's should or would need to delegate fiduciary authority to an outside entity to adopt either the Alternative or Emerging structures. (JX226; *see* Tr. I (Punnoose) at 68-69 ("At no point did I suggest to anyone at Lowe's that retaining a delegated fiduciary, much less retaining Aon for that role, was necessary to adopt either the recommended alternative structure or emerging structure.")).

77. The November 2013 presentation also did not indicate that Lowe's should or would need to use any particular funds—including Collective Trust funds—to implement either

25

the Alternative or Emerging structures. (Tr. IV (Abshire) at 878-79; JX226). Both the Alternative and Emerging structures could have been implemented through plan-specific funds using a "white labeling" approach. (Tr. I (Punnoose) at 90; Tr. II (Punnoose) at 306, 308-09; Tr. IV (Abshire) at 883-84).[7] Aon discussed with the Subcommittee the possibility of creating a single, white-labeled U.S. active equity fund for use in the Alternative structure by combining the Plan's pre-existing equity mutual fund options and allocating assets among them. (Tr. I (Punnoose) at 82-83; Tr. II (Punnoose) at 306-09; Tr. IV (Abshire) at 883-84; JX210 at JX0210.00015).

78.     At the Subcommittee's request, Aon provided a virtually identical presentation describing its structural recommendations to the full Committee in December 2013. (Tr. IV (Abshire) at 884, 886; JX227). The following slide, (*see* JX227 at JX0227.0013), depicts the structural changes that were discussed as part of the presentation:

---

[7] White labeling is an approach through which one or more funds are packaged into a custom investment solution under a generic name or the name of the plan sponsor, making it possible to change investment managers without having to remove an entire plan investment option from the menu and find a replacement. (Tr. I (Punnoose) at 82-83; Tr. II (Punnoose) at 306-09; Tr. III (Dyson) at 647; Tr. IV (Abshire) at 883-84).

26



**Potential Structure Evolution**

| Current | Alternative | Emerging |
|---|---|---|
| Target Date Funds | Target Date Funds | Target Date Funds |
| Capital Preservation | Capital Preservation | Capital Preservation |
| | Passive U.S. Bond | Income |
| | Active U.S. Bond | |
| Passive U.S. Large Cap Equity | Passive U.S. Equity | |
| Active U.S. Large Cap Value | | |
| Active U.S. Large Cap Growth | | |
| Active U.S. Mid Cap Value | | Growth |
| Active U.S. Mid Cap Growth | Active U.S. Equity | |
| Active U.S. Small Cap Value | | |
| Active U.S. Small Cap Growth | | |
| Active Non-U.S. Equity | Active Non-U.S. Equity | |
| | Passive Non-U.S. Equity | Inflation Protection |

- Target Date Funds
- Passive Funds
- Active Funds

Again, Plaintiff notes that Aon's "Emerging" structure (depicted on the right side of the graphic), aligned with Aon's proprietary delegated fiduciary funds and asserts Aon had this structure in mind when it was designing the Aon Growth Fund in 2012. (*See* JX232 at JX0232.0005; Trial Tr. Vol. V at 1172:2–1173:1 (Clink)).

79.     However, as discussed above, the Court credits Abshire's testimony that these various Plan structural investment choices followed directly from the broader discussions of ways to address shortfalls in participant retirement planning in June 2013 that were not part of any sales effort. Further, as discussed below, it would not be unlawful, without more, for a company to simply design an investment fund to fit into a potentially beneficial generic retirement plan investment structure that was ultimately suggested to clients. Indeed, it would make little sense to create investment funds that would be unlikely to fit well as part of a broader investment menu structure.

27

80.     Like the November 2013 presentation, Aon's December 2013 presentation thus outlined three possible plan structures: the Traditional, Alternative, and Emerging structures. (Tr. IV (Abshire) at 886-87; JX-227; JX4 at JX0004.0002-03) and again referred to the Alternative structure as the "recommended" structure for the Lowe's Plan.  (Tr. I (Punnoose) at 56, 81, 85; Tr. II (Punnoose) at 307-08; Tr. IV (Abshire) at 886-87; JX227 at JX0227.0002).

81.     Like the Investment Subcommittee's reaction to the November 2013 presentation, the full Committee appeared to be receptive to the Alternative structure.  (Tr. IV (Abshire) at 887). Some Committee members wanted more information about how the Alternative structure would work, and the Committee decided to schedule a follow-up meeting to further address issues related to the Plan's investment structure.  (JX4 at JX0004.0003).

82.     In early 2014, Abshire and Punnoose worked on the concept of white labeling the Plan's existing equity offerings into an active U.S. equity solution that could be incorporated into the Alternative structure.  (Tr. I (Punnoose) at 83-84, 90; Tr. IV (Abshire) at 889-90; AX249; JX210 at JX0210.0016; JX255; *see* PX-229 at 1 (explaining "we are working with Lowe's to merge their six active us equity funds into one active U.S. equity fund in their 401(k) plan").

The new white label fund would assign market-efficient weights to each of the six active U.S. equity funds included in the strategy, rather than carry forward the participants' legacy allocations.  (Tr. IV (Abshire) at 889-90; *see* PX259 at 11).

83.     The investment consulting team was scheduled to present at the March 2014 Committee meeting, but that meeting was cancelled due to Committee membership turnover and organizational delays.  (Tr. I (Punnoose) at 88-89; Tr. IV (Abshire) at 891; *see also* AX247).

84.     The next meeting was scheduled for June 2014.  (Tr. I (Punnoose) at 89; Tr. IV (Abshire) at 891; JX5).  In anticipation of that meeting, the Aon consultants began drafting a presentation that built on the November and December 2013 decks and contemplated implementation of the recommended Alternative structure with Aon in a consulting role (with no additional fees being charged by Aon).  (Tr. IV (Abshire) at 891-93; *see* PX-259 at 3, 10-12).

85.     Before the draft deck for the June 2014 meeting could be completed, the Aon consultants had a call with Committee members Bob Ihrie and Melanie Ellis in May 2014.  (Tr. IV (Abshire) at 895; JX-210 at JX0210.0013-14).  Ihrie, who was by then the new Chair of the Committee, explained that in light of significant changes in the Committee's membership, he wanted to pause work on implementing the Alternative structure (including the construction of a white label fund) and instead have the consultants provide another high-level summary on investment structure at the June 2014 meeting to get the new Committee members up to speed.  (Tr. IV (Abshire) at 895-97; JX210 at JX0210.0014; JX5). However, at that meeting the Committee ran out of time to hear the consultants' presentation on investment structure (Tr. IV (Abshire) at 897-98) so the Committee postponed the plan structure discussion to a special meeting in October 2014.  (Tr. I (Punnoose) at 98; Tr. IV (Abshire) at 898-99; JX5 at JX0005.0003).

86.     Unlike the original draft presentation for the June 2014 meeting, which focused on detailed implementation of the Alternative structure, the Aon consultants' presentation for the October 2014 meeting again more broadly presented the higher-level structural concepts presented in November and December 2013.  (Tr. IV (Abshire) at 899; JX228).

87.     In addition, as described in more detail below, in September 2014, Punnoose sought permission from a Committee member to have members of Aon's delegated fiduciary

services team attend the Committee meeting to present on Aon's delegated offering, (Tr. I (Punnoose) at 100-01, 118; Tr. IV (Abshire) at 900) and his request was granted. Accordingly, Punnoose arranged for Aon sales representatives to join the October meeting, and the Aon consultants assisted the sales team with the preparations for their sales pitch. (Tr. I (Punnoose) at 169-70; JX257; Tr. IV (Abshire) at 904-05).

88.    However, Abshire testified credibly that his priority was to continue his earlier efforts to present the Committee with the best investment advice on structural issues, not to facilitate the sales team's pitch. (Tr. IV (Abshire) at 907, 984-85; *see* Tr. IV (Abshire) at 968 (testifying that it was "always [his] intent" to "act in the best interest of the participants")).[8]

89.    Aon's presentation for the October 2014 meeting thus included: (1) a continuing discussion about investment structure, to be led by the investment consulting team, and (2) a discussion of Aon's delegated services offering, presented by the delegated services team. (Tr. I (Punnoose) at 126, 131; Tr. IV (Abshire) at 913-14; JX228). Abshire and Punnoose attended the meeting in their consulting roles, accompanied by a member of Aon's research team. (Tr. IV (Abshire) at 911). Craig Pearlman and Kevin Brown[9] attended the meeting as representatives from the delegated sales team. (Tr. IV (Abshire) at 911).

---

[8] In contrast, as discussed below, the Court finds Punnoose's testimony that his "singular focus" was on the Plan and ignored Aon's efforts to sell its delegated fiduciary services is not credible. Beyond the often evasive nature of his live testimony, Punnoose's protestations that he was not also focused on the possibility of Aon selling additional services and obtaining increased fees are inconsistent with the documents and testimony that clearly establish his ongoing focus on encouraging, arranging and participating in that sales effort which he saw as a way to burnish his candidacy to become a Partner at Aon.

[9] There is conflicting testimony about whether Brown attended in person or by phone. The Court need not resolve this conflict, which appears to be immaterial to the substance of the Committee meeting.

30

90.    In the first part of the meeting, Abshire led the discussion, and the consultants delivered another similar presentation on structural considerations entitled, as with the prior decks, "DC Plan Structure Discussion."  (Tr. IV (Abshire) at 913-15; JX228.0001-0011).  Both the Alternative and Emerging options continued to highlight "a more streamlined menu" focused on "fewer options under better management" and "multi-manager portfolios, producing better investment outcomes with participant-friendly fee structures."  (JX6 at JX0006.0002; Tr. IV (Abshire) at 914-15).   Due to significant recent turnover in the Committee's membership, this was the first time that half of the Committee members present at the meeting had heard this information from Aon.  (Tr. IV (Abshire) at 915).

91.    While the written materials Aon provided to the Committee again recommended that the Plan adopt the Alternative structure, (JX228 at JX0228.0002, JX0228.0009), and the Committee's meeting minutes reflect that Aon's "ultimate recommendation" was the Emerging structure, (JX6 at JX0006.0002), Lowe's Committee member David Green understood Aon to be presenting a balanced view between the Alternative and Emerging structures, (Tr. II (Green) at 376-79, 392-94), leaving it up to the Committee to choose its preferred investment menu structure.  Also, the Committee understood that it could implement either the Alternative or Emerging structure without the use of a delegated fiduciary.  (Tr. II (Green) at 344-45).

F.    **Aon's Efforts to "Cross-Sell" its Delegated Fiduciary Services**

92.    Aon launched its new delegated fiduciary offering along with its proprietary funds in the AHCIT in October 2013. However, Aon's attempt to shift from investment

consulting to investment management was not immediately successful. In 2013, Aon reported that its delegated pipeline was "below level needed." (PX227 at 84).[10]

93.　　To gain a foothold in the market, Aon sought to cross-sell its delegated investment management services to Aon's existing consulting clients. An internal document from October 2012 describing "DC Delegated Next Steps" stated that Aon intended to "Cross-sell" to "[Hewitt] DC clients." (JX231 at JX0231.0001). A December 2013 internal presentation listed Aon's "DC Client Base" as one of the "Sales Channels" for Aon's new funds, describing DC plans as a "new asset pool[]" and encouraging "Leveraging Aon Hewitt Brand—Cross-selling," (PX227 at 15, 60, 63).

94.　　These cross-selling efforts were not limited to salespeople and included investment consulting personnel who served in a fiduciary capacity. As part of Aon's cross-selling strategy, Aon's fiduciary consultants were assigned "revenue goals," (Pearlman Dep. transcript (Doc. No. 235-01) at 131:20–132:1, 146:3–7), tied to the sale of Aon's delegated fiduciary services. (*Id*. at 127:20–128:1; *see also* Tr. I at 217:24–218:8 (Punnoose)).

95.　　Aon also created a bonus plan for "increasing revenue/cross-selling." (JX278 at JX0278.0002).

96.　　Aon's cross-selling plan included Lowe's, which was a top entry on Aon's list of prospects for its delegated fiduciary services. (PX228). Further, in another Aon document describing its delegated "Sales Campaign[]," Lowe's was listed as one of the "Top Opportunities," with over $500,000 in projected annual revenue. (PX66 at 3, 6).

---

[10] This issue persisted. In 2014, Aon noted that "[t]he DC pipeline has stagnated." PX464 at Trial Exhibit Page 4. And in 2015, Aon acknowledged that there was a "lack of new clients that are willing to provide a reference." JX278 at JX0278.0002.

97.     Plaintiff contends that providing potential defined contribution plan clients with Aon's "A Call to Action" white paper was the initial step in Aon's cross-selling strategy. Craig Pearlman, Aon's Head of Delegated Product and Business Development, testified that Aon introduced its delegated fiduciary services to clients not by pitching them directly, but by initially discussing "plan structure" ideas or Aon's white papers. (Doc No. 235-01 at 74:23–75:24). Pearlman further testified that Aon pursued this sales approach regardless of whether an investment consulting client had expressed interest in delegated fiduciary services. (*Id*. at 74:13–22). However, the first step in Aon's internal five-step "Defined Contribution – Strategic Sales Process" was simply to "[e]ducate on basic fiduciary models." (JX281 at JX0281.0005).

98.     In November 2013, Aon's delegated fiduciary sales team created a slide deck for consultants "to introduce Delegated DC to their clients." (PX217). Aon sent this presentation to Punnoose, who Pearlman later described as a "rock-star[]" at introducing Aon's delegated services to existing clients (PX363 at 2) and one of a "[s]mall group of investment consultants actively educating clients with the delegated team." (JX278 at JX0278.0002).

99.     Before the December 2013 meeting, Punnoose also spoke with Beth Halberstadt, a member of Aon's defined contribution solutions team, and learned about Aon's delegated fiduciary offering to defined contribution plans.   (Tr. I (Punnoose) at 57-58; JX253 at JX0253.0003).

100.     In December 2013, Punnoose attended multiple calls with Aon executives about Aon's delegated fiduciary services. (PX219). Abshire also attended a sales training for these services. (Tr. IV at 978:4–14 (Abshire)). On December 10, Punnoose told the executives, "I want to start talking about [Aon's delegated services] at a meeting I have next week with a $4.3 billion DC plan…. Client is Lowe's." (PX219). On December 13, the Aon executives had

33

another call with Punnoose about Aon's delegated fiduciary services and noted that "[h]e meets with Lowe's next Wed[nesday] and will be introducing the delegated model to them then." (PX220 at 1). The same day, Punnoose told another pair of Aon executives, "I'm going to work on possibility of Delegated DC" for Lowe's. (JX252 at JX0252.0001) and in the same email, noted that the success of the cross-selling effort might impact his role on the Lowe's account: "if I can't move [Lowe's] to Delegated DC," responsibility for the Lowe's account could be transferred to Abshire. (*Id.*; *see also* Tr. IV at 980:5–10 (Abshire)).

101.    Later that day, an Aon executive sent Punnoose a Lowe's specific "intro deck" about Aon's delegated fiduciary services "that you can use to lead the conversation." (PX221 at 1). The slide presentation, titled "Delegated Defined Contribution Consulting," strongly resembled the plan structure recommendations Aon had been providing to the Committee. (*See generally* JX254). It listed the same "Issues Facing Participants" that Aon's plan structure presentations provided. (*Compare id.* at JX054.0003 with JX226 at JX0226.0011). And, it recommended using Aon's funds with Aon's delegated fiduciary services in the new plan structures that Aon had been recommending to the Committee. (JX254 at JX0254.0005, JX0254.0008). The presentation stated that Aon would "facilitate[] everything (fiduciary governance included)" and would act as an "expert investment manager," as well as providing other benefits. (*Id.* at JX0254.0004, JX0254.0008).

102.    Punnoose ultimately did not give the delegated fiduciary presentation to Lowe's because Aon's compliance department failed to approve it in time. (*See* PX223 at 1).[11] Instead,

---

[11] Punnoose testified that had this presentation been approved in time, he intended to send the deck, along with the press release and executive summary, to Committee members as "informational material" (of course actually sales materials) about Aon's new product offering.  (Tr. I (Punnoose) at 72-74).

Punnoose sent a press release and separate summary of Aon's delegated fiduciary services. (Tr. I (Punnoose) at 67-68; Tr. IV (Abshire) at 884; PX226). Punnoose told the Committee members that Aon's delegated fiduciary service "dovetails nicely" with Aon's recommended Plan structure changes, and that "[w]e can discuss further at your convenience." (PX226).

103.    Punnoose's efforts with respect to Aon's delegated fiduciary services did not move forward at that time. When Punnoose spoke with Committee Chairman Randy Moon after sending the materials, Moon told him that Lowe's was probably not interested in delegating fiduciary responsibility to an outside entity like Aon, "as the Committee likes to be a little more hands-on." (PX226; Tr. I (Punnoose) at 71-72; Tr. IV (Abshire) at 884-86). However, Punnoose did not understand Moon's response to "completely shut the door" on possible interest in the delegated model. (PX226 at 1).

104.    In light of Moon's feedback, Punnoose and Abshire did not raise the subject of Aon's new delegated offering at the December 2013 meeting with the Committee. (Tr. IV (Abshire) at 885; JX210 at JX0210.00015).  Nonetheless, during the meeting, Moon inquired about how Aon's delegated offering would implement the mandates in the structures they were discussing.  (Tr. I (Punnoose) at 71; Tr. IV (Abshire) at 885-86; JX210 at JX0210.0015). In response, Abshire stated that the Committee should first discuss and decide on the investment structure, and that discussions about implementation of that structure should come afterward. (Tr. IV (Abshire) at 887).

105.    Although Aon was told at that time that Lowe's wanted to remain "hands-on" and was not interested in delegated fiduciary services, Punnoose believed that his proposal of Aon's delegated services was nevertheless "[a] good defensive action" and noted, "[c]ompetition lurking in every corner!" (PX226). Aon executives agreed, responding, "Fyi – to

35

make sure we are pushing. Jacob did the right things but mercer is out there – this is our client." (*Id.*).

106.    Aon thereafter continued to follow up on the possibility of cross-selling to Lowe's. In March 2014, an Aon account executive checked in with Punnoose and Abshire, asking, "Any more progress on moving towards expanding the work?" (JX255 at JX0255.0001; *see also* Tr. I at 95:16–96:4 (Punnoose)). In August 2014, Aon's delegated fiduciary sales team compiled "a list of [Aon's] traditional investment consulting clients" and agreed to "review together and how to introduce Delegated DC/SimPlus." (PX250 at 1). Abshire "had some of those conversations as well." (Tr. IV at 983:13–17 (Abshire)). The next week, an Aon Delegated DC Sales Specialist, Rich Swanson, emailed Punnoose a list of Punnoose's consulting clients, including Lowe's, to discuss in a delegated sales meeting. (PX252).

107.    Not long after this meeting, Punnoose made the September 2014 request to Committee member Melanie Ellis discussed above for Aon's delegated sales representatives to make a presentation to Lowe's. (JX257 at JX0257.0002).

108.    Once Punnoose secured the opportunity to present to Lowe's, two salespeople from Aon's "Delegated team" began working with Punnoose and Abshire as a "pitch team," (PX290)*,* to prepare for the sales effort. One was Craig Pearlman, Aon's head of delegated sales; the other was Kevin Brown.[12] Abshire recommended setting up a call with the delegated sales team "to discuss the best ways to position this." (JX259 at JX0259.0001). Punnoose, Abshire, Pearlman, and Brown then collaborated to prepare a delegated sales presentation for the

---

[12] Plaintiff offered evidence that Brown received bonus incentives to sell delegated services to Lowe's and Lowe's was not informed about the potential bonus. The Court finds this evidence that a salesman would be compensated for selling services unremarkable (as no doubt would Lowe's or any potential customer) and gives it no weight.

36

upcoming Committee meeting. (*See* PX271 ("Craig and I worked in conjunction with Brian Abshire and Jacob Punnoose to produce the just completed attached deck for Lowe's."); *see also* PX259; PX266 at 1).

109.    During the October 2014 meeting, Pearlman and Brown made Aon's delegated fiduciary sales presentation after Punnoose and Abshire's presentation on Aon's Plan restructuring recommendations. Similarly, in Aon's single written presentation, Aon's sales presentation followed the discussion of recommended changes to the Plan investment menu, separated only by a page/slide entitled "Implementation & Fiduciary Considerations."[13] (JX228 at JX0228.0012).

110.    At their October 2014 meeting, the Committee voted to adopt Aon's "Emerging" structure; however, the minutes for that meeting do not reflect a vote to hire Aon as the Plan's delegated fiduciary (JX6 at JX006.0003). Aon believed that the Committee had not voted to select Aon as the Plan's delegated fiduciary at that time, (*See* JX210 at JX0210.0013; Tr. I at 152:7–13 (Punnoose)), although Green testified that the Committee believed it had selected Aon as the Plan's new delegated fiduciary at the October 2014 meeting. Tr. II at 404:17–405:5 (Green)).

111.    After the October 2014 meeting, Aon's fiduciary consultants and salespeople strategized about how to capture Aon's appointment as the Plan's delegated fiduciary, including collaborating on another sales presentation regarding Aon's delegated fiduciary services. (*See*

_____

[13] Aon somewhat disingenuously argues that this title page reflected a "clear distinction" between the Plan restructuring and delegated fiduciary sales presentation. The Court disagrees. If Aon wanted to show a clear break between the two presentations then it could have quite easily prepared two truly *separate* written presentations to the Committee or, at a minimum, specifically labeled the sales presentation as such (i.e., "Aon's Delegated Services Program"). Nevertheless, Lowe's understood the different decisions it needed to make with respect to Plan restructuring and engagement of a delegated fiduciary manager.

PX304). Brown circulated ideas to Punnoose, Abshire, and Pearlman to "help[] structure and focus strategy and tactics to get to 100% of probability of the deal closing" (JX263 at JX0263.0001), and scheduled meetings with them "to discuss our strategy to win." (PX288). Abshire—one of the fiduciary consultants to the Plan—added, "I just hope we win it." (PX297).

112. In the meantime, Punnoose worked on the delegated fee proposal and set up a "pre-meeting" with two Committee members for the purpose of promoting Aon's delegated fiduciary services. (JX264 at JX0264.0001; PX285 at 1). Punnoose ultimately reviewed, edited, and approved the presentation to be given at that meeting. (*See* JX268 at JX0268.0002-0004; *see generally* JX264; *see also* Tr. I at 171:25–175:3 (Punnoose)).[14]

113. On December 4, 2014, Punnoose and three Aon salespeople (Craig Pearlman, Kevin Brown, and Janet Osborn) met with two Committee members, Melanie Ellis and Bob Ihrie. (JX210 at JX0210.0011). At this sales meeting, the participants again discussed Aon's delegated fiduciary services. (*See* JX268).

114. Punnoose's notes from the December 4 sales meeting reflect that he was focused on closing the sale, stating: "It feels like we are in the driver's seat and should have a solid probability of getting a Yes during the [next full Committee] meeting." (JX210 at JX0210.0012). Shortly after the meeting, Punnoose wrote to his boss, "My assessment of probability of success went from 50% to 75%," and he predicted around $500,000 in new annual revenue for Aon. (JX269; Tr. I at 188:2–189:5 (Punnoose)).

---

[14] Plaintiff notes that before this information was sent, Pearlman removed investment performance information for the Aon Growth Fund from the December 2014 sales presentation. (PX 292). However, the Court does not find this fact to be material because Aon was free to include or not include any information it deemed helpful or unhelpful to its sales effort so long as it did not commit actionable fraud or misrepresentation, which has not been alleged. It was up to Lowe's (as with any customer) to ask questions and otherwise perform due diligence as to the details of Aon's offering.

115.     On December 8, Ellis called Punnoose and informed him that Aon had been selected as the Plan's delegated fiduciary. (PX322). Shortly after the call, Punnoose told Aon executives, "Got it" (referring to the new Lowe's business) and noted that Aon's fee would increase by nearly $500,000 per year and "importantly…should grow over time." (PX 313). Pearlman told Punnoose that Pearlman would "make sure everyone recognizes your contributions." (PX312 at 1).

116.     Aon executives congratulated Punnoose and Abshire for the sale. (PX315; PX318). Aon's CEO also congratulated Pearlman, who called the sale a "[b]usiness game changer" and "our largest conversion yet." (PX328; PX329 at 1; PX332 at 1). Ward congratulated Punnoose on being part of the team that secured the win and sought Punnoose's advice about how to replicate the sale in the future. (Tr. III at 775:17–776:1 (Ward)).  Punnoose replied that Aon won thanks to its "solid relationship with Lowe's." (PX323; Tr. III at 778:14–25 (Ward)). Another Aon executive stated that he had "always envisioned" building Aon's delegated fiduciary business by "converting existing trusted advisory clients into the model." (PX314 at 1).

117.     Punnoose summarized his sales insights in an email to Aon executives with the subject line "Lowe's - Fantastic News - New Delegated DC Client." (*See* JX274). He remarked that "[g]oing after the larger clients first has many pluses," including preventing competing consultants from putting Aon's "Core revenue…at risk." (*Id*. at JX0274.0002). Punnoose advised that "[i]nstead of initially trying to get a meeting established to talk about delegated per se, perhaps we take the approach of trying to get a meeting to talk about our latest research on retirement income adequacy, leading edge thinking in DC plans, future evolution of DC plans, and enhanced structures that can save substantial fees." (*Id*. at JX0274.0001). Punnoose also

39

noted that "[t]here is a lot of time that it takes from introduction of topic to point of sale to revenue flowing," saying that he and Abshire "started the conversation about retirement income adequacy, etc. with Lowe's probably 12 - 18 months ago and delegated DC revenue will start effective January 1, 2016." (*Id.*). He further observed that "it's absolutely vital that we build scale faster than our competitors because if a competitor gets in first, they have moved the goalposts," noting that whichever firm locked in the initial Lowe's fee savings would be hard to dislodge. (JX274 at JX0274.0001).

118.    Punnoose and Abshire did not receive commissions as part of their compensation, and to their knowledge they did not earn any direct bonus for introducing the delegated sales team to Lowe's. (Tr. IV (Abshire) at 924-25; Tr. I (Punnoose) at 217-18). However, the Aon consultants understood that making introductions to clients might indirectly factor into their compensation. (Tr. I (Punnoose) at 217-18; Tr. IV (Abshire) at 924-25).

G.    **Lowe's Decision to Change the Plan's Investment Options**

119.    According to the Committee's meeting minutes,[15] the Lowe's Committee "discussed vigorously" the information presented by Punnoose and Abshire, "posing probing questions … about the proposed 'Alternative' and 'Emerging' structures." (JX6 at JX0006.0002; Tr. I (Punnoose) at 124; Tr. IV (Abshire) at 918).

---

[15] The Parties agreed to allow all of the Committee's relevant meeting minutes to come into evidence without any testimony from any person who prepared the minutes. While the only Lowe's witness, David Green, testified that the meeting minutes were reviewed for accuracy, (Tr. II at 334:5–17 (Green)), in several instances the minutes appear to be inconsistent with witness testimony (on both sides) and corporate minutes are, of course, intended to summarize the meeting (typically after the fact) not transcribe it. Accordingly, while the Court has considered the meeting minutes, it has not relied on their accuracy to the exclusion of contradictory testimony or documents. Rather, the Court has weighed the meeting minutes as only one piece of evidence along with the relevant testimonial and documentary evidence.

120.    In his presentation, Punnoose told the Committee that the current Plan structure "provides potentially too much choice" and that "[t]oo many choices may paralyze employee decision-making due to too many options." (JX4 at JX0004.0002). Aon further told the Committee that the Emerging structure provided "the best opportunities for participants" and that Aon "would accept and adhere to increased fiduciary obligations if the Committee were to adopt the 'Emerging' structure." (JX6 at JX0006.0002). Finally, Aon told the Committee that "you're eventually going to get to the emerging" because it is "what's going on in the industry." (Tr. II at 378:13-21 (Green)). However, as noted above, Lowe's understood Aon to be presenting both the Alternative and Emerging structures, (Tr. II (Green) at 376-79, 392-94), leaving it up to the Committee to choose the structure it wanted.

121.    During discussions at the meeting, the Aon consultants did not suggest to the Committee that the adoption of either proposed investment structure necessitated the use of Aon or any other firm as a delegated fiduciary.  (Tr. I (Punnoose) at 116, 125; Tr. II (Punnoose) at 310-11; Tr. III (Abshire) at 923; JX228).  Nevertheless, the Aon sales presentation promoting that result immediately followed the Aon consultants' presentation (as requested by Punnoose) so Aon's emphasis on the absence of any formal suggestion regarding using delegated services has limited impact, considering the circumstances as a whole. More important to the Court is the unrebutted testimony of the Lowe's Committee member Green that Lowe's understood that hiring a delegated fiduciary was a separate decision, which was the Committee's responsibility. (Tr. II (Green) at 344-45).

122.    Although the Committee had previously indicated that it favored the Alternative structure, at the October 2014 meeting, Committee members told the Aon investment consultants they believed "it would be easier to communicate to participants with the Growth,

41

Income, Cap Preservation, and Inflation-Protected funds" used in the Emerging structure than it would be "to explain what does Active US equity mean versus Passive US equity" with the Alternative structure. (AX269; *see also* Tr. II (Green) at 379; Tr. IV (Abshire) at 918-19).

123.    In response to the Committee's preference for the Emerging structure over the Alternative option, Abshire raised two possible modifications to the Emerging structure for the Committee to consider: an additional tier of passively managed funds, and a brokerage window. (Tr. IV (Abshire) at 919). A passive tier would have given Plan participants the option to allocate their accounts to an all-equity investment option, at very low cost. (Tr. IV (Abshire) at 920).

124.    However, at the time the Committee said that it did not want to add a passive tier, because it felt that introducing additional options would be inconsistent with the simplified approach embodied in the Emerging structure. (Tr. IV (Abshire) at 920). Years later, the Committee added a passive tier to the Plan menu in consultation with its new investment advisor, Arthur J. Gallagher & Co. ("Gallagher"), who was hired in 2016. (Tr. II (Green) at 391; Tr. IV (Abshire) at 921).

125.    If Lowe's had chosen to add a brokerage window to the Plan, participants would have had access to thousands of mutual funds on the market, including a range of all-equity mutual fund options. (Tr. III (Abshire) at 861-62; Tr. IV (Abshire) at 921-22; *see also* Tr. II (Wagner) at 509-10). The Committee, however, rejected the idea of adding a brokerage window, as it had when the possibility was raised in connection with the June 2013 presentation. (Tr. III (Abshire) at 862; Tr. IV (Abshire) at 921; JX210 at JX0210.0010, JX0210.0015, JX0210.0019, JX0210.0020, JX0210.0022, JX0210.0029).

126.    As reflected in their written materials and their oral comments to the Committee, Abshire and Punnoose fully supported the Emerging option once it was clear that the Committee was ready to embrace a change to that structure. (*See* JX 228; Tr. IV (Abshire) at 922-23).

127.    Ultimately, "after extensive discussion," the Lowe's Committee "voted to adopt the Emerging model" at its October 2014 meeting. (JX-6 at JX0006.0002; *see also* Tr. II (Punnoose) at 315; Tr. IV (Abshire) at 918-19, 926)).

## H.    Lowe's Decision to Engage Aon as a Delegated Fiduciary Investment Manager

128.    As discussed above, there is no dispute that Lowe's hired Aon as the Plan's delegated fiduciary investment manager in 2014, effective October 1, 2015. However, the timing of that decision and Lowe's selection "process" (if any) that led to Aon being engaged as the delegated fiduciary is less certain.

129.    Indeed, the Court's ability to determine these facts (and others related to Lowe's conduct and decision making) is limited because the Parties only presented one witness from Lowe's, current Committee chairman David Green. To be clear, the Court found Green to be a helpful, credible and forthright witness who testified to the best of his recollection. However, the evidence showed that other Committee members had a more active role on the Committee with respect to working with Aon and the matters in dispute, and Green had at best secondhand knowledge of their efforts (when he had any knowledge at all). Further, according to his testimony, Green apparently had a bit of a contrarian view of what the Committee should have done so the Court has no direct evidence from any of those on the Committee who fully supported the Committee's course. In sum, the Court is left to find various facts related to what Lowe's did (or didn't do) and why based only on Green's testimony, but, of course, that is a circumstance of the Parties' own making.

43

130. Neither Punnoose nor Abshire offered the Committee any advice about whether to hire a delegated fiduciary or Aon in particular, and the Committee did not ask them for any such advice. (Tr. IV (Abshire) at 923-24). The Committee understood that the decision to hire a delegated fiduciary was a separate decision which it had to make. (Tr. II (Green) at 345 ("And so there were really two decisions of the fund structure and the second was delegated fiduciary. So we could go to the fund structure without the delegated fiduciary role. And so the committee really had to make a decision on both of those.")).

131. With respect to the choice of whether to engage a delegated fiduciary, Lowe's understood that Aon had a financial interest in getting the delegated business and wanted to get it. (Tr. II (Green) at 381). And, not surprisingly, Lowe's did not look to Aon to identify competitors, seek competing proposals or compare its proposal to potential competitive offerings because, as Green testified, "I felt like that was something we should be doing on our own." (Tr. II (Green) at 382-83).

132. After Aon's presentation on its delegated fiduciary proposal, Green wanted to "see other proposals" and "look at the whole structure." (*Id*.). However, the Committee did not conduct a "full market analysis" as Green preferred. (Tr. II. (Green) at 404-405) ("I think I wanted to -- I wanted a full, kind of, market analysis and that's part of the reason I abstained from the vote.")).

133. Instead, a few members of the Committee in practical effect conducted a "price check" on Aon's proposed delegated fees in November 2014 with Mercer, a large potential competitor. (*See* Tr. IV (Abshire) at 927; AX503).

134. As to the timing of Aon's selection, Green testified that "[t]here was a lot of confusion, at least on my part." Green said that "I asked for clarification on that at the December

44

meeting and each one of the participants at the October meeting was also there at the December meeting as we went through the minutes, and they all agreed that yes, we had voted on the delegated authority [at the October meeting] and they were comfortable with that." (Tr. II. (Green) at 404-05). But, regardless of the timing of the vote, according to Green, the Committee never considered any firm other than Aon as a full Committee. (Tr. II. (Green) at 405).

135.    Even though the Lowe's Committee members believed they had made the decision to hire Aon (subject to a check on the amount of their fees) at the October meeting, Aon claims that it was unaware that the decision had been reached. (Tr. I (Punnoose) at 152; Tr. IV (Abshire) at 926-27; JX210 at JX0210.0013; *see* Tr. II (Punnoose) at 315 ("My recollection at the end of the [October] meeting, Lowe's had selected that they wanted to go with the emerging structure and that they were interested in delegating services," but "had not selected Aon")).

136.    Aon's delegated sales team and Punnoose met with two Committee members for a second time on December 4, 2014, providing additional information about Aon's delegated services and fees.  (Tr. I (Punnoose) at 162-65; Tr. II (Punnoose) at 317-19; JX268).  Consistent with Green's testimony, during the December 4 meeting, Committee member Ihrie said that Lowe's had compared Aon's proposed delegated fiduciary fees to Mercer's and found them to be the same.  (JX-210 at JX0210.0012; *see* AX503 at AX503.0007) (Mercer presentation showing proposed delegated fiduciary fee of 5 basis points).

137.    On December 8, 2014, without any additional meeting of the Committee, Committee member Ellis informed Punnoose that the Committee had decided to retain Aon as delegated fiduciary for the objective-based options in the new investment lineup.  (Tr. I (Punnoose) at 189-90; Tr. IV (Abshire) at 930; JX271).

138. Prior to assuming its new role, Aon entered into an Investment Management Agreement with Lowe's, which was fully executed on May 4, 2015. (*See* JX219). Under the Investment Management Agreement, Aon was delegated authority under section 3(38) of ERISA to select and monitor certain Plan investment options. (*Id*. at JX0219.0012–0013). No testimony was presented at trial related to the negotiation of the Investment Management Agreement or Lowe's expectations or view of its terms. Again, the Court is left only with Green's thoughts. Green testified that, "once we went to the delegated model, from a committee standpoint, it was up to Aon to pick what they were going to put in the Lowe's growth fund" and "I assumed that -- again, as delegated fiduciary, they could pick any type of investment they wanted … consistent with our investment policy." (Tr. II. (Green) at 348, 371).

139. Aon officially assumed its role as delegated fiduciary to the Lowe's Plan on October 1, 2015. (JX219 at JX0219.0002).

**I.      Aon's Selection of the Aon Growth Fund as the Plan's "Growth" Equity Investment Option**

140. Aon's responsibilities as a delegated fiduciary are set forth in an Investment Management Agreement ("IMA") with Lowe's. (JX-219 at JX0219.0002). The IMA grants Aon "the requisite authority to take any and all actions on behalf of the Plan," in place of the Committee, with respect to certain specified assets. (*Id*.). In other words, Aon became the decision maker as to those assets, whereas previously it had provided only recommendations for the Committee's consideration. (*See* Tr. II (Green) at 370-71, 384, 396-97 (testifying that he understood that selection of investment vehicles would be Aon's decision as delegated fiduciary)). Under the IMA, Aon received an asset-based fee of 5 basis points (0.05%) for assuming responsibility for the Plan's objective-based options, regardless of how it chose to implement those mandates in the Plan. (JX-219 at JX0219.0017; *see* Tr. V (Clink) at 1227-28).

46

141.    In the IMA, Lowe's and the Committee also acknowledged reviewing the Offering Statement for the Collective Trust.  (JX-219 at JX0219.0013).  The Offering Statement disclosed that investments in the objective-based strategies offered through the Collective Trust were subject to a trustee fee.  (*See* JX-121 at JX0121.0048-49). The original trustee for the Collective Trust was Reliance Trust Company ("Reliance'), a third-party unaffiliated with Aon, and Aon disclosed the possibility that Reliance might be replaced with an Aon affiliate.  (JX-219 at JX0219.0013; Tr. IV (Clink) at 1107-08).

142.    In October 2015, Aon Trust Company ("ATC"), an Aon affiliate, replaced Reliance as the trustee for the Collective Trust, *See* Tr. IV (Clink) at 1108, and when ATC assumed the trustee role for the Collective Trust, it inherited the same trustee fee terms (0.5 basis points (0.005%)) previously negotiated at arm's length by Reliance during the competitive bidding process to select a trustee.  (Tr. IV (Clink) at 1107-08; *see also* JX-121 at JX0121.0048-49, 56; JX-122 at JX0122.0048-49; JX-223 at JX0223.0009; JX-126 at JX0126.0058-59).

143.    The 2015 IPS approved by the Committee sets forth the Plan's investment objectives as well as criteria for selection and retention of managers and funds.  (*See* JX-321; *see also* Tr. II (Green) at 354-55).  Under the 2015 IPS, Aon is assigned responsibility for the Plan's objective-based growth, income, and inflation-protection strategies. (JX-321 at JX0321.0004).

144.    In addition, until October 2016, Aon continued to provide investment consulting services with respect to the target date and stable value funds offered in the Plan (that is, the funds in the lineup, aside from the Lowe's company stock fund, for which Aon did not have final decision-making authority), and Lowe's agreed to pay Aon a reduced annual fee of $50,000 for that work.  (JX-219 at JX0219.0019; *see also* JX-220 at JX0220.0001).

47

145.     Lowe's was aware that Aon might exercise its discretion to implement plan investment mandates using the investment funds in Aon's Collective Trust.  In fact, the IMA explicitly provided Aon had "no obligation to consider" investment options for the Plan other than its own funds, (JX219 at JX0219.0013). Significantly, however, the IMA also specifically precluded Aon from using any affiliated sub-advisors to meet the Plan's needs.  (JX-219 at JX0219.0005; *see* Tr. IV (Clink) at 1106).  Aon credibly testified that it did not understand this contractual language to preclude it from implementing investment mandates in ways other than the use of its "own" funds in the Collective Trust, or to otherwise limit its fiduciary obligations to act prudently and loyally when deciding which approach to use.  (Tr. IV (Clink) at 1106-07).

146.     The 2015 IPS called for separate Capital Preservation, Inflation Strategy, Income, and Growth strategies as the Plan's objective-based investment options, (AX-63 at AX0063.0006-07) and instructed that these objective-based strategies would "utilize a broad range of asset classes and periodic rebalancing process to provide an appropriate mix of returns and risks consistent with each fund's risk profile." (*Id.*; Tr. IV (Clink) at 1098).[16]

147.     Aon chose to implement the Plan's Growth, Income and Inflation objective-based investment options through three of its Collective Trust funds, the Aon Growth Fund, the Aon Hewitt Income Fund, and the Aon Hewitt Inflation Strategy Fund.  (Tr. III (Ward) at 753; Tr. IV (Clink) at 1064; Tr. V (Clink) at 1160-62; JX-191; JX-228 at JX0228.0022).

---

[16] The Plan's revised IPS was drafted according to an Aon template for plans seeking an objective-based menu.  (Tr. IV (Clink) at 1097; *see* Tr. III (Ward) at 835 (explaining that Aon assists in drafting the IPS for clients adopting objective-based menus)).  Plan clients would start with the template and then modify it as necessary to meet the needs of their individual plans. (Tr. IV (Clink) at 1097-98; Tr. V (Clink) at 1177-78). Lowe's offered a company stock fund in the Plan, and therefore Lowe's customized the template IPS prepared by Aon to add language addressing the company stock fund.  (Tr. IV (Clink) at 1098; Tr. V (Clink) at 1178-79; *see* AX-63 at AX0063.0007).

48

148.    While the final decision to select these funds was not formally made until June 2015, when Aon's Delegated Portfolio Oversight Committee ("DPOC"), the group within Aon designated to consider and authorize delegated fiduciary investments, voted to approve the selections, the Court finds that Aon and Lowe's effectively assumed that Aon would likely use its own funds from the time that Aon was selected as the delegated fiduciary.

149.    Aon presumed – and told Lowe's – that it would likely select the Aon Growth Fund for the Plan, even before Aon learned that it had been selected as the Plan's delegated fiduciary. (*See* JX264 at JX0264.0001 (October 30, 2014 email from Punnoose to Brown, Pearlman, and Abshire stating that "The equity funds would be mapped to Growth Fund."); Tr. II at 397 (Green); *See also* JX266 (November 2014 Aon email expressing concern over Aon Growth Fund's performance in discussion about whether Lowe's will adopt Aon as delegated fiduciary); JX268 at JX0268.0028 (December 4, 2014 presentation from Aon to Committee members reflecting selection of "Aon Hewitt Growth" for the Plan)).

150.    And, after Aon was selected, this assumption was regularly repeated as Aon and Lowe's prepared for Aon to become the Plan's delegated fiduciary. (*See* JX277 at JX0277.0004-6 (January 2015 Aon presentation to Lowe's showing all equity funds mapped to "Aon Hewitt Growth" and listing "Aon Hewitt Growth" as one of the Plan's "New Funds"); PX346 at 5, 10 (February 2015 presentation to Lowe's showing the same); PX652 (April 2015 email and attachment reflecting Aon Growth Fund's selection for Plan lineup); JX230 at JX0230.0002 (May 2015 Aon presentation to Lowe's reflecting Aon Growth Fund's selection for Plan lineup)).

151.    Aon formally authorized and approved the choice to use the funds in Aon's Collective Trust for the Lowe's Plan during the DPOC's June 29, 2015 meeting. (JX-57; *see* Tr.

V (Clink) at 1228-29). At this meeting, the DPOC reviewed a memorandum prepared by Aon's internal Lowe's client team (primarily Punnoose and Abshire) that summarized the key terms of the new Lowe's Plan IPS (which was then in draft form)[17] and discussed potential options for implementing the objective-based investment mandates based on recommendations developed in consultation with Aon's internal research teams. (Tr. IV (Clink) at 1096-97; Tr. V (Clink) at 1228-29; JX-57; JX-279).

152.    The DPOC meeting minutes do not reflect whether the Committee had any discussion of the substance of the Lowe's Plan other than listing three follow-up items related to confirming that Aon did not have any fiduciary responsibility with respect to the Plan's option to purchase company stock (which Aon did not recommend based on its "lack of diversification and concentration of investment risk." (JX 57)). In particular, the minutes do not reflect any discussion of other potential investment options for the Lowe's Plan before the DPOC's "approval of the Lowe's investment in the AHCIT." (*Id*.).

153.    Although the DPOC minutes do not reflect any reasons for their decision, Aon's trial witnesses testified that based on the summary of the key terms of the draft IPS (which Aon had itself initially drafted for Lowe's), the DPOC concluded that the objective-based strategies offered through the Collective Trust were a good fit for the Lowe's Plan and approved the selection of the Growth Fund to fill the Plan's growth mandate. (Tr. III (Ward) at 801; Tr. IV

---

[17] The DPOC did not have a full copy of the draft IPS at the time of its June 2015 meeting, but it reviewed that document at its July 13, 2015 meeting in addressing some follow-up issues about the status of the Lowe's company stock fund, which the IPS directs must be a Plan investment option. (JX-55; *see* AX-63 at AX0063.0007). When accepting a new delegated mandate from a defined contribution plan, the DPOC would on occasion approve investment decisions subject to later review of the finalized IPS, as transition planning often needs to begin earlier in the process. (Tr. III (Ward) at 835).

(Clink) at 1092, 1096-97; Tr. V (Clink) at 1147; JX-279 at JX0279.0002-03; JX-57 at JX0057.0001).

154.    Plaintiff asserts, as one of the core reasons that he contends that the Court should find a breach of fiduciary duty in Aon's selection of the Aon Growth Fund, that Aon did not consider any option other than the use of its own Collective Trust funds prior to making its investment decision. While it is true that Aon never specifically considered any funds other than the Aon Growth Fund for the "Growth" equity option in the Lowe's Plan,  and in fact selected the Aon Growth Fund (or a custom version of the Aon Growth Fund) for every client that used Aon's "Emerging" plan structure, (Tr. III at 838:22–24 (Ward); Kelly Dep. (Doc. No. 235-02) at 69–70), the full story (which must be considered) is more nuanced. That is, Aon did compare the Aon Growth Fund (and the other funds in the Collective Trust) to other potential investment funds and strategies, including those that Plaintiff argues should have been considered when the DPOC approved the Lowe's investment, but that comparison occurred earlier when Aon first created the funds.

155.    Aon was aware that there were off-the-shelf "growth" strategies available on the market, but in developing the Growth Fund, it had examined those options and concluded that none was consistent with Aon's thinking with respect to asset allocation (offering asset classes not typically available in defined contribution plans) and the use of multiple complementary unaffiliated managers in each asset class.  (Tr. IV (Clink) at 1064-67; Tr. V (Clink) at 1142-43, 1152).

156.    Off-the-shelf "growth" strategies from other providers often use single-manager lineups for their underlying funds, rather than individually assessing and selecting the best managers for each asset class.  (Tr. IV (Clink) at 1065-67). For example, the underlying funds

used in the T. Rowe Price Spectrum Growth Fund, referenced by the Parties as a potential alternative option for the Lowe's Plan, were almost exclusively T. Rowe Price funds. (Tr. IV (Clink) at 1066). In addition, because the sub-managers in such strategies are affiliated with the "manager of managers," there is an inherent potential conflict of interest in how the manager of managers decides how to allocate assets among the underlying funds, and there is an incentive to favor higher-fee options to maximize fees. (Tr. IV (Clink) at 1066-67).

157.   To avoid the shortcomings of these off-the-shelf options, white label and custom funds are commonly used by large plans with sufficient scale to build a plan-specific, diversified portfolio at a reasonable fee, using multiple investment managers. (Tr. IV (Clink) at 1048-51). For instance, the Federal Thrift Savings Plan and several of Aon's private plan clients have utilized white label solutions for their participants. (Tr. IV (Clink) at 1050-51; *see also* Tr. III (Dyson) at 646 (testifying that his former employers assisted some of their retirement plan clients with custom funds in an advisory role)).

158.   By offering customized, multi-manager investment strategies, the Collective Trust sought to provide these same benefits to Aon's delegated clients, enabling Aon to select what it believed to be "best-in-class" managers in individual asset classes, to set the asset allocation according to its forward-looking capital market assumptions, and to make adjustments to the third-party sub-managers or asset allocation without the cost and disruption of fully removing and replacing an option in a plan's investment lineup. (*See* Tr. III (Ward) at 747-48; Tr. IV (Clink) at 1063, 1065-67, 1067, 1086-90, 1101). Further, under Aon's fee structure, any reduction in the fees paid to the underlying third-party investment managers within a Collective Trust strategy accrues to the benefit of the plans and their participants. (Tr. IV (Clink) at 1086; Tr. V (Clink) at 1174).

159.    Aon took advantage of the flexibility afforded by the Collective Trust's structure, adjusting the manager selections and asset allocation in the Growth Fund as updated manager research and capital market expectations revealed opportunities to improve the expected risk/return profile of the portfolio.  (Tr. IV (Clink) at 1086-90, 1095). For example, in late 2017, Aon removed the Keeley Teton SMID Cap Value strategy from the group of third-party managers used in the Growth Fund, in response to concerns from Aon's Global Investment Management Team about the manager's incentive structure, investment style drift, and concentrated portfolio construction.  (Tr. IV (Clink) at 1086-88; *see also* JX-78 at JX0078.0001; AX-535 at AX0535.0006-07; AX-174 at AX0174.0106-07; JX-125 at JX0125.0108).

160.    Similarly, in 2016, Aon adjusted the Growth Fund's asset allocation by reallocating its investment in real estate investment trusts (REITs) to a direct real estate investment strategy.  (Tr. IV (Clink) at 1088-90; JX-318).  Direct real estate investments had previously been an option only for defined benefit plans but had recently become available for use in defined contribution plan portfolios.  (Tr. IV (Clink) at 1088-90; JX-318).  Moving from REITs to direct real estate enabled Aon to offer a more diversified portfolio with a smoother expected pattern of returns.  (Tr. IV (Clink) at 1088-90; JX-318).

161.    In sum, the Court finds that Aon did not need to again compare the Aon Growth Fund to specific off-the-shelf offerings such as the T. Rowe Price Spectrum Moderate Growth Allocation Fund and Vanguard LifeStrategy Growth Fund to appreciate the claimed structural advantages provided by the Collective Trust, where the Collective Trust strategies aligned with a client's desired investment mandates. Also, although Aon was aware of other providers in the "manager of managers" business, such as Russell and SEI, that could have constructed a custom multi-manager growth vehicle for the Plan, Aon's use of its discretion to hire such a provider

53

would have added another layer of fees to the Plan's expenses. (Tr. IV (Clink) at 1066, 1068; Tr. V (Clink) at 1139, 1144, 1217).

162.   Moreover, such an action would have run counter to the Plan's decision to specifically hire Aon to fill the "manager of managers" role. (Tr. IV (Clink) at 1066, 1068; Tr. V (Clink) at 1139, 1144, 1217). To that end, Aon believed that if a plan wanted a provider other than Aon to fill the "manager of managers" role, the best approach would have been for that plan to simply hire Russell or SEI directly. (Tr. V (Clink) at 1217).

163.   In this context, the Court finds unpersuasive the opinions of plaintiff's experts Mr. Dyson and Ms. Wagner that Aon's process for selecting the Growth Fund was inconsistent with industry practice because Aon did not sufficiently consider alternatives, including specific "unaffiliated" options, for the Lowe's Plan. (*See* Tr. II (Wagner) at 450-51, 474-75, 480; Tr. III (Dyson) at 568-69).

164.   While such a process is commonly used by fiduciaries that are choosing between different investment managers or products, the assets in the Collective Trust were managed exclusively by third-party managers, and the evidence establishes that Aon used such a process to select those managers. (*See* Tr. IV (Clink) at 1071). Thus, the evidence does not establish that Aon was required to explicitly revisit the possibility of using single-manager growth products that it had already concluded would be inferior to a highly diversified strategy relying on multiple unaffiliated managers.

165.   The Court also finds that the evidence does not support plaintiff's suggestion that the DPOC did not adequately consider the investment-selection criteria set forth in the Lowe's Plan IPS (namely, manager tenure, and prior performance against benchmarks and peers) when

54

deciding how to implement the Plan's objective-based mandates.  (*See* AX-63 at AX00063.0008 (IPS listing criteria to be considered)).

166.   The DPOC was the entity ultimately responsible for approving the design—including manager selection and asset allocation—of the Growth Fund, drawing on recommendations developed by Aon's internal specialist teams.  (Tr. V (Clink) at 1171; *see* JX-232).  In light of its central role in overseeing the management of the Collective Trust, the DPOC was knowledgeable about the Growth Fund and its underlying third-party managers when it approved its addition to the Lowe's Plan. (Tr. V (Clink) at 1145-46). Nothing in the applicable Lowe's Plan IPS precluded the DPOC from implementing the Plan's growth mandate through the Growth Fund if it determined that was the best approach in the circumstances.  (*See* AX-63 at AX0063.0007-08 (describing "Investment Guidelines" and "Selection and Retention Criteria for Investment Managers or Funds," under which the IPS provides a list of factors that "will be considered" when making investment decisions)).

167.   While the DPOC understood that the Growth Fund had been launched in October 2013, it also knew that each of the Fund's underlying third-party managers had a long tenure and track record in its asset class.  (Tr. IV (Clink) at 1072-73; Tr. V (Clink) at 1146, 1155, 1163-64; AX-523 at AX0523.0008-12; *see also, e.g.*, JX-156 at JX0156.0033-37). Specifically, at the time the DPOC selected the Growth Fund for the Plan, each of the underlying third-party managers used to manage Growth Fund assets had achieved long-term performance ahead of its assigned benchmark, as reflected in reports reviewed by the DPOC.  (Tr. IV (Clink) at 1069-73, 1103-04; AX-523 at AX0523.0008-12; JX-232 at JX0232.0017-35; *see, e.g.*, JX-156 at JX0156.0033-37).

168.	Moreover, functionally similar custom target date funds and white label funds that are created for a specific plan do not have a track record as distinct investment vehicles before they are added to a plan.  (Tr. III (Dyson) at 646-47; *see also* Tr. III (Ward) at 746-47 (explaining that any custom fund designed for an individual plan would start off without a track record)).  Nonetheless, the Department of Labor has recommended that plan fiduciaries consider using custom target date funds, and one of Plaintiff's expert Dyson's former investment consulting employers provided similar advice to its plan clients.  (Tr. III (Dyson) at 644-45).

169.	Dyson further agreed that, in evaluating a plan-specific custom or white label fund, plan fiduciaries would instead want to focus on the track records of the underlying managers responsible for the fund portfolios, among other things.  (Tr. III (Dyson) at 647-48; *see also* Tr. V (Clink) at 1163-64 (explaining that, in its advisory work, Aon might recommend a fund with a short track record to a client if there were other means of evaluating the fund manager's aptitude)).

170.	Of course, the DPOC had also been closely tracking the Growth Fund's performance since its inception and understood how it compared against benchmark and peer funds.  (Tr. IV (Clink) at 1103-04; Tr. V (Clink) at 1145-46; *see, e.g.*, JX-156 at JX0156.0033; AX-351 at AX0351.0039-40).

171.	The Court finds that the use of the Aon Growth Plan reasonably complied with the Plan's IPS. The 2015 IPS called for a growth strategy designed "to achieve long-term capital appreciation."  (AX-63 at AX0063.0006-07). Clink, who helped author the template document on which the Plan's IPS was based, credibly testified that he understood the IPS's language— namely, the language calling for a "diversified," objective-based growth strategy "utiliz[ing] a broad range of asset classes and periodic rebalancing process to provide an appropriate mix of

returns and risks consistent with [the] fund's risk profile"—to require a portfolio encompassing more than just equities, and more than even a mix of equities and bonds. (Tr. IV (Clink) at 1098-1100; *see* AX-63 at AX0063.0006).

172.  Consistent with the language of the Plan's IPS, the Growth Fund has consistently relied on a broad range of asset classes, including asset classes beyond just equities and bonds. (Tr. IV (Clink) at 1088-89, 1098; AX-63 at AX0063.0006-07; *see also* JX-126 at JX0126.0014; JX-121 at JX0121.0010-11). For instance, the Growth Fund portfolio has at various times included asset classes such as REITs, private real estate, commodities, equity insurance risk premia, high-yield debt, and emerging-market debt. (Tr. IV (Clink) at 1088-89; Tr. V (Clink) at 1152, 1186; *see* Tr. V (Chalmers) at 1240; AX-393).

173.  Defined contribution plans rarely offer such asset classes as distinct investment options, due in part to the challenges of daily valuation and concerns that participants would not understand how to integrate them into a diversified portfolio. (Tr. IV (Clink) at 1088-90; *see* JX-226 at JX0226.0014 (explaining that additional asset classes can be used in the Emerging structure's objective-based strategies "without fear of participants over-allocating to them")). These asset classes, however, are often found in retirement portfolios managed by (or in close coordination with) investment professionals, such as defined benefit plans and target date funds. (Tr. IV (Clink) at 1088-89, 1089-90; Tr. V (Chalmers) at 1252-54; AX-430).

174.  Like other strategies available through the Collective Trust, the Growth Fund is a "fund of funds"—that is, it invests through a set of underlying funds with varied investment strategies. (*See* Tr. IV (Clink) at 1046-47, 1068 (describing Aon's role as "manager of managers")). Neither Aon nor any Aon affiliates serve as sub-managers in the Growth Fund.

57

Aon entities do not pick the stocks, bonds, or other assets in which the Growth Fund ultimately invests. (Tr. IV (Clink) at 1046-47, 1062, 1071-72, 1086).

175. In constructing the Growth Fund, Aon in many instances combined multiple managers within an asset class rather than hiring only one, which allowed it to build a portfolio with a balance of styles—such as growth and value—to produce a more stable performance pattern. (Tr. IV (Clink) at 1072; *see* JX-232 at JX0232.0007, JX0232.0013-14). Thus, in selecting managers for the Growth Fund, Aon sought a set of managers within each asset class that had relatively low correlations with one another. (Tr. IV (Clink) at 1070).

176. Aon sought to build a portfolio for the Growth Fund that would both keep up with the markets during upward swings and protect against portfolio losses by adding excess return, relative to the benchmark, when the markets turned down. Accordingly, Aon closely studied individual managers' "downside capture," or the percentage of a down market's pricing movements that a manager's portfolio experienced, when deciding which managers to include in the Growth Fund. (Tr. IV (Clink) at 1070-71; *see, e.g.*, JX-232 at JX0232.0031, JX0232.0035).

177. The managers that Aon evaluated for the Growth Fund (and ultimately selected for the portfolio) were generally all "buy"-rated by Aon's investment research teams. (Tr. IV (Clink) at 1071). Before selecting them for the Growth Fund, Aon had previously used many of the same underlying managers in the Group Trust that was established years earlier. (*Compare* AX-3-1 at AX0003-001.0002 *with* JX-232 at JX0232.0012-14).

178. As of 2015, all of the active managers used to manage the Growth Fund portfolio had long track records of managing portfolios in their asset classes, many of which were decades long. As noted already, these track records showed that the managers had delivered excess

58

returns, relative to their benchmarks, over the long term, including since the inception of their strategies and over the trailing five years. (Tr. IV (Clink) at 1072-73; AX-523 at AX0523.0010-12).

179.    Along with Aon's qualitative analysis of the people and processes used by these third-party managers, the managers' long and favorable track records in their asset classes helped assure Aon that the managers selected for the Growth Fund had successfully managed their respective portfolio strategies through full market cycles.  (Tr. IV (Clink) at 1073). Also, over the same period that the active managers selected for the Growth Fund were outperforming over the long run, the passive managers within the Growth Fund were delivering returns that closely tracked their benchmarks, less their fees, consistent with Aon's expectations.  (Tr. IV (Clink) at 1073-74; AX-523 at AX0523.0010-12).

180.    Aon presented expert testimony from finance professor John Chalmers analyzing the track records of the underlying third-party managers used in the Growth Fund.  (*See* Tr. V (Chalmers) at 1234-35; AX-398). Professor Chalmers is a Professor of Finance and Finance Department Head at the University of Oregon, where he has been on the faculty since 1996. (AX-382 at AX0382.0001; Tr. V (Chalmers) at 1230).  The Court finds that Professor Chalmers has comprehensive, relevant experience and expertise and is well-qualified to evaluate the characteristics of the Growth Fund and opine on the economic reasonableness of the multi-manager portfolio constructed by Aon.

181.    Consistent with Mr. Clink's testimony, Professor Chalmers's analysis showed that many of the actively managed strategies in the Growth Fund had inception dates for their assigned strategies more than a decade before the Growth Fund was added to the Lowe's Plan. (Tr. V (Chalmers) at 1234-35; AX-398 at AX0398.0001).  For example, the strategy inception

59

dates of the U.S. large-cap equity managers used in the Growth Fund—Dodge & Cox U.S. Equity, Fred Alger Capital Appreciation, and Parnassus Core Equity—are January 1965, January 1976, and August 1992, respectively. (AX-398 at AX0398.0001). Thus, each of those strategies was established more than twenty years before the Growth Fund was added to the Plan in October 2015, and two out of three had a track record of more than forty years at that point.

182. The Growth Fund's underlying managers also collectively had attracted well over one hundred billion dollars in strategy-specific assets under management, reflecting the confidence investors had in their capabilities based on their performance track records and indicating the managers' high quality. (Tr. V (Chalmers) at 1235; AX-398 at AX0398.0001).

183. Some of the diversifying, non-equity strategies used in the Growth Fund had somewhat shorter track records as of 2015. (*See* AX-398 at AX0398.0001). Nevertheless, at that time those managers and their strategies were relied upon by numerous other defined benefit and defined contribution plans for portfolio management. (*See* Tr. V (Chalmers) at 1274-75; AX-426). Plaintiff did not present any testimony, expert or otherwise, criticizing the quality or experience of the underlying third-party managers used to manage Growth Fund assets, or criticizing the process used by Aon to select or monitor those third-party managers. (*See* Tr. III (Dyson) at 649-50, 666).

184. Aon testified that in its investment consulting and delegated fiduciary work, Aon has always favored more diversified portfolios over more concentrated, and thus more risky portfolios. In setting the asset allocation for the Growth Fund in particular, Aon sought to build a fund that would produce returns similar to global equity over the long run, but with less volatility and more protection against losses in down markets. (Tr. IV (Clink) at 1075).

60

185.   Aon's asset allocation decisions were rooted in its forward-looking capital market assumptions for the long-run performance of individual asset classes.  (*See* Tr. IV (Clink) at 1076-77).   Aon then further increased the diversification of the Growth Fund portfolio by introducing additional, non-equity asset classes to the diversified equity exposure in the Fund. (Tr. IV (Clink) at 1078-79).   The addition of these other asset classes reduced the amount of volatility in the portfolio compared to a pure global equity strategy, without sacrificing much in terms of the expected rate of return over the long run.  (Tr. IV (Clink) at 1079; *see* JX-785 at JX0785.0002).

186.   In developing its objective-based funds, Aon also looked to the asset allocations employed by target date fund managers as a reference point.  (Tr. IV (Clink) at 1074-75, 1080-81).   While target date funds employ a range of asset allocation strategies, no target date fund managers allocate their portfolios 100 percent to equities, even for the most aggressive maturity in the series, and some of them incorporate additional diversifiers such as real estate and commodities.  (Tr. IV (Clink) at 1080-81).

187.   Professor Chalmers testified credibly that the Growth Fund was well diversified across multiple dimensions.  (*See* Tr. V (Chalmers) at 1238-51). The Growth Fund included investments across a wide range of asset classes including U.S. large-cap equity, U.S. small- and mid-cap equity, global equity, non-U.S. equity, and high yield and emerging market debt.  (Tr. V (Chalmers) at 1239-40; AX-393). The Growth Fund also provided exposure to at least three asset classes not previously available in the Lowe's Plan investment lineup (and not typically found as stand-alone investments in defined contribution plans):   private real estate, commodities, and equity insurance risk premia.  (Tr. V (Chalmers) at 1240, 1252; AX-393).

61

188.   Many of these asset classes are commonly found in defined benefit plans and target date funds, both of which are typically managed by (or in close consultation with) sophisticated investment professionals.   (Tr. V (Chalmers) at 1252-54; *see* AX-430).   The returns to private real estate and commodities investments historically have had a very low correlation with the returns to other asset classes in the Growth Fund portfolio.   (Tr. V (Chalmers) at 1241-42; AX-406).   Modern Portfolio Theory predicts that introduction of such asset classes into a portfolio will reduce portfolio risk while still generating the same expected level of return.   (Tr. V (Chalmers) at 1240-41).   A modest allocation to an asset class like commodities is a useful diversifier even though the asset class has relatively low return expectations because it helps reduce the level of risk in the portfolio.   (Tr. V (Chalmers) at 1242; *see* Tr. IV (Clink) at 1079 (explaining that commodities have a low correlation with the other asset classes in the Growth Fund portfolio)).

189.   Notably, asset allocation decisions based on forward-looking forecasts and models rather than the quality of particular investment managers often determine the relative success of a multi-asset / multi-manager fund such as the Aon Growth Fund. Professor Chalmers credibly testified, and the Court finds, that the fact that the other funds (such as the compared Vanguard and T. Rowe Price funds) outperformed the Growth Fund, in hindsight, does not indicate whether or not Aon's asset allocation decisions for the Growth Fund were reasonable at the time Aon made them.   (Tr. V (Chalmers) at 1276).

190.   To evaluate the effect of asset allocation (and eliminate the impact of hindsight bias in the assessment), Professor Chalmers compared the expected performance of the Growth Fund's asset allocation against the expected performance of the T. Rowe Price and Vanguard

fund portfolios based on forward-looking capital market assumptions from 2016. (*See* Tr. V (Chalmers) at 1276-80).

191.    Specifically, Professor Chalmers used data from a 2016 survey of capital market assumptions conducted by Horizon Actuarial Services, LLC, which reflected responses from 35 investment advisors regarding their forward-looking expectations for the performance of different asset classes over the next ten years.  (Tr. V (Chalmers) at 1277; AX-423; *see* AX-734 at AX0734.0003 (2016 Horizon survey reporting list of participants)).  Professor Chalmers weighted the average expected 10-year return for each asset class, as reported in the Horizon survey, according to the actual allocation of the Growth Fund and T. Rowe Price and Vanguard funds in 2016 to determine how the three portfolios would have been expected to perform looking forward from that point in time.  (Tr. V (Chalmers) at 1277-78; AX-423; *see also* AX-425 (showing assumptions underlying this analysis)).  He found that the Growth Fund had an expected average annual return of 6.49 percent, compared to expected average annual returns of 6.34 and 6.17 percent for the T. Rowe Price and Vanguard funds, respectively, (Tr. V (Chalmers) at 1277-78; AX-423), which he found to be "all very comparable."  (Tr. V (Chalmers) at 1278).

192.    Professor Chalmers performed the same exercise using Aon's own capital market assumptions from 2016—rather than the Horizon survey averages—and again found that the expected average annual returns for the three funds were very close, with the Growth Fund's expected return somewhat higher than those for the two other funds.  (Tr. V (Chalmers) at 1279-80; AX-422).

193.    Accordingly, in Professor Chalmers opinion, which the Court accepts, the actual returns of the Growth Fund in the class period trailed those of the Vanguard LifeStrategy Growth Fund and T. Rowe Price Spectrum Moderate Growth Allocation Fund because certain asset

classes included in the funds did not perform as expected based on forward-looking projections in 2016. (Tr. V (Chalmers) at 1280-82; *see* AX-421 (comparing Horizon survey results to realized returns)). Specifically, the T. Rowe Price and Vanguard funds had larger allocations to U.S. large-cap equity than the Growth Fund did. (Tr. V (Chalmers) at 1280-81). Actual returns for U.S. large cap equity in the 2016-2020 period were substantially higher than any investment industry participants predicted they would be, based on the Horizon survey, delivering returns nearly five percent per year higher than the highest projection from any of the 35 Horizon survey respondents. (Tr. V (Chalmers) at 1281; AX-421).

194. The T. Rowe Price and Vanguard funds also had higher allocations to corporate bonds, for which realized returns also turned out to be substantially higher than any of the Horizon survey respondents predicted in 2016. (Tr. V (Chalmers) at 1275, 1280-81; AX-421). At the same time, the Growth Fund had a larger allocation to commodities than the T. Rowe Price and Vanguard funds, and although investment industry participants all predicted positive returns for commodities during the 2016-2020 period, the actual returns to commodities investments during this period were negative. (Tr. V (Chalmers) at 1275-76, 1281; AX-421).

195. So, while the differences between the actual performance of these asset classes and consensus expectations for these asset classes explain why the T. Rowe Price and Vanguard funds delivered higher returns than the Growth Fund over the relevant period, they do not nullify the reasonableness of Aon's choice of asset allocation for the Growth Fund before the fact. (Tr. V (Chalmers) at 1280-82).

196. Neither plaintiff nor his experts identified any basis, before the fact, for questioning the reasonableness of the Growth Fund's asset allocation or the capital market assumptions on which Aon's asset allocation decisions were based. (*See* Tr. III (Dyson) at 654

(testifying that he did not look at, and has no criticism of, the processes Aon used to construct or revise the asset allocation for the Growth Fund)). Indeed, Aon's capital market assumptions over the last ten years have generally been very similar to those of other industry experts. (Tr. IV (Clink) at 1031-32; *see* JX-305 (analyzing Aon's 2016 capital market assumptions compared to averages reported in the 2016 Horizon survey)).

197. Beyond investment returns, the fees charged by investment funds were important to Plan participants. (*See* Tr. II (Green) at 340). The Court finds that the fees charged by the Aon Growth Fund were reasonable and, indeed, beneficial to the Plan.

198. The investment management fees paid by investors in the Growth Fund are solely a function of the fees charged by the underlying third-party sub-managers, who are unaffiliated with Aon. (*See* Tr. III (Ward) at 751). Aon does not collect any fee for its work as manager of managers for the Collective Trust funds in addition to its delegated fiduciary fee – and that fee is the same regardless of who Aon chooses to implement a client's investment mandates. (*See* Tr. III (Ward) at 751; *see also* Tr. V (Clink) at 1227-28 (delegated fee applies regardless of vehicle chosen)).

199. During the class period, the Growth Fund's expense ratio has been approximately 40 basis points. (Tr. IV (Clink) at 1084, 1195; Tr. V (Chalmers) at 1261, 1282; see AX-413 (compiling reported expense ratios between 37 basis points and 40 basis points in 2015-2018 period)).

200. As of 2015, when the Growth Fund was added to the Plan, the Growth Fund's fees were lower than the fees charged by all but one of the equity mutual funds that had previously been offered in the Plan—an index fund. (Tr. V (Chalmers) at 1282; AX-413; *see also* Tr. III (Reetz) at 425 (agreeing that the Growth Fund's expense ratio was lower than the expense ratios

of the two mid-cap funds in which he invested with the prior Plan menu)). At the same point, the Growth Fund's fees were also lower than the weighted average of the fees for the eight equity mutual funds that the Growth Fund replaced. (Tr. V (Chalmers) at 1282-83; AX-413).

201. As a result of these fee differentials, the Plan saved roughly eight to ten basis points per year in investment management fees by moving to the Growth Fund, or approximately $800,000 to $1 million per year. (Tr. V (Chalmers) at 1283).

202. Finally, with respect to the small trustee fee charged by an Aon affiliate, DPOC member Matthew Clink testified credibly that the fee did not affect Aon's fiduciary decisions about whether to use the Collective Trust funds to implement delegated client investment mandates. (Tr. IV (Clink) at 1108-09; *see also* Kelly Dep. (Doc. No. 235-2) at 188-89).

203. To be clear, the Court acknowledges that at the time it was selected for the Plan, the Aon Growth Fund itself had very little performance history, and the history that it had was poor relative to its benchmarks and peers. At the time Aon added the Aon Growth Fund to the Plan (October 2015), the fund (i) had only two years of performance history, (ii) was in the bottom 10% of its peers over all periods, (iii) was included in only two other retirement plans in the country, and (iv) was not included in any similarly-sized retirement plans. (JX158 at JX0158.0032, JX0158.0118; JX159 at JX0159.0028). Also, the fund had relatively few assets under management, (PX389 at 1[18]), and was not performing well even in comparison to its custom benchmark. (JX266).

---

[18] At year-end 2015, the Plan's $1 billion investment in the Aon Growth Fund represented nearly three-quarters of the fund's total assets. (*See* JX100, Schedule D). The total amount invested by all other investors in the Aon Growth Fund at year-end 2015 was only about $350 million. (*See id.*).

204. However, considering the totality of the circumstances and weighing the evidence, the Court finds that Aon's forward-looking process for developing the Aon Growth Fund and selecting it for the Lowe's Plan was reasonable for a longer term investment and in line with industry standards, properly understood and not affected by an analysis dependent on a hindsight comparison of historical fund results or a small sample of results during a period in which the Aon Growth Fund (with relatively fewer domestic equity investments) would be expected to lag its peers.

**J.   Aon's Retention of the Aon Growth Fund in the Plan**

205. After selecting the Aon Growth Fund for the Lowe's Plan in 2015, Aon, through the DPOC, continued to review the fund as it related to the Plan in the same way that it did in connection with the selection of the fund. As it did before the Growth Fund was added to the Lowe's Plan, the DPOC reviewed extensive quantitative and qualitative information about the Growth Fund's performance, underlying managers, and asset allocation, (Tr. IV (Clink) at 1095, 1111-12; Tr. V (Clink) at 1218-19; Tr. III (Ward) at 837; *see, e.g.*, JX-153; JX-154), but Aon never specifically considered any alternative to retaining the fund in the Plan. Indeed, there is no evidence that the DPOC discussed the Lowe's Plan at all after its selection. (Tr. II at 259, 287, 298 (Punnoose); Tr. IV at 975-76 (Abshire)).

206. The Growth Fund's objective is "to obtain exposure to equity-like returns … with reduced volatility," using "a base exposure to globally-weighted equities but diversified to other return-seeking asset classes." (JX-291 at JX0291.0005; *see* Tr. IV (Clink) at 1075, 1185).

207. From a forward-looking perspective as of 2016, Aon expected the annual returns for the Growth Fund portfolio to be around 6.85 percent on average over the next ten years, compared to 7.10 percent per year for a pure global equity portfolio, but with lower risk (JX-

67

291 at JX0291.0006; *see* Tr. IV (Clink) at 1081-83). Significantly, this expectation of "a little bit less" "upside" and "downside" was shared by Lowe's. (*See* Tr. II (Green) at 363). [19]

208. Aon also expected that the performance of the Growth Fund relative to a global equity portfolio would vary somewhat depending on the specific market conditions. (*See* Tr. IV (Clink) at 1082-83; JX-291 at JX0291.0006. In strong markets for global equities, the Growth Fund's performance was expected to trail 100-percent global-equity portfolios, but the Growth Fund was expected to outperform such pure-equity portfolios in down markets. (Tr. IV (Clink) at 1083; *see* JX-291 at JX0291.0006).

209. In high-growth equity markets, Aon expected the more diversified asset allocation of the Growth Fund to trail the returns of a pure global equity portfolio by about 1 to 2 percent per year, without accounting for any fees (including the approximately 40 basis points per year in fees expected to be paid by investors in the Growth Fund to third-party managers). (Tr. IV (Clink) at 1083-84; *see* JX-291 at JX0291.0006). This expected performance difference derived entirely from the difference in asset allocations, and Aon did not assume any outperformance by the Growth Fund's active managers in this comparison. (Tr. IV (Clink) at 1083-84; *see* JX-291 at JX0291.0006, JX0291.0009).

210. In the recent high-growth equity markets, the Growth Fund's trailing five-year annual return as of March 31, 2021 was 11.84 percent gross of fees paid to third-party managers (and 11.44 percent net of such manager fees). (Tr. IV (Clink) at 1113-14; AX-786; *see* AX-291 at AX0291.0006; *see also* Tr. V (Chalmers) at 1260; AX-433). Over the same period, global equity returns, as measured by the MSCI ACWI NR USD index, have been 13.21 percent per

---

[19] However, there was no evidence presented at trial with respect to what range of "upside" or "downside" Lowe's was led to expect.

68

year. (*See* Tr. IV (Clink) at 1113-14; AX-786). The Growth Fund portfolio has thus trailed the performance of a pure global equity portfolio by at least 1 to 2 percent per year in a high-growth period for equity securities. (Tr. IV (Clink) at 1112).

211. At the same time, and also in line with Aon's expectations in 2016, the Growth Fund's overall risk has been lower than the risk of a pure global equity portfolio. In particular, realized annualized volatility for the Growth Fund has been 12.63 percent, versus 14.48 percent for a pure global equity portfolio, as represented by the MSCI ACWI NR USD index. (AX-786; *see* Tr. IV (Clink) at 1113-14).

212. So, Aon asserts that it has achieved the level of performance it expected in such market conditions and testified that its perspective on the benefits of the Growth Fund's more diversified strategy over the long run has not changed. (Tr. IV (Clink) at 1112-14; *see* JX-291 at JX0291.0006; AX-786). Of course, to Plaintiff, this shortfall simply reflects the calculation of the losses suffered by Plan participants, notwithstanding Aon's claimed lowered "expectations."

213. The Parties similarly disagree on their view of the Growth Fund's standing among its "peer" funds, with Plaintiff's expert testifying that as of the fourth quarter of 2015, the Growth Fund was ranked near the bottom of its peer group based on since-inception returns, with the Growth Fund trailing the median performance of the peer group by three percentage points, (Tr. III (Dyson) at 574-76 (discussing JX-206 at JX0206.0053)), and Aon countering that it can be difficult to identify an appropriate peer group for multi-asset strategies like the Growth Fund and such rankings are dynamic over time. (Tr. V (Clink) at 1218-20; JX-150 at JX0150.0070) (noting that as of September 30, 2019, the Growth Fund's annual returns were near the peer group median on a since-inception basis (6.3 percent to 6.8 percent), and the

Growth Fund was ranked in the top quartile over the trailing three-year period, outperforming the peer group median 8.6 percent to 7.8 percent per year)).

214.    The Court does not find these ongoing "peer group" comparisons to be particularly material in the final analysis.[20] Rather, the bottom line regarding the performance of the Growth Fund appears to be that its performance admittedly lagged the returns of comparable growth funds and benchmarks,[21] but that underperformance was the result of the relative mix of equity and non-equity assets (rather than incompetent investment managers) as discussed above. In "up" markets, the Growth Fund was expected to and did do less well, but in "down" markets it was expected to do better. The difficult circumstance pervading this action is that over the class period there has not been a "down" market of any significant duration to really test the Growth Fund over a "full" market cycle.

215.    The continuing underperformance of the Growth Fund in the strong equity markets of 2015 to present has been challenging for Aon – in particular, its sales department. For example, in February 2016, an Aon Senior Partner wrote, "In looking at our results for our Collective Investment Trusts, my gut reaction is that we need to start thinking about formulating a Plan B on how to grow our DC Delegated business, as many of our funds are below benchmark and rank in the bottom-quartile of a peer universe. My experience tells me that plan sponsors do

---

[20] The Court notes, however, that under Morningstar's well-known star-rating system (which evaluates investment products by comparing their risk-adjusted returns against a group of peer funds) the Growth Fund currently has a five-star rating from Morningstar, placing it in the top 10 percent of its peer group based on returns per unit of risk, or risk-adjusted performance. (Tr. III (Ward) at 773; *see also* Tr. V (Chalmers) at 1319 (noting five-star Morningstar rating as of May 31, 2020 reflected in JX-189 at JX0189.0018). The Growth Fund has generally maintained that five-star rating over time and has never received a rating lower than four stars from Morningstar during its rating history. (Tr. III (Dyson) at 659; *see, e.g.*, JX-184 at JX0184.0019, JX0184.0026; JX-188 at JX0188.0018, JX1088.0024).

[21] *See* Tr. III at 587-89 (Dyson).

not hire below benchmark and below median funds. If you are hearing something different form the market, I'd be interested in hearing what they are saying." (JX283). Similarly, in October 2016, an Aon investment manager wrote that Aon was getting "questions" about the Aon Growth Fund, "especially given its difficult peer-relative performance over the last three years." (PX448 at 1). In December 2016, an Aon review of proprietary fund performance noted, "DC Growth Fund and TDF suffered again from non-US equity exposure, creating large competitive drag." (PX67 at 3).

216.    In January 2018, Aon observed that its objective-based funds "improved over prior year but [were] not compelling longer-term," and that Aon's funds "need to be revamped/restructured" "expeditiously." (PX490 at 13, 34–35). The same month, Aon's Chief Investment Officer noted that "[w]e're trying to overhaul the AHCIT but…the real problem, as we've discussed during the year, is that our asset allocation is too conservative with diversifiers underperforming equity." (JX295 at JX0295.0001).

217.    However, contrary to Plaintiff's arguments, the Court does not find these understandable sales frustrations to be significant evidence on the question of whether Aon breached its fiduciary duty in retaining the Aon Growth Fund in the Plan. Most simply put, the short term focus of the sales department, which was tasked with the difficult job of selling customers on a long term investing vision saddled with poor initial fund performance during "unfavorable" (for the fund) market conditions, is fundamentally different than Aon's proper fiduciary focus to provide for the enduring investment success of Plan participants through full market cycles. Therefore, the Court finds that some Aon employees' criticism of their own funds reflect commercial sale realities rather than evidence of fiduciary incompetence.

71

218.    Moreover, in the third quarter of 2020, Aon made the decision to close the Collective Trust, including the Aon Growth Fund to new defined contribution plan clients. Aon claims that this "suspension" of using the Collective Trust was taken because the cost of defending litigation related to the Collective Trust was exceeding the fees Aon earns on its delegated fiduciary relationships, (Tr. III (Ward) at 766-69), rather than as a result of the fund's poor performance or lack of belief in its long term strategy.

219.    While the Court finds that the questionable performance of the fund was unlikely to be irrelevant to Aon's decision to close the funds to new defined contribution plan clients, the Court accepts that the combination of ongoing litigation and Aon's fiduciary duty to use its best judgment on behalf of its clients puts it in a challenging position. If Aon's best judgment would otherwise lead it to use the Aon Growth Fund for a client, then it risks committing a breach of fiduciary duty both if it uses the fund and if it doesn't.

220.    Accordingly, during the period of the "suspension," Aon has required new client plans, in their engagement agreements, to instruct it not to use the Collective Trust in providing delegated services so that Aon does not face a discretionary choice whether to implement its best investment thinking through the Collective Trust.  (Tr. III (Ward) at 767-68). As a result, if a new defined contribution plan client were to hire Aon to implement an objective-based growth strategy today, Aon would construct a plan-specific custom fund if the plan had sufficient assets to do so, aiming to track the composition of the Growth Fund as closely as possible.  (Tr. III (Ward) at 839-40; *see* Tr. III (Ward) at 770-71).  If a plan lacked sufficient assets in the mandate to support a custom fund, Aon would implement the strategy using an off-the-shelf option that most closely matched its investment criteria.  (Tr. III (Ward) at 839-40; *see* Tr. III (Ward) at 770-71). However, Aon continues to use the Collective Trust strategies for new engagements by

72

defined benefit plans, a context in which participant-filed litigation is uncommon. (Tr. III (Ward) at 768).

221.    Taking into account the full context of Aon's decision, the Court does not find that Aon's suspension of the Collective Trust offering to new defined contribution plan clients signals that Aon has lost confidence in its strategy for long-term retirement savings. (Tr. III (Ward) at 76-69). Therefore, the Court does not view Aon's recent decision to partially close the fund to be significant evidence in support of Plaintiff's position.

222.    In evaluating Aon's retention of the Growth Fund, it is, however, important – especially in the context of the ongoing issues with the fund's performance, etc. as discussed above – for the Court to consider the views of Gallagher, the independent fiduciary investment consultant that Lowe's engaged to advise the Committee after Aon was engaged as a delegated fiduciary.

223.    As noted above, after Lowe's selected Aon as its delegated provider for the objective-based funds, Aon did not serve as the investment advisor for those funds. (Tr. IV (Abshire) at 937). Aon remained the investment advisor only for the stable value and target date funds, for which Aon did not act as delegated fiduciary. (Tr. II (Punnoose) at 300-01; Tr. IV (Abshire) at 937). However, Aon's consultants continued to report to the Committee about the performance of the objective-based funds. (Tr. I (Punnoose) at 230, 265 ("[T]hey did require us to present performance on the objective-based funds"); Tr. IV (Abshire) at 939 (testifying that Aon continued to provide "[i]nformation on the asset allocation, the returns, risk metrics, details of the strategies")).

224.    Not long after Aon took over its delegated fiduciary duties, the Committee took notice of the potential conflict posed by Aon's dual positions as the Plan's investment consulting

73

fiduciary and investment manager. (*See* PX415 (Green told Aon that "the committee was concerned with the potential conflict of interest.")). At the February 2016 Committee meeting, the new Committee Chair, Matt Eurey, raised a question about how Lowe's would oversee Aon in its role as delegated fiduciary. (Tr. IV (Abshire) at 949; JX-210 at JX0219.0004-05).

225.    With the assistance of PricewaterhouseCoopers, the Committee conducted an RFP in April 2016 and received responses from several leading investment consulting firms, including NEPC Investment Consulting, Willis Towers Watson, and Gallagher. (*See* JX 243; JX-244; JX-245; JX-287). Aon did not play any role in that RFP process. (Tr. IV (Abshire) at 948). However, the RFP informed candidates that "[t]he Committee prefers not to change the current investment structure" and had the goal of "ultimately maintaining" Aon's funds in the Plan. (JX243 at JX0243.0004; JX285).

226.    The Committee ultimately chose Gallagher as the Plan's new investment consultant. Gallagher has over 40 years of experience providing investment advisory services and provides investment consulting and fiduciary decision-making to over fifty defined contribution plans with assets ranging in excess of $1 billion. (AX-204 at AX0204.0006). In responding to the RFP, Gallagher understood that Lowe's "expressed a preference to keep [Aon's funds] in place," and after Gallagher was selected, Gallagher was again told that "there will not be initial changes to the investment lineup." (JX286 at JX0286.0001; PX538 at 1). Gallagher assumed its role in October 2016.

227.    Gallagher's contractual responsibilities as the Plan's investment consultant included providing recommendations about the investment lineup; overseeing the selection, retention, and dismissal of investment managers; and conducting due diligence and summary reporting on investments and capital markets. (JX-316 at JX0316.0002). After Gallagher came

74

on board in October 2016, Aon no longer served as investment consultant for any portion of the Lowe's Plan. (Tr. I (Punnoose) at 230-32).

228.     In its first meeting in November 2016, Gallagher presented the Third Quarter 2016 Quarterly Investment Review, which included the actual historical performance of the objective-based funds. (JX-14 at JX0014.0001). Gallagher told the Committee that "[o]verall, [the] performance of [the] funds was in line with industry benchmarks." (JX-14 at JX0014.0001; see also JX-209 at JX0209.00009-10). However, in subsequent meetings, Gallagher told the Committee that Aon's funds "have a short history" and "a comprehensive assessment cannot be made until the five year mark." (JX-15 at JX0015.0001; JX-16 at JX0016.0001). Green affirmed that Gallagher felt that the Aon Growth Fund "was relatively new" and couldn't be properly evaluated yet. (Tr. II at 398:8–20 (Green)).

229.     Following the November 2016 meeting, Gallagher continued to attend each of the Lowe's Committee's meetings, (See JX-15; JX-16; JX-17; JX-18; JX-19; JX-20; JX-21; JX-22; see also JX-23; JX-24; JX-25) and prepared materials which included detailed reporting on the performance of the Collective Trust funds offered in the Plan. (See, e.g., JX-184; JX-322).

230.     Since assuming its role as the Plan's investment consultant, Gallagher has never suggested to the Committee that the Growth Fund is an inappropriate investment option or that Aon should be removed as delegated fiduciary. (Tr. II (Green) at 390; see Tr. III (Dyson) at 663).

231.     Committee minutes from 2017-2019 reflect Gallagher's observations that the "Objective Based Fund is currently performing as [it is] expected to and it is a good opportunity for Participants to access core real estate and diversify their assets," (JX-18 at JX0018.0001), "[o]verall, the funds are performing well based on expectations as long term retirement

75

investments." (JX-20 at JX0020.0001), "Objective Based Funds continue to do well over time compared to the custom benchmarks," (JX-21 at JX0021.0001), "[t]he Objective Based Funds are generally in line with its industry benchmarks over the longer term," (JX-22 at JX0022.0001), "[t]he Funds continue to perform well and as expected. Specific to the Growth Fund, … that fund outperformed during a recent market downturn," (JX-23 at JX0023.0001), it "was pleased with the performance of the Growth Fund," (JX-24 at JX0024.0001) and "the Growth and Income Funds are performing as expected and are ranking well compared to their industry peers and those funds' "diversification and lower risk [are] beneficial to participants." (JX-25 at JX0025.0001).

232.    Plaintiff has challenged whether Gallagher gave the Committee its unvarnished view of Aon and the Growth Fund based on the Committee's expressed preference (at least initially) to keep the same delegated fiduciary and investment funds that had just been put in place to preserve continuity and not confuse participants and a document in which a Gallagher employee suggests a need to "tread lightly" on Aon's Growth Fund. (PX 172 at 1).

233.    Plaintiff's expert Mr. Dyson, who worked for six years at an affiliated Gallagher company, agreed that Gallagher has substantial experience in the retirement industry and is a reputable, leading investment consulting firm. (Tr. III (Dyson) at 660). He also testified that in the six years he was at Gallagher, he never once observed any Gallagher employee provide advice they did not think was in a client's best interest or saw Gallagher getting strong-armed by a client to provide advice with which it did not actually agree. (Tr. III (Dyson) at 661).

234.    Thus, in the absence of any testimony from a Gallagher witness to explain or dispute the statements attributed to it in the Committee minutes and the lack of evidence of any Gallagher action to seek removal of Aon or the Aon Growth Fund, the Court finds no basis to

conclude that Gallagher's reporting and fiduciary advice to the Committee regarding the Growth Fund did not reflect its honestly held views and will thus take those comments at face value.[22]

235.    Finally, with respect to Aon's retention of the Aon Growth Fund, the DPOC periodically approved asset allocation changes and changes to the third-party teams of managers used in the Growth Fund throughout the relevant period.  More specifically, Aon focused in particular on whether adjustments to the asset allocation of the Growth Fund would be appropriate in light of the long-term, high-growth market environment.  (Tr. III (Ward) at 752).

236.    In September 2018, the DPOC approved a change to the Parametric equity insurance risk premium strategy used in the Growth Fund, providing the Portfolio Management Team additional flexibility to increase the underlying exposure to the S&P 500 index from a beta of 0.5 (in essence, limiting exposure to equity returns to 50 percent) to a full 1.0.  (Tr. III (Ward) at 752-55; JX-89; AX-135 at AX0135.0003).  This effectively resulted in a slight increase in the Growth Fund's equity exposure.  (*See* Tr. III (Ward) at 753-55).

237.    Although materials before the DPOC at the time of this decision noted that a lower equity beta "allows for runway during down-markets," the materials also observed that it "creates a risk of chronic underperformance during prolonged equity bull markets."  (AX-135 at AX0135.0012; *see* Tr. III (Ward) at 753-55).  By "[a]llowing for beta modification," the DPOC was told, the change created an "opportunity for changing the profile to decrease peer risk during strong equity markets."  (AX-135 at AX0135.0012).

238.    In addition, more recently, in the fall of 2020, Aon implemented changes to the specific non-equity asset classes used to diversify the Growth Fund portfolio, removing

---

[22] Overall, however, Aon's failure to call any Gallagher witness or present any direct Gallagher testimony through a deposition (despite Aon's argument that the Court should find Gallagher's views particularly relevant) does reduce the weight the Court gives to Gallagher's views.

commodities from the Growth Fund portfolio and adding high-yield fixed income and emerging-markets debt to the mix. (Tr. IV (Clink) at 1117-18; JX-134 at JX0134.0044).

239.    Aon has also moved away from the Parametric equity insurance risk premium strategy as a separate investment in the Growth Fund, given changes in the relative returns available to investors in that strategy. (Tr. IV (Clink) at 1117). Aon replaced that investment with an enhanced index strategy that relies on incremental income from fixed-income investments. (Tr. IV (Clink) at 1117; Tr. V (Clink) at 1187).

240.    Further, Aon has broadened the mandates within the equity component of the Growth Fund, shifting away from active managers in more specialized classes of domestic securities, many of whom were struggling against their benchmarks, and toward managers of broader global portfolios, who were less constrained by the narrowness of the market within certain segments and had more opportunities to outperform. (Tr. IV (Clink) at 1117; *see* JX-134 at JX0134.0044).

241.    Following these changes, the Growth Fund performed very well through the first several months of 2021, beating its custom benchmark by roughly 2 percent through May. (Tr. IV (Clink) at 1118; *see* Tr. V (Clink) at 1208). The improved performance of the Growth Fund's active managers also brought its since-inception annual performance within 25 basis points of the custom benchmark, net of fees paid to the Fund's third-party sub-managers. (Tr. IV (Clink) at 1118).

242.    Aon also recently implemented a modest increase to the Growth Fund's overall exposure to equities, from about 80 percent to 85 percent, based on its evolving expectations about how various asset classes are expected to perform in the future. (Tr. IV (Clink) at 1118; AX-787). This change was designed to bring the expected return for the Growth Fund closer to

78

that of global equities while delivering similar risk-adjusted returns relative to the prior Growth Fund portfolio. (Tr. IV (Clink) at 1118; Tr. V (Clink) at 1208). In making this change to the Growth Fund's asset allocation, Aon analyzed whether it was expected to improve the efficiency of the portfolio in terms of risk-adjusted returns, as it did in making all such adjustments to the Fund. (Tr. IV (Clink) at 1090, 1119).

243. In sum, the Court finds that the changes that Aon made to the Growth Fund's underlying third-party managers and asset allocations were reasonably designed to address concerns with the Growth Fund's underperformance against more equity concentrated strategies in the extended high-growth equity markets.

### K. Plaintiff's Alleged Damages

244. Plaintiff's damages expert, Dr. Brian Becker, testified that the Plan has sustained investment losses as a result of Aon's changes to the Plan's investment structure and its selection and retention of the Aon Growth Fund for the Plan. While the Court finds Dr. Becker to be well-qualified and his testimony to be credible (Aon does not challenge its mathematical accuracy), Dr. Becker's testimony was limited in the sense that he simply performed analyses suggested by Plaintiff's counsel. (Tr. III at 689 (Becker)). Also, the testimony and underlying information was in part incomplete as discussed below. Aon did not offer a damages expert.

245. Dr. Becker developed four so-called "loss models" to determine whether Aon's misconduct generated a loss to the Plan. In Dr. Becker's first model, he compared the performance of the Aon Growth Fund to the performance of the funds in the Plan that the Aon Growth Fund replaced. (*Id.* at 678; PX747 at 5). Under this model, Dr. Becker calculated losses of $189.5 million with a present value of $222.5 million. (Tr. III at 684 (Becker)).

246.    In Dr. Becker's second model, he compared the performance of the Aon Growth Fund to the performance of the funds that Aon selected for a similarly situated plan (the Vitalant 401(k) Retirement Savings Plan). (Tr. III at 679 (Becker)). The Vitalant 401(k) Retirement Savings Plan hired Aon as the plan's delegated fiduciary, previously offered eight equity funds and then replaced the Vitalant 401(k) plan's eight equity funds with two index funds: the Vanguard Total Stock Market Index Fund and the Vanguard International Stock Index Fund. (*See JX300 at JX0300.0023*).  Under Model 2, comparing the returns of the Aon Growth Fund to the Vanguard funds that Aon selected for the Vitalant 401(k) plan, Dr. Becker calculated losses of $232.8 million with a present value of $277.1 million. (Tr. III at 684-85 (Becker)).

247.    In Dr. Becker's third model, he compared the Aon Growth Fund to index funds that tracked the Aon Growth Fund's market benchmark. (Tr. III at 679 (Becker)). The Plan's fiduciaries used three slightly different versions of the MSCI ACWI Index (a commonly used global equity market index) to benchmark the Aon Growth Fund's performance against the market during the class period. The "Benchmark Index Funds Portfolio" used by Dr. Becker in this analysis provides the investment returns from an equally-weighted composite of these three MSCI index fund comparators. This model aims to reflect the near equity-like returns that the Committee and Plan participants were told was the goal of the Aon Growth Fund. Under Model 3, comparing the returns of the Aon Growth Fund to the composite of the three index fund benchmarks, Dr. Becker calculated losses of $121.2 million with a present value of $138.1 million.

248.    In Dr. Becker's fourth model, he compared the Aon Growth Fund to two marketplace alternatives identified by one of Aon's non-testifying experts: the Vanguard LifeStrategy Growth Fund and T. Rowe Price Spectrum Moderate Growth Allocation Fund. (Tr.

80

III at 680 (Becker)). According to Aon's expert, these are "objective funds with a 'growth' investment strategy" that "provide access to a wide range of growth-oriented assets in a professionally managed diversified structure."[23] Under Model 4, Dr. Becker calculated losses of $58.9 million with a present value of $70.9 million if the Vanguard LifeStrategy Growth Fund had been selected, or $107.7 million with a present value of $129.5 million if the T. Rowe Price Spectrum Moderate Growth Allocation Fund had been selected. (Tr. III at 685 (Becker)). However, with respect to this model, Dr. Becker has only provided the Court with a summary final number with no information about the details of the investment performance of the allegedly comparable funds.

## II.      CONCLUSIONS OF LAW

### A.      Jurisdiction and Venue

249.      This Court has jurisdiction over this action under ERISA § 502(e) and (f), 29 U.S.C. § 1132(e), (f).

250.      Venue is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

### B.      Aon's Fiduciary Status

251.      ERISA is a "remedial statute[]" and "should be liberally construed in favor of protecting the participants in employee benefits plans." *Teamsters Joint Council No. 83 v. Centra, Inc*., 947 F.2d 115, 123 (4th Cir. 1991); *see also Boggs v. Boggs*, 520 U.S. 833, 845 (1997) ("The principal object of the statute is to protect plan participants and beneficiaries.").

---

[23] *See* Doc. No. 152-01 (Expert Report of Terry Dennison), ¶ 61. Although Mr. Dennison did not testify at trial, the Court takes judicial notice of his opinions regarding these alternative growth funds, as those opinions were filed with the Court in advance of trial and are not subject to dispute. *See* Fed. R. Evid. 201(b) and (d); *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1012 (D. Md. 2019) ("A court may also take judicial notice of its own records.") (citing *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990)).

252.    In passing ERISA in 1974, Congress recognized "that the continued well-being and security of millions of employees and their dependents are directly affected by [retirement] plans." 29 U.S.C. § 1001(a). The "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators," and "ERISA was designed to prevent these abuses in the future." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985). Accordingly, the Court "must be attendant to ERISA's remedial purpose" in interpreting the statute. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 597 (8th Cir. 2009) (citing *Russell*, 473 U.S. at 140 n.8).

253.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is also a type of qualified plan under 26 U.S.C. § 401, known as a "401(k) plan."

254.    Aon was a named fiduciary of the Plan pursuant to its Investment Consulting Agreement with Lowe's. *See* 29 U.S.C. § 1102(a)(2). Aon also was (and continues to be) a named fiduciary of the Plan pursuant to its Investment Management Agreement with Lowe's. *Id*.

255.    In addition to being a named fiduciary, Aon was a functional fiduciary of the Plan in both its investment consulting and investment management roles. *See* 29 U.S.C. § 1002(21)(A). As an investment consultant, Aon "rendere[ed] investment advice for a fee" with respect to the Plan. *See* 29 U.S.C. § 1002(21)(A)(ii). As an investment manager, Aon had discretionary authority with respect to management of Plan assets. *See* 29 U.S.C. § 1002(21)(A)(i).

256.    Aon's core fiduciary status is undisputed. The dispute between the parties related to Aon's fiduciary status is whether Aon was a fiduciary with respect to Lowe's selection of

Aon as the Plan's delegated investment manager. The Court concludes that while Aon continued to act as a fiduciary with respect to its fiduciary consultants' efforts to "cross-sell" Aon's separate delegated fiduciary services, Aon was not engaged in a fiduciary role in either Lowe's decision to select Aon as a delegated investment manager or Aon's direct sales efforts to obtain that engagement.

257.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), provides that a person is a fiduciary of a plan:

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

258.    As a result of this "to the extent" formulation, "a person may be an ERISA fiduciary with respect to certain matters but not others."  *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co*., 302 F.3d 18, 28 (2d Cir. 2002) (quotation omitted).

259.    Department of Labor regulations provide in relevant part that a person renders "investment advice" within the meaning of ERISA § 3(21)(A)(ii) if:

> [s]uch person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property

and the person provides such advice:

> on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan **regarding such matters as, among other things,**

83

**investment policies or strategy,** overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c) (emphasis added).

260.    Again, there is no dispute that Aon served as an investment consulting fiduciary to the Plan with respect to "investment policies or strategy," among other duties.[24] A consulting fiduciary's "cross-selling" of additional fiduciary services and/or financial products almost always involves, either explicitly or implicitly, advice related to such policies or strategies. Here, whether or not Lowe's used a delegated fiduciary investment manager was presented as a part of a review of its investment strategy (i.e., whether to outsource more investment selection responsibility to a professional investment firm that could make changes more readily and presumably with greater skill).[25] Therefore, Aon's request that Lowe's listen to Aon's sales pitch to serve as a delegated fiduciary investment manager was at least an implicit suggestion that Aon serving in that role would be an appropriate and beneficial addition to the Plan's investment

---

[24] Aon argues that the Court should strictly limit the scope of Aon's fiduciary status to only advice about the value of or investing in, etc. particular securities or property, ignoring both the broader scope of its agreement with Lowe's and the admitted fiduciary nature of its advice to the Committee on broader strategic issues, consistent with 29 C.F.R. § 2510.3-21(c). Aon bases its argument on an invalidated proposed rule which would have expanded the current rule to include the "selection of other persons to provide investment advice or investment management services" to the definition of "investment advice." *See* Doc. No. 260 at 162-64. Putting aside the clearly distinguishing fact that the issue here relates to the potential selection of the named fiduciary Aon, not some "other person," as an investment manager, the rule was invalidated on other grounds and, indeed, the court that invalidated the proposed rule did so, in part, because the rule did not preserve the critical element of a "special relationship" between the claimed fiduciary and its client. *See Chamber of Com. of U.S. v. United States Dep't of Lab.*, 885 F.3d 360, 377 (5th Cir. 2018). It is specifically that "special relationship" which is the principal grounds for this Court's ruling that "cross-selling" by a named fiduciary is undertaken within its fiduciary status (even though, of course, it may or may not be a breach of fiduciary duty depending on the facts).
[25] Also, Aon and Lowe's Investment Consulting Agreement specifically called for it to provide services regarding "Investment Manager Evaluation and Selection." Thus, there was a "mutual agreement" that Aon would provide advice regarding investment manager selection. See 29 C.F.R. § 2510.3-21(c)(1)(i)(B).

84

process. Thus, Aon's "cross-selling" is well within the fiduciary role of providing "investment advice."

261.    Moreover, viewed more broadly – and realistically – the essence of any "cross-selling" of a company or firm's products and services in this context is, at least in part, an attempt to leverage an existing relationship for the fiduciary's benefit. In other words, the fiduciary consultant hopes to be able to use the trust and regard that he or she has established with the client to make it more likely that the client will consider doing additional business with the firm. To hold otherwise, "blinks at reality." *See Tatum v. RJR Pension Inv. Comm. ("Tatum I")*, 761 F.3d 346, 361 (4th Cir. 2014).  To be clear, such "cross-selling" is not wrong or *per se* unlawful. Indeed, it is natural and entirely appropriate for successful commercial relationships to expand over time for the benefit of all involved. However, the relationship of trust and confidence that is often at the core of "cross-selling" is also the heart of fiduciary status (and fiduciary obligation). So, the practice of "cross-selling" (i.e., the introduction of and/or suggestion that a client consider purchasing additional services or products from the same company or firm) is within the scope of fiduciary status, even though, as discussed below, the actual selling of additional services or products is not a fiduciary act.

262.    Although Aon was a fiduciary with respect to "cross-selling," Aon was not engaged in a fiduciary role in Aon's direct sales efforts. The selling of services, even for a fiduciary role, is not a fiduciary act; rather, as clearly understood by Lowe's Committee, it is a financially self-interested act in which the seller seeks to increase its income and the buyer must independently decide whether to make the purchase. *See* Tr. II (Green) at 381-83. Similarly, a party does not act as a fiduciary in negotiating the terms of its retention, even if it is being retained for a fiduciary role.  *See, e.g., McCaffree Fin. Corp. v. Principal Life Ins. Co*., 811 F.3d

85

998, 1002-03 (8th Cir. 2016); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011). Indeed, the Department of Labor recognized that, even under its more expansive (and since-invalidated) regulatory definition of investment advice, "a person or firm" could still "tout the quality of his, her, or its own advisory or investment management services or those of … an affiliate, without triggering fiduciary obligations." 81 Fed. Reg. at 20,968.

263.    Aon was also not a fiduciary with respect to Lowe's decision to select Aon as a delegated investment manager. While Aon encouraged Lowe's to buy its delegated services during the sales process, it was clearly left for Lowe's to decide for itself whether to use and ultimately who to engage as a delegated investment manager. *See* Tr. II (Green) at 381-83. Further, even though Aon's request that it be permitted to make a sales pitch for its delegated services offering carried with it an implicit recommendation that those services were at least suitable for Lowe's, that is different from making a recommendation that Lowe's choose Aon to provide the services rather than a competitor.

264.    Aon consultants never made a recommendation that Lowe's choose Aon for this work. In the sales process, Aon presented its delegated services not as a fiduciary recommendation from an advisor, but as a vendor seeking potential business, and the Committee fully understood that it needed to make the decision on who to select independently. *Id*. Therefore, Aon did not act as a fiduciary with respect to Lowe's decision to engage Aon as a delegated fiduciary investment manager for the Plan.

## C.    Aon's Fiduciary Duties

265.    ERISA protects the "financial soundness" of retirement plans "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans[.]" 29 U.S.C. § 1001(a)–(b). As Congress recognized in enacting the statute, these fiduciary

86

standards are essential to safeguarding the rights of participants and beneficiaries. *See* S. Rep. No. 93-127, at 29 ("[W]ithout standards by which a participant can measure the fiduciary's conduct ... he is not equipped to safeguard either his own rights or the plan assets.").

266.   ERISA's fiduciary duties are set forth in 29 U.S.C. § 1104. These fiduciary standards are "strict." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014) (quoting *Cent. States, SE & SW Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)). Indeed, they are among "the highest known to the law." *Tatum I,* 761 F.3d at 355–56.

### 1.   Duty of Loyalty

267.   "Perhaps the most fundamental duty of a [fiduciary] is that he must display ... complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000). As stated in the statute, fiduciaries must "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1).

268.   "ERISA fiduciaries must 'scrupulously adhere to [their] duty of loyalty and make any decisions in a fiduciary capacity with an eye single to the interests of the participants and beneficiaries.'" *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418–19 (4th Cir. 2007); *see also Pegram*, 530 U.S. at 235. This duty is "absolute." *Bedrick v. Travelers Ins. Co*., 93 F.3d 149, 154 (4th Cir. 1996). "There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Id*. Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries." DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

87

269.    An ERISA fiduciary breaches its duty of loyalty when its conduct is "based on anything other than the best interests of the Plan participants." *See DiFelice*, 497 F.3d at 422; *see also Bussian v. RJR Nabisco*, Inc., 223 F.3d 286, 299 (5th Cir. 2000) ("The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure their duty of loyalty is not compromised."). Liability does not stem from mere potential conflicts of interest; "what matters is why the defendant acted as he did." *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 875 (D. Minn. 2018), *aff'd sub nom. Allen v. Wells Fargo & Co.*, 967 F.3d 767 (8th Cir. 2020), *cert. denied*, 2021 WL 1725177 (May 3, 2021); *see also, e.g.*, *In re Northrop Grumman Corp. ERISA Litig.*, 2015 WL 10433713, at *28 (C.D. Cal. Nov. 24, 2015) ("[A] conflict of interest is not a *per se* breach …. Instead, in order to prove a violation of the duty of loyalty, the plaintiff must go further and show actual disloyal conduct." (first alteration in original) (internal quotation marks omitted)).

270.    However, a fiduciary may not act for self-interested reasons even if its advice is prudent. "A fiduciary can abuse its discretion and breach its duties by acting on improper motives, even if one acting for the right reasons might have ended up in the same place." *Tussey v. ABB, Inc.* ("Tussey III"), 850 F.3d 951, 958 (8th Cir. 2017) *cert. denied*, 138 S. Ct. 281 (2017); *see also Pledger v. Reliance Tr. Co.*, 2019 WL 10886802, at *17 (N.D. Ga. Mar. 28, 2019) ("The duty of loyalty is separate from the duty of care and prudence and may provide a cause of action even where an investment decision was prudent."). Thus, a fiduciary can fully comply with the "standard of care," yet still breach the duty of loyalty if its "operative motive was to further its own interests." *See Brotherston v. Putman Invests., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018)).

## 2.  Duty of Prudence

271.  Beyond the threshold duty of loyalty, ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see DiFelice*, 497 F.3d at 420. These duties under § 1104(a)(1)(B) are often collectively referred to as the "duty of prudence." 29 U.S.C. § 1104(a)(1)(B); (4th Cir. 2007).  Because "the content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific."  *Dudenhoeffer*, 573 U.S. at 2014.

272.  In the context of this case, the duty of prudence includes both an initial "duty to exercise prudence in selecting investments" and a "continuing duty to monitor [those] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Likewise, "[s]etting the asset allocation and investment structure" are areas where the fiduciary duty of prudence comes into play.  In addition, "fiduciaries must exercise prudence in the selection and retention of third-party service providers." *Pizarro v. Home Depot, Inc*., 2020 WL 6939810, at *2 (N.D. Ga. Sept. 21, 2020).

273.  The duty of prudence also includes a "duty to investigate, research, and review the options for investment of Plan assets." *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 216 n.8 (4th Cir. 2011). A fiduciary's failure to "ever consider[] an alternative" course of investment action may be evidence of an imprudent process. *Tatum I*, 761 F.3d at 358–60; *Cryer v. Franklin Res., Inc*., 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018) ("The reasonably prudent fiduciary standard merely requires that fiduciaries reach a well-reasoned decision after weighing the risks and benefits and considering other alternatives.").

89

274. In that regard, the regulations to the applicable statutory provision state that the duty of prudence includes giving "appropriate consideration" to "the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks." 29 C.F.R. § 2550.404a-1 (emphasis added); *see also* DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (fiduciary should not proceed with a "decision to make an investment … unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan").

275. As noted, for purposes of determining whether the applicable standard has been met, context is important. *See* 29 U.S.C. § 1104(a)(1)(B) (identifying standard of care as that of prudent person acting in "like capacity" with respect to enterprise of "like character"). Because Aon was hired as an investment professional, the standard that applies to it is one of an expert, not a layperson. *See In re Meridian Funds Grp. Sec. & ERISA Litig*., 917 F. Supp. 2d 231, 239–40 (S.D.N.Y. 2013) (ERISA's prudence standard is "measured against hypothetical sophisticated and prudent investment professionals"). Moreover, the size of the Plan and its billions of dollars in investable assets also is an important consideration for purposes of determining the applicable standard of care. *See* Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule, 44 Fed. Reg. 37221, 37224 (June 26, 1979) ("[A] fiduciary of a plan with assets of $50,000" would not be expected to use "the same investment management techniques as would a fiduciary of a plan with assets of $50,000,000.").

276.     In sum, "the court must consider all relevant evidence … as part of a totality-of-the-circumstances inquiry." *Tatum I*, 761 F.3d at 360 (citation omitted); *see also DiFelice*, 497 F.3d at 420 ("[W]e examine the totality of the circumstances[.]"). In doing so, it is important to consider the fiduciary's entire course of conduct, not just each individual action in isolation. *See Davidson v. Cook*, 567 F. Supp. 225, 237 (E.D. Va. 1983), *aff'd sub nom. Davidson for & on Behalf of Loc. 666 Ben. Tr. Fund v. Cook*, 734 F.2d 10 (4th Cir. 1984), and *aff'd sub nom. Accardi v. McGuire, Woods & Battle*, 734 F.2d 10 (4th Cir. 1984) ("The Court cannot say that failure to take any of these steps, standing alone, would constitute such imprudence as to violate a fiduciary's duty. These omissions together do, however, constitute such neglectful practice that the Court cannot conclude a prudent investor in similar circumstances would have acted in the same manner.").

277.     Finally, "[g]ood faith does not provide a defense to a claim of a breach of these fiduciary duties." *DiFelice*, 497 F.3d at 418. "[A] pure heart and an empty head are not enough." *Id*. In other words, merely having a "firmly held belief" on the wisdom of a course of action or honestly employing one's own "best thinking" (a phrase which Aon's witnesses repeatedly offered as almost an incantation during the trial) is not sufficient, standing alone, to satisfy a plan consultant's or delegated investment manager's fiduciary duty. If it was, then the standard for fiduciary duty would simply amount to establishing good faith. More is required. *See Chao v. Moore*, 2001 WL 743204, at *3 (D. Md. June 15, 2001).

278.     "A fiduciary's subjective, good faith belief in his prudence will not insulate him from liability. Rather, the prudent person standard has been determined by the courts to be an objective standard, requiring the fiduciary to (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and

91

familiarity with such matters; and (3) exercise independent judgment when making investment decisions." *Chao,* 2001 WL 743204, at *3, (quoting *Reich v. King*, 867 F. Supp. 341, 343 (D. Md. 1994)); *see also DiFelice v. U.S. Airways, Inc*., 436 F. Supp. 2d 756, 784 (E.D. Va. 2006), *aff'd*, 497 F.3d 410 (4th Cir. 2007) ("[T]he prudent [person] standard is derived from the law of trusts, and that, in the context of a plan fiduciary's investment choices, 'the appropriate benchmark with which to judge a fiduciary's behavior is an objective one measured against the standard of the investment industry.'") (footnote and citation omitted).

### D. Aon's Alleged Breaches of Fiduciary Duty

279. In the Fourth Circuit, an ERISA plaintiff bears the burden of proving a breach of fiduciary duty and establishing a prima facie case of loss to the plan. *See Tatum I,* 761 F.3d at 356-57.

280. Based on the evidence presented at trial, the Court concludes that Aon did not breach its fiduciary duties to the Plan. Plaintiff argues that instead of faithfully serving the Plan as a trusted investment advisor, Aon engaged in an orchestrated scheme to upsell Lowe's on Aon's delegated fiduciary service and the proprietary funds that were offered with it (including the Aon Growth Fund). Then, according to Plaintiff, Aon imprudently and disloyally selected the Aon Growth Fund for the Plan and maintained it in the Plan even as the fund's performance continued to lag its benchmarks and peers. However, the Court disagrees and finds that Aon acted loyally and prudently with respect to its recommendations to change the Plan's investment choices – which were consistent with its industry research and the thinking of other financial consultants – as well as its selection and retention of the Aon Growth Fund in the Plan, which was similarly reasonable based on Aon's investment expertise and legitimate strategic choices.

### 1. Plan Investment Structure and Menu Recommendations

#### a) Alleged Breach of Duty of Loyalty

281.    Plaintiff claims that Aon's advice on simplifying the Plan's investment menu structure was improperly motivated by a desire to promote additional Aon products and services. The Court finds that Aon did not breach its duty of loyalty with respect to those recommendations.

282.    As found above, the evidence established that Aon's "operative motive," as reflected in the thinking and conduct of consultant Abshire, was to benefit Plan participants through a consolidated menu of investment choices that was easier to understand and led participants to more broadly diversified investments. Therefore, Aon did not "act[] for the purpose of providing benefits to itself or someone else," rather than furthering participants' interests. *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019); *see DiFelice*, 497 F.3d at 422.

283.    There was no inherent conflict of interest in Aon recommending the Alternative or Emerging structures for the Plan because neither structure required the delegation of fiduciary responsibility to Aon or anyone else, or the use of Aon investment funds. The Committee understood that it could have continued to retain primary responsibility for the selection of the Plan's investment options within either structure, Tr. II (Green) at 345, and the Aon consultants actively discussed ways to implement the recommended Alternative structure through "white labeling" funds already in the Plan's lineup, with Aon remaining in a consulting role and earning no additional compensation.[26]

_____

[26] As an additional argument, Aon points out that the possibility of outsourcing investment responsibility to a delegated fiduciary might have represented a risk to Aon as much as an

284.     It was possible that a decision to restructure the Plan's investment lineup could also cause the Committee to change its fiduciary structure, potentially leading to additional business for Aon. However, Abshire did not shape his recommendations to serve that interest. Aon included its thoughts on restructuring as one of a number of subjects in its June 2013 presentation to the Committee on industry trends based on its then recent white paper covering those issues in response to the Lowe's Committee request for Aon's views on plan investment structures. There is no evidence that the analysis and proposals conveyed in the white paper reflected anything but Aon's honest and well-founded assessment of the challenges facing retirement plan participants.  More directly, there is no evidence that Abshire had any delegated services sales training or any thought of starting a sales effort in developing the June 2013 presentation, the substance of which was specifically carried over to later presentations in November and December 2013 and October 2014.

285.     Also, the evidence reflects that Aon did not suggest to Lowe's that there was any urgency in considering the proposed changes and presented the pros and cons of the status quo "traditional" investment menu. Further, when Aon made its written recommendations, it proposed that the Committee take the more modest initial step of adopting the Alternative structure, which was less likely to lead to the engagement of a delegated fiduciary. Indeed, Aon prepared a draft presentation for the June 2014 Committee meeting on the assumption that the

---

opportunity. However, the Court finds this reasoning unpersuasive. In light of acknowledged competitive pressures from other companies offering similar delegated fiduciary services, Aon could well have seen making an effort to sell delegated services to its clients, including Lowe's, as a competitive necessity. And, even in the absence of those market dynamics, it could have reasonably decided to take the calculated risk of losing a relatively smaller amount of consulting fees to get delegated services fees which were several times higher. More persuasive to the Court is the simple fact that Abshire did not have any sales efforts in his mind when he presented Lowe's with the proposed simplified investment menus.

94

Committee would vote to implement the Alternative structure and that Aon would assist the Committee with that implementation as a consultant for no additional fee. Tr. IV (Abshire) at 891-93; *see* PX-259 at 11-12. These facts are inconsistent with an ongoing "operative motive" to sell more services to Lowe's.

286.     Ultimately, Plaintiff's position that Aon acted disloyally in recommending that Lowe's simplify the Plan's investment menu rests on 1) the evidence that Punnoose eagerly promoted and participated in Aon's delegated services sales efforts and 2) documents suggesting that Aon consultants should use research on emerging retirement plan structures as an entry point for selling delegated services. However, while this evidence certainly lends support to Plaintiff's position, weighing all the evidence and examining the totality of the circumstances, the Court concludes that it is insufficient to establish a breach of the duty of loyalty.

287.     The Court does not find Punnoose's testimony persuasive. Punnoose was often evasive in response to Plaintiff's counsel's questioning, repeatedly testifying that he did not "recall" or "I don't recall if I did or didn't", Tr. I (Punnoose) at, *e.g.*, 93-94, 103, 127, 141. Then, when questioned by his own counsel, he conveniently regained his memory. Moreover, the Court does not find credible Punnoose's efforts to downplay his active and ongoing role in getting Lowe's to allow Aon to make sales presentations on delegated services as well as creating the sales pitch itself.[27] On the cusp of consideration for partnership at Aon, Punnoose was clearly focused, at least in part, on increasing delegated sales to his clients, *see* PX-434 at 2, as well as presenting himself as a company thought leader in how Aon consultants could most effectively help sell delegated services. *See* JX-274.

---

[27] In contrast, Abshire more credibly testified that he supported Aon's delegated fiduciary offering and sales effort and wanted Aon to win the business, but it was not the focus of his efforts nor did it influence his recommendations.

288. Still, the question before the Court is not Punnoose's credibility as a witness but instead whether, in the context of all the evidence, his conduct as found by the Court makes Aon liable for breach of fiduciary duty. If not for credible testimony from Abshire and the undisputed evidence that Punnoose was uninvolved in the foundational June 2013 presentation (which predated any consideration of a delegated services sales effort for Lowe's), the Court could well find that Punnoose allowed his sales efforts to color his restructuring recommendations for the Plan. However, considering the totality of the circumstances, the Court finds that Abshire's proper motive for Aon's Plan restructuring recommendations preceded Punnoose's efforts to use those restructuring discussions as a springboard for the benefit of the delegated services sales effort and Abshire's appropriate reasons continued through October 2014, when Lowe's decided to change to the "Emerging" structure. Therefore, the Court concludes that Aon's restructuring recommendations were loyally made and Aon did not breach its duty of loyalty to Lowe's and the Plan.

### b)    Alleged Breach of Duty of Prudence

289. Plaintiff also alleges that Aon breached its duty of prudence in advising the Lowe's Committee about potential structural changes to the Plan investment menu.  For the reasons that follow, the Court concludes that plaintiff has failed to prove a fiduciary breach.

290. As discussed above, the key question under the prudence standard is "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a 'prudent man acting in like capacity.'" *DiFelice*, 497 F.3d at 420 (quoting 29 U.S.C. § 1104(a)(1)(B)). "[F]iduciaries who act reasonably—i.e., who appropriately investigate the merits of an investment decision prior to acting—easily clear this bar." *Tatum I*, 761 F.3d at 358.

291. Aon's advice that the Committee consider simplifying the Plan's investment lineup was developed from its extensive experience as an investment consultant to defined contribution plans and was consistent with Aon's May 2013 white paper, which presented a proposed approach for structuring plan investment lineups based in part on Aon's study of 10,000 defined-contribution-plan participant portfolios. The white paper identified specific concerns with participant confusion and poor investment decision-making and provided a reasoned basis for Aon's belief that a streamlined lineup of internally diversified options with more understandable investment goals/strategies would help address those concerns.

292. Also, other investment consulting firms and retirement industry leaders were making similar findings and developing their own strategies to address these issues around the same time, including strategies very similar to the ones proposed by Aon. Tr. VI. (Clink) at 1060-61; *see, e.g.*, AX-470 at AX0470.0004.

293. In May 2015, Northern Trust published a paper recommending that plan sponsors consider simplifying their investment menus by reducing the number of options and using easier-to-understand descriptors for each investment. AX-470 at AX0470.0004; *see* Tr. VI. (Clink) at 1060-61. Specifically, Northern Trust advised that "providing fewer, better-diversified choices would promote better asset allocation for all plan participants" and for that reason suggested that "plan sponsors should strongly consider streamlining the investment menu in a DC plan to a simplified series of objective-based funds essential to investment for retirement, plus a series of target date funds." AX-470 at AX0470.0010; *see* Tr. VI. (Clink) at 1060-61.

294. Plaintiff's expert Dyson agreed that Aon "certainly wasn't alone in thinking" that adoption of a streamlined menu of objective-based funds "might be a good step for plans to

97

take," and he had seen other papers, in addition to Northern Trust's publication, making this type of suggestion. Tr. III (Dyson) at 629-30. Also, Dyson testified that Mercer, one of the largest investment consultants in the country, "had a similar solution." Tr. III (Dyson) at 630; *see* Tr. III (Dyson) at 638 (agreeing that Mercer "had a similar objective-based proposal on the market").

295. In a November 2014 presentation to the Lowe's Committee regarding Mercer's delegated fiduciary services, Mercer described the benefits of "streamlined" menus using "[g]eneric naming convention[s]" for funds offering "diversified exposure without the need to actively allocate and rebalance among styles." AX-503 at AX0503.0002, AX503.0008. Mercer proposed a potential investment structure for the Plan that would "simplify participant choice" and provide "lower cost investment vehicles" by focusing on active and passive asset-class strategies (eliminating distinctions between growth and value styles), alongside a suite of target date funds. AX-503 at AX0503.0005; *see* Tr. IV (Abshire) at 931.

296. In addition, several well-known and well respected financial advisory firms reviewed and praised the Plan's new investment menu in their spring 2016 responses to the Committee's request for proposal ("RFP") for investment advisory services.[28] Willis Towers Watson stated that the Committee's approach of "streamlin[ing] the[] investment lineup and reduc[ing] the overall number of options, while leveraging multi-manager pooled vehicles to provide broad access to key asset strategies" was "consistent with [Willis Towers Watson's] investment beliefs that fund lineups should focus on quality and clarity of options versus

---

[28] While the Court acknowledges (and to some extent shares) Plaintiff's concern that such praise may have been inevitable because Lowe's stated in the RFP that "[t]he Committee prefers not to change the current investment structure," JX243 at JX0243.0004, there was no specific evidence presented from which the Court could conclude that these companies' statements did not reflect their actual beliefs.

98

quantity, while recognizing that participants need only a few, broad asset classes to construct an efficient portfolio." JX-244 at JX0244.0018. Another RFP respondent, NEPC Investment Consulting, commented: "A streamlined traditional plan design is offered using custom multi-manager funds along with passive target date fund[s]. This structure allows participant choice but does not overwhelm individuals." JX-245 at JX0245.0019. Finally, when presenting its services to the Lowe's Committee as part of the RFP process, Gallagher stated that the Plan's new structure was "well aligned with industry best practices for large DC plans." AX-204 at AX0204.0013 (capitalization removed). Among the "current positives" of the Lowe's Plan investment lineup, Gallagher observed that the Plan's "limited investment menu … limits participant confusion and return chasing." AX-204 at AX0204.0013 (capitalization removed).

297. To the extent that the strategies offered by other consulting firms, or the practices of other plans, differed from the approach proposed by Aon, that is not evidence of imprudence. *See, e.g., DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (assertions about what is "typical" said "little about the wisdom of [the defendant's] investments"); *Anderson v. Intel Corp. Inv. Policy Comm.*, 2021 WL 229235, at *10 (N.D. Cal. Jan. 21, 2021) (allegations that allocation model deviated from industry standard did not state a claim for breach of fiduciary duty); *Barchock v. CVS Health Corp.*, 2017 WL 9324762, at *5 (D.R.I. Jan. 31, 2017) (fiduciaries are not "held to the standard of looking to the average and copying what they see"), adopted, 2017 WL 1382517 (D.R.I. Apr. 18, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018). For example, the record reflects that plan investments that were once relatively rare, such as target date funds, have become prevalent over time. *See* 29 C.F.R. § 2550.404c-5(e)(4)(i) (DOL regulation identifying target date funds as an acceptable qualified default investment alternative for defined contribution plans).

298.    In addition to having a reasoned basis for their advice concerning the Plan's investment structure, Aon also followed a reasonable process in conveying that advice.  Aon initially included the concept of streamlining as part of a broader update covering a number of current topics in the defined contribution plan space after the Lowe's Committee specifically asked for Aon's ideas about plan investment structures.  When the Committee expressed interest in discussing the investment-structure topics further, the consultants provided a broader assessment, identifying advantages and disadvantages of both the Plan's existing, "Traditional" menu and a more streamlined approach.  The consultants did not suggest that a change was urgently needed, but instead indicated to the Committee that, while they believed a more streamlined lineup would be beneficial, the Plan's existing structure was reasonable and the Committee did not need to rush to make a decision.  JX-5 at JX0005.0003.  Also, in its written presentations, Aon recommended the "middle path" of the "Alternative" structure.

299.    In sum, Aon did not fail to apply appropriate "care, skill, prudence, and diligence" in forming or delivering its advice concerning the Plan's investment structure.  29 U.S.C. § 1104(a)(1)(B).

300.    Plaintiff's remaining arguments do not directly attack the level of care Aon applied in advising the Committee, but instead attack the merits of the Emerging structure itself.  Specifically, plaintiff's experts propose that the Emerging structure was flawed because it offered fewer investment options than was typical of similarly sized plans at the time and did not include stand-alone index funds or an all-equity option aside from the Lowe's stock fund.  *See* Tr. III (Dyson) at 566-68 (testifying that in his experience nearly all 401(k) plans offer at least one index fund option); Tr. II (Wagner) at 459, 482-83 (opining that the absence of any all-equity options in the streamlined investment structure was "highly, highly atypical").

301.    The first criticism—that the Emerging structure included fewer investment options than was typical—overlooks that reducing the number of choices presented to participants from typical levels was precisely the point of the restructuring proposal.  ERISA does not require defined contribution plans to offer a large number of investment options.  To the contrary, ERISA § 404(c) provides a potential safe harbor for plans offering as few as three choices with varied risk/return profiles.  *See* 29 U.S.C. § 1104(c); 29 C.F.R. § 2550.404c-1(b)(2).  Also, while the Emerging structure reduced the number of investment options in the Plan menu, each of its multi-asset objective-based funds provided participants access to a professionally managed, diversified group of component funds.  The structure thus preserved the key benefits of the more traditional menu of lots of options —affording participants a range of options allowing them to diversify and align investments to match a particular level of risk tolerance—while mitigating the negative consequences that can come with too much choice, including participant confusion and sub-optimal diversification.

302.    ERISA likewise does not demand that plans offer index funds, an all-equity mutual fund option, or any other particular type of investment.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (nothing in ERISA "requires plan fiduciaries to include any particular mix of investment vehicles in their plan"); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 704 (W.D. Mo. 2019) (rejecting claim that fiduciaries imprudently failed to offer index funds in plan menu).  Moreover, the evidence shows that when the Committee indicated that it was interested in pursuing the Emerging (rather than Alternative) structure, the Aon consultants proposed that the Committee consider supplementing the Emerging structure with an index fund sleeve and/or a brokerage window through which participants who wanted to invest single-asset-class funds (including all-equity options) could do so.  Tr. IV (Abshire) at

919-20. Thus, it was the Committee, not Aon that chose to fully limit the investment menu, which the Court concludes was a reasonable exercise of its authority to manage the Plan.

303.    Accordingly, Plaintiff's disagreement about whether the "Emerging" structure was the best approach to plan menu design does not establish a fiduciary breach where the evidence shows that Aon's advice was the reasonable product of its expertise.  *See Wildman*, 362 F. Supp. 3d at 705 ("Although one could argue the benefits of including [certain investment strategies in a plan], the Court cannot find the Committee was imprudent in failing to offer those options.  The decision was made after careful consideration."); *see also, e.g., Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (prudence does not require fiduciaries "to take any particular course of action if another approach seems preferable" (quotation omitted)); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006) (fiduciary decisions often involve "a balancing of competing interests" that "requires an exercise of discretion").

304.    Aon provided the Committee reasoned advice based on substantial research into investor behavior and decades of experience as an investment consultant to retirement plans. That advice fully satisfied ERISA's duty of prudence.

## 2.    "Cross-Selling" of Delegated Fiduciary Services

305.    In addition to Aon's Plan investment structure recommendations, Plaintiff challenges Aon's "cross-selling" of its delegated services together with those recommendations. The Court does not find any breach of fiduciary duty in Aon's cross-selling conduct.

306.    As discussed above, "cross-selling" is neither inherently wrong nor a *per se* breach of fiduciary duty. There is no clear authority detailing when "cross-selling" violates the obligations inherent in the fiduciary relationship. Instead, as with the fiduciary duties discussed above, the lawfulness of "cross-selling" depends on the relevant facts and circumstances,

including the nature of the fiduciary relationship, the sophistication and resources of the fiduciary client, the suitability of the additional product or service for the client and the ability of the fiduciary to reasonably provide the additional product or service.

307.    Here, the Court easily concludes that Aon did not breach any fiduciary duty in offering its delegated services to Lowe's.

308.    First, Lowe's and Aon enjoyed a longstanding and trusting fiduciary relationship, which could have allowed Aon to take advantage of its position, but Aon did not use its role as a fiduciary advisor to make any recommendation on who Lowe's should select as a delegated fiduciary. Second, Lowe's is a very large and sophisticated company with tremendous resources which allowed it – if it had chosen to do so[29] – to fully evaluate Aon's delegated services offering and compare it to competitive options. Significantly, Lowe's lone witness testified that Lowe's well understood the difference between Aon's fiduciary advice on Plan restructuring and Aon's sales efforts with respect to delegated fiduciary services. *See* Tr. II (Green) at 381-83.  Third, as discussed above, delegated fiduciary services were clearly suitable for Lowe's, particularly after Lowe's decided to change its Plan investment menu to the "Emerging" structure with objective-based investment options, which encompassed underlying multi-fund investments.  Finally, while Aon had limited experience as a delegated services manager for defined contribution plans, it had extensive experience and resources as an investment advisor, so it was not imprudent for Aon to suggest that Lowe's consider using Aon's delegated services.

---

[29] As described above, although Lowe's conducted a "price check" after Aon's delegated services pitch, it did not go through an RFP process or otherwise do any significant due diligence to analyze whether Aon was the best choice to provide delegated fiduciary services for the Plan. However, any failing in this regard is Lowe's responsibility not Aon's, as fully recognized by the Committee. *See* Tr. II (Green) at 381-83.

309.     Therefore, Aon did not breach any fiduciary duty to Lowe's or the Plan in "cross-selling" its delegated fiduciary services.

### 3.     Selection of the Aon Growth Fund as a Plan Investment

#### a)     Breach of Duty of Loyalty

310.     Plaintiff contends that Aon also breached its fiduciary duty of loyalty by selecting the Aon Growth Fund for the Plan as the Plan's delegated fiduciary. While Plaintiff acknowledges that the law allows "participation in what are generally called 'proprietary mutual funds,'" he argues that Aon was not relieved of its general fiduciary duty and failed to "act in the interest of" the Plan participants. *See* Restatement of Trusts (Third) § 78, cmt. c(8) (internal cross references omitted). Indeed, Plaintiff asserts that the selection of the Aon Growth fund is the type of self-dealing that ERISA's duty of loyalty is designed to forbid. *See, e.g*., *French v. Wachovia Bank, N.A*., 722 F.3d 1079, 1085 (7th Cir. 2013) ("One aspect of the duty of loyalty is the strict prohibition against self-dealing.").

311.     The Court disagrees and holds that Plaintiff has failed to prove that Aon's selection of the Growth Fund was the result of disloyalty.  As discussed above, for purposes of ERISA's duty of loyalty, "what matters is why the defendant acted as he did."  *In re Wells Fargo ERISA 401(k) Litig*., 331 F. Supp. 3d at 875.

312.     Even where a fiduciary has a direct financial incentive to select an affiliated fund for a plan menu, courts have rejected claims of disloyalty based on that fact alone—including where there is no indication that the fiduciary considered specific unaffiliated alternatives.  *See, e.g*., *Brotherston v. Putman Invests., LLC*, 907 F.3d 17, 40-41 (1st Cir. 2018) (disloyalty is established only where the "operative motive" behind a fiduciary's action "was to further its own interests." (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018)); *Moitoso v.*

*FMR LLC*, 451 F. Supp. 3d 189, 197, 204 (D. Mass. 2020); *Wildman*, 362 F. Supp. 3d at 701; *see also Fuller v. SunTrust Banks, Inc*., 2019 WL 5448206, at *23 (N.D. Ga. Oct. 3, 2019) (noting that any "inherent conflict" in offering affiliated funds is "insufficient to evidence a breach").

313.     Also, unlike conventional proprietary funds where an affiliated manager picks the securities in which the fund invests and collects investment management fees for performing that work, Aon acted here as "manager of managers" for the Growth Fund, picking the unaffiliated underlying managers and setting the allocation among them. Therefore, all of the investment management fees paid by Plan participants flow exclusively to those unaffiliated sub-managers, not Aon.  Aon's only compensation in connection with the Plan's objective-based mandates was its delegated-fiduciary fee, which was not tied to use of the Collective Trust. In other words, Aon would have received the same fees if it had chosen to use third-party funds.[30]

314.     Although Aon did not receive separate compensation from the Plan as a "fund manager" for the Aon Growth Fund in addition to its fee as the Plan's delegated fiduciary, Plaintiff contends that Aon still had a financial incentive to transfer Plan assets to this fund. Under its Investment Management Agreement, Aon only collected its 5 basis point fee on "Eligible Assets."  Plan assets in the Lowe's company stock fund, stable value fund, and target date funds (i.e., the non-objective based funds) were excluded from "Eligible Assets," leaving only the objective-based funds (such as the Aon Growth Fund) included under the new "Emerging" structure. Thus, Plaintiff argues the Investment Management Agreement (which

---

[30] Also, as noted above, while Aon affiliate ATC received an asset-based trustee fee on investments in the Collective Trust, plaintiff presented no evidence that ATC's fee (which plaintiff does not challenge as unreasonable) had any effect on the DPOC's decision-making, and members of the DPOC credibly testified that it did not.

105

Aon drafted) was structured in a way that incentivized Aon to move as much money to the Aon Growth fund and other objective based funds as possible. But Plaintiff's argument ignores the admitted fact that Plan participants were given a full opportunity to direct their investments following the change in Plan investment options and thus participants, not Aon, ultimately had the final say in which investment "bucket" their assets would go.

315.  Moreover, the evidence established that Aon recommended that the Committee consider "re-enrollment" of Plan assets (which would have had the effect of initially directing Plan assets to target date funds rather than the Growth Fund) after Aon became a delegated fiduciary. *See* Tr. III (Abshire) at 858-59; Tr. IV (Abshire) at 933-35. This evidence points directly away from a disloyal motive with respect to the "mapping" of the Plan assets into "eligible" assets.

316.  Plaintiff also notes that Aon had a business incentive to attract sufficient capital to the Aon Growth Fund to make it viable in the marketplace – especially in light of its limited assets under management ("AUM") at the time it was selected by Aon for the Plan. Therefore, Plaintiff contends that Aon sought to use the Lowe's Plan to 'seed' and legitimize its relatively new Growth Fund.

317.  This claim has more substance. There can be little doubt that Aon was pleased to see a billion dollars of Lowe's assets going into the Aon Growth Fund, which in turn allowed Aon sales employees and others to promote the fund more effectively to potential clients. However, the Court must be careful to distinguish the *reason* for selection of the fund with the inherent *effects* of that selection, including the facts that putting Lowe's Plan assets in the fund would likely make it more attractive to other plans and reduce Aon's required "subsidy" of the fund's expenses.

106

318.    Again, on this issue, the Court credits the testimony of Aon's DPOC member Clink that Aon created the Aon Growth Fund to pursue its own different strategy for growth fund investing and then used that fund for its delegated clients because Aon believed it was the best long-term investment option for plan participants (in the absence of specific contrary directions from a plan). Therefore, after weighing the evidence and considering the totality of the circumstances, the Court finds that Aon did not have a disloyal "operative motive" in selecting the Aon Growth Fund for the Lowe's Plan and did not breach its fiduciary duty of loyalty to the Plan.

### b)    Breach of Duty of Prudence

319.    Plaintiff also alleges that Aon breached its fiduciary duty of prudence in selecting the Aon Growth Fund for the Plan's "growth" / equity investment option.

320.    Again, ERISA's duty of prudence requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(B).  The primary question is whether the fiduciary, "at the time [it] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment." *DiFelice*, 497 F.3d at 420.

321.    As discussed in detail above, the primary choice before the Court is whether to hold that Aon did not use the appropriate care, etc. because it failed to separately and specifically "conduct any investigation" regarding which fund should fulfill the growth mandate under the new Plan structure, *see Tatum I*, 761 F.3d at 358, or instead hold that Aon's earlier extensive investigation of investment alternatives when it created the Aon Growth Fund (with investments such as the Lowe's Plan plainly in mind) is sufficient to fulfill its fiduciary duty.

322.    While Plaintiff's argument that Aon simply chose its own fund without considering alternatives has an indisputable appeal on the surface (and the Court of course does not intend to authorize or approve a fiduciary's failure to properly investigate investment options), the Court concludes that the reality and substance of Aon's conduct, taking into account all the circumstances, was not unlawful.

323.    In making this determination the Court finds several points significant. First, the evidence clearly established that Aon - an experienced and well-respected investment fiduciary with broad responsibility for the Federal employee's Thrift Savings Plan and other major plans – understood the investment fund options in the marketplace and then employed substantial resources and expertise in creating its unique Aon Growth Fund to be used in the specific way that it was used in the Lowe's Plan. The skill and diligence demonstrated in these efforts compares favorably to that normally applied by fiduciaries of other large defined contribution plans, particularly with respect to the expertise of decision makers, the amount of time devoted, and the depth of information considered.

324.    In other words, Aon's lack of a separate, documented discussion of "alternative" third party investment funds does not, in the Court's view, reflect the absence of a careful and thoughtful decision to use the Aon Growth Fund for investments such as the Lowe's Plan. Rather, Aon made its investigation of other structurally different options when it created the fund and did not go through the motions of again considering (and rejecting) those same options each time it made an investment as a delegated fiduciary. Under these facts, Aon's failure to engage in a side-by-side comparison between the Growth Fund and specific outside options when deciding how to implement the growth mandate in the Lowe's Plan was reasonable.

325.   In so holding, the Court emphasizes that 1) it can be difficult to draw the line between a fiduciary which fails its fiduciary duty by simply relying on its own so-called "best thinking" without real and prudent consideration of viable alternatives and the acceptable fiduciary conduct found here (because of Aon's overall care, actual consideration of alternatives and close ongoing attention to asset allocation and investment manager performance in the fund) and 2) the distinction depends heavily on the credibility of witnesses and the particular facts and circumstances of each case. *See Tatum I*, 761 F.3d at 358 (There is no one-size-fits-all, "uniform checklist" for prudence); *Dudenhoeffer*, 573 U.S. at 425 (the prudence inquiry is "context specific").

326.   In addition to the reasonableness of Aon's process for selecting the Growth Fund, the Court concludes that the Growth Fund was itself an appropriate investment option for the Plan, even though in hindsight the strategic choices inherent in the fund's design turned out to be less successful in light of actual market conditions (which favored investment funds with more reliance on domestic equity investments).

327.   Fiduciaries of large plans frequently make a similar decision to retain control and flexibility through the use of plan-specific investment vehicles such as custom and white label funds.  Aon had strong reasons to believe that retaining control over asset allocation and selection of underlying managers was in the Plan's interest.  Evaluation and comparison of competing managers is one of the core functions of investment consulting firms like Aon, and Aon devoted substantial resources toward that end.  Similarly, Aon's asset allocation views are relied upon by its many public and private retirement plan clients, including the federal government's defined contribution plan.  It was not unreasonable for Aon to provide delegated plans and their participants the full benefits of those same views.

328.     The Collective Trust structure also provided advantages that a typical plan-specific custom fund does not.  As a delegated fiduciary to multiple plans, Aon was able to use the Collective Trust to aggregate the assets of plans with common investment mandates in a single investment vehicle without compromising the fiduciary control and flexibility associated with a custom fund. The Court rejects Plaintiff's criticisms that the Growth Fund lacked a sufficiently long performance history as a fund-of-funds vehicle or a large enough client or asset base to be an appropriate choice for the Lowe's Plan.  Indeed, those same criticisms could be lodged against any custom or white label fund.  Yet, such investment vehicles are common among large defined contribution plans, and the Department of Labor itself has encouraged plans to consider them. And, as noted above, each of the Growth Fund's underlying managers had a long and impressive track record that Aon could and did review.

329.     Further, the evidence shows that the Growth Fund has at all times been well diversified and carried reasonable fees, and that Aon has made adjustments to the Growth Fund's underlying managers and asset allocation over time to take advantage of new opportunities and the evolution of its investment strategies. For example, the fund included several diversifying asset categories such as real estate investments which are typically unavailable in 401(k) plan menus.

330.     Finally, the Court cannot conclude that Aon's overall strategy of choosing investments that would be expected to provide less upside in "up" equity markets but more protection in "down" markets was unreasonable at the time Aon selected the Growth Fund for the Lowe's Plan. The only argument offered by Plaintiff against the prudence of such a strategy is based on historical results rather than market / asset allocation forecasts at the time of the selection of the fund. A finding of imprudence based on such hindsight would be plainly wrong.

110

An investment fiduciaries' conduct is properly measured by its reasonableness at the time of its investment selection not an after the fact accounting of how the investment performs. In fact, such is the difference between a determination of liability and damages (*if* liability is first established). *See DiFelice*, 497 F.3d at 424 ("whether a fiduciary's actions are prudent cannot be measured in hindsight"); *see also Seawell v. Brown*, 2010 WL 11561287, at *8 (S.D. Ohio Sept. 9, 2010) ("[I]t is easy to say in retrospect what asset classes were producing the highest rates of return and what those rates of return were. What is not so simple is to predict where the highest rates of return will lie in the future.").

331.    During the five-year period ending March 31, 2021, the Growth Fund provided average annual returns of 11.44 percent – admittedly less than the returns of a global equity portfolio, but with less risk. This performance profile closely tracks Aon's reasonable expectations for the Growth Fund portfolio in the high-growth market conditions that have existed during the relevant period, relative to a pure global equity portfolio. The Growth Fund's performance has also closely tracked its custom benchmark, which matches the Fund's strategic asset allocation to take into account the risks and return prospects of that allocation. Further, as noted, Lowe's expected less "upside" in return for less "downside" over time.

332.    It is unsurprising that equities, or funds with greater concentrations in equity, would generate greater returns when equities are performing exceptionally well. Also, strong equity markets are unlikely to last forever, and the Growth Fund's diversified approach was designed to provide downside protection and opportunities for returns during periods when equities performed poorly. *See Tussey v. ABB, Inc*., 850 F.3d 951, 960 (8th Cir. 2017) ("Not only can good bets go bust and bad bets hit the jackpot, but some investments are simply meant

to pay off less than others, in return for lower risks, different exposures, or countless other considerations.").

333.    The value of such diversification is acknowledged in ERISA itself, which specifically charges fiduciaries with "diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  29 U.S.C. § 1104(a)(1)(C). ERISA does not require fiduciaries to chase returns or prioritize raw returns over other considerations, including the higher risk associated with higher expected returns. *See, e.g., Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("Nothing in the record suggests that it was not reasonable and prudent to select conservative funds with long-term growth potential and to stay with those mutual funds even during years of lower performance."); *White v. Chevron Corp*., 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("[A] fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy.").

334.    In sum, Aon had principled reasons for believing that the Growth Fund would be an appropriate investment vehicle for plans seeking a diversified, multi-manager growth strategy throughout the relevant period. The fact that, in hindsight, the Growth Fund underperformed more equity-concentrated investments in market conditions that favored equities does not undermine the reasonableness of that conclusion or suggest that Aon's selection of the Growth Fund was a product of inadequate skill or care.

### 4.    Retention of the Aon Growth Fund

#### a)    Breach of Duty of Loyalty

335.    Separately, Plaintiff asserts that even if Aon's initial selection of the Growth Fund passes fiduciary muster, Aon's retention of the fund in the Plan breached its fiduciary duty.

336. With respect to breach of the duty of loyalty, the Court finds that Aon retained the Growth Fund in the Lowe's Plan for the same reasons that it selected the fund initially. That is, Aon believed that the Growth Fund was an appropriate investment option that would serve Plan participants well. Also, Plaintiff has not offered evidence that some different additional benefit accrued to Aon because the Growth Fund remained in the Lowe's Plan. In fact, Aon has now closed the Growth Fund to new defined contribution plan clients so Plaintiff's arguments that Aon benefited from the Lowe's investment in its ability to market the fund is less applicable to Plaintiff's retention claim. Therefore, on the same grounds as the Court's ruling with respect to the issue of the duty of loyalty in connection with the selection of the Growth Fund, the Court concludes that Aon did not breach its duty of loyalty in retaining the fund in the Plan.

### b)    Breach of Duty of Prudence

337. Plaintiff similarly challenges the prudence of Aon's retention of the Growth Fund in the Lowe's Plan in light of the fund's continuing underperformance. In support of this claim, Plaintiff reprises its argument that the DPOC never investigated or discussed whether a different fund might be more appropriate for Lowe's Plan – or even discussed the Plan at all – in the over five years since the Aon Growth Fund was added to the Plan lineup.

338. The Supreme Court has held that fiduciaries have a "continuing duty to monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 528–30. Consistent with this duty, Aon's fiduciary training materials state that "[p]oor oversight of investments" and ignoring "[p]oorly performing managers and not doing anything about it" are "Breach Examples." Moreover, Aon's "closely monitoring [of its] … funds is not the same as closely monitoring the Plan's lineup." *Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, at *9 (D. Mass. June 19, 2017), *aff'd in relevant part*, 907 F.3d 17 (1st Cir. 2018).

339.    So, again, the Court must decide if Aon's lack of consideration of alternative investments breached its fiduciary duty, even as it continued to devote extensive attention to the Growth Fund, including making changes to the fund to respond to the ongoing bull market for equity investments.

340.    This final issue may be the closest question presented to the Court in this action. Although an investment fiduciary is of course required to always exercise its best judgment in the interest of plan participants, it cannot forever stubbornly cling to its "best thinking" without reflection as time and experience demonstrate that thinking to be unsuccessful. Rather, a fiduciary investment manager must, in light of poor investment performance, at *some* point change an investment that is hurting Plan participants. So, in this case, the Court must decide whether Aon ever reached the point at which it was acting imprudently in not removing the Aon Growth Fund as the Plan's "growth" investment option. Taking into account all the circumstances, however, the Court finds no breach of fiduciary duty.

341.    In determining Aon's prudence, the Court considers several factors to be significant.  First, as discussed at length above, Plaintiff has not presented evidence that at any point the Aon Growth Fund was an unreasonable investment based on the competence of the underlying investment managers or its forward-looking asset allocations (in comparison to other market forecasts). Plaintiff's hindsight attacks on the fund based on historical results are unpersuasive and, as noted, the dynamics of the market could have changed at any time making the Aon Growth Fund not only reasonable but likely more profitable for Plan participants.

342.    Second, as previously detailed, Aon over time exercised its expertise to keep apprised of alternate investments in the market, closely monitored the Aon Growth Fund and modified the fund to take more advantage of the continuing strong equity market. *See Birse v.*

*CenturyLink, Inc.*, 2020 WL 1062902, at \*5-6 (D. Colo. Mar. 5, 2020) (recognizing that where fiduciaries "made a series of adjustments" to managers and asset allocation in response to new information, those changes served as confirmation that the fund was prudently monitored), appeal dismissed, 2020 WL 5900551 (10th Cir. June 4, 2020).

343.    Third, albeit in only "the past year or two," Tr. II (Green) at 391; Tr. IV (Abshire) at 921, Lowe's has added a passive equity option to the Plan investment menu. This option allows Plan participants to obtain full equity investment risk if they choose to do so. Having this additional option for participants (which Aon had suggested that Lowe's consider at the time Lowe's engaged Aon as a delegated fiduciary), makes retention of Aon's more risk-adverse portfolio as a Plan choice more reasonable.

344.    Fourth, and perhaps most significant, the Court believes that it would be wrong to conclude that Aon breached its fiduciary duty in not removing the Growth Fund from the Plan when Lowe's and Gallagher, its well-qualified fiduciary consultant, never suggested that Aon should remove the Growth Fund. Instead, with full knowledge of the fund's results relative to the same benchmarks and peers that Plaintiff points to as reasons the fund should have been abandoned, Gallagher appears to have judged the Growth Fund to be an appropriate investment to maintain in the Plan or at least believed that the fund should be given more time to prove itself.   Among other things, Gallagher's reports to the Committee emphasized the Growth Fund's superior long-term risk-adjusted returns relative to peer funds, as measured by Morningstar's assignment of a five-star rating to the Growth Fund. In sum, if an independent investment consulting fiduciary (with its own fiduciary obligations which have not been challenged) did not view the inclusion of the Growth Fund in the Lowe's Plan's during the

relevant period as improper, then it is difficult for the Court to conclude that Aon should, as a matter of law, have removed the Growth Fund from the Plan lineup.

345. Accordingly, the Court concludes that Aon has not breached its fiduciary duty of prudence in retaining the Growth Fund in the Lowe's Plan.

## III. LOWE'S COMPARATIVE FAULT / RESPONSIBILITY

346. Although the Court need not reach the issue of damages[31] because it finds that Aon did not breach any fiduciary duty, it will briefly note that if a breach had been found, the Court would have found that Lowe's bears substantial responsibility for any damages suffered by Plan participants.

347. First and foremost, Lowe's failed to perform any real due diligence or comparison of alternatives before selecting Aon to be the Plan's delegated fiduciary investment manager. And, current Committee chairman Green, the only Lowe's witness, admits as much, saying that he abstained from voting for Aon because he thought the decision needed further study. Had the Committee conducted an RFP (as it did when it engaged a new *consultant* who had no direct authority to impact the Plan's investments) or at least learned more about and fully considered other options, it might have avoided many of the issues raised in this action.[32]

348. Further, had the Committee learned more about and discussed the Growth Fund's limited track record, etc. either before or after Aon was selected as a delegated fiduciary, Lowe's

_____

[31] In any event, the calculation of any damages would have been exceedingly difficult for the Court in the absence of detailed relevant information on comparable investments that might have been chosen if the Aon Growth Fund had not been selected or retained.

[32] The Court does not mean to suggest by this statement that Lowe's should not have ultimately engaged Aon, who was well-qualified, to provide delegated fiduciary services. However, conducting a fair and thorough RFP process (particularly with an uninterested advisor) would have likely eliminated any claims for breach of the duty of loyalty or prudence with respect to the selection of a delegated fiduciary, regardless of who was selected.

may well have not entered into a management agreement that authorized Aon to select its own funds without directly considering other options. Instead, Lowe's could have exercised its authority, if it chose to do so, to require more direct and robust consideration of alternative investments and/or more clearly documented its expectations regarding future fund performance (which, again, might have avoided a number of issues presented here).

349.    In other words, the purchaser as well as the seller of fiduciary services bears responsibility for diligently exploring whether the services offered are the most beneficial for plan participants. This is particularly true when the purchaser Committee, as here, is also a Plan fiduciary. Unfortunately, it appears to the Court that Lowe's fell short of its responsibility to protect the Plan (which, of course, may well be reflected in the settlement of Plaintiff's claims against Lowe's and the Committee).

## IV.    THE AWARD OF COSTS AND FEES

350.    "In an ERISA action, a district court may, in its discretion, award costs and reasonable attorneys' fees to either party under 29 U.S.C. § 1132(g)(1), so long as that party has achieved "'some degree of success on the merits.'" *Hardt v. Reliance Std. Life Ins. Co*., 560 U.S. 242 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)); *Williams v. Metro. Life Ins. Co*., 609 F.3d 622, 634 (4th Cir. 2010).

351.    The first step of this analysis requires the Court to consider whether either party achieved "some degree of success on the merits," thereby making it eligible for an award of attorneys' fees and/or costs. Clearly, Aon has garnered "some degree of success on the merits" by avoiding liability on Plaintiff's claims. Conversely, having failed to establish any breach of fiduciary duty, Plaintiff has not obtained any success on the merits, although the Court finds that

117

Plaintiff's claims were plainly worthy of careful and lengthy consideration. Therefore, Aon but not Plaintiff is eligible for an award of attorneys' fees under the *Hardt* standard.

352.     However, even a successful party such as Aon does not enjoy a presumption in favor of an attorneys' fees award. *See Williams*, 609 F.3d at 635; *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir.1993) (en banc). In *Quesinberry*, the Fourth Circuit identified five factors that a district court should consider in informing its exercise of discretion when considering whether to award fees or costs in an ERISA case: (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Quesinberry*, 987 F.2d at 1029. This five-factor approach is not a "rigid test," but instead provides "general guidelines." *Id*.

353.     Notably, in exercising its discretion to award fees or costs under the statute, the Court is entitled to consider the remedial purposes of ERISA to protect employee rights and secure effective access to federal courts. *See Williams*, 609 F.3d at 636; *Quesinberry*, 987 F.2d at 1030 (noting district courts should consider remedial purposes of ERISA in exercising discretion to award attorneys' fees); *Denzler v. Questech, Inc*., 80 F.3d 97, 104 (4th Cir.1996) (describing remedial purposes of ERISA).

354.     The Court also has substantial discretion when it comes to costs. *Constantino v. S/T Achilles*, 580 F.2d 121, 123 (4th Cir. 1978); *Fells v. Va. DOT*, 605 F. Supp. 2d 740, 742 (E.D. Va. 2009). However, with respect to costs (unlike attorneys' fees) the Fourth Circuit has

held that Federal Rule of Civil Procedure 54(d)(1) creates a presumption that the prevailing party will be awarded costs. *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999). Therefore, if the Court decides not to award costs, it must justify its decision by "articulating some good reason for doing so." *Oak Hall Cap and Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990).

355.    Considering all the relevant facts and circumstances, the remedial purpose of ERISA and in the exercise of its discretion, the Court concludes that there are several good reasons why Aon should not recover any fees or costs in this action.

356.    First, Plaintiff has not acted in bad faith in his conduct with respect to the Plan or Aon or in bringing or prosecuting this action. Further, from the evidence presented, it appears unlikely that Plaintiff, a former Lowe's non-executive hourly employee, has the means to satisfy a significant award of attorneys' fees or costs. *See Williams*, 609 F.3d at 636 ("We therefore conclude that a plaintiff's ability to pay attorneys' fees may be considered by the district court in its exercise of its discretion under *Quesinberry*").

357.    With respect to whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances, the Court finds that an award of fees or costs against Plaintiff might well deter others from filing or participating in appropriate yet uncertain litigation; so, in light of the remedial purpose of ERISA this factor favors not making an award to Aon. Similarly, Plaintiff sought to benefit all participants and beneficiaries of the Lowe's ERISA plan in his action.

358.    Finally, the Court finds that while on balance the facts and law amply support the Court's decision to enter judgment in Aon's favor on all of Plaintiff's claims, there was also support for Plaintiff's positions as described above.

359.     Accordingly, applying the relevant factors, the Court will exercise its discretion to require the parties to bear their own attorneys' fees and costs with respect to the claims between Plaintiff and Aon. [33]

## V.     ORDER AND JUDGMENT

**NOW THEREFORE IT IS ORDERED THAT:**

**1.**     Judgment is entered in favor of Aon on Plaintiff's claims; and

**2.**     The Court exercises its discretion to order the parties to each bear their own costs and attorneys' fees with respect to the dispute between Plaintiff and Aon.

**SO ORDERED ADJUDGED AND DECREED**.

Signed:     October     12,  2021

Kenneth D. Bell
United States District Judge

---

[33] This ruling has no effect on Plaintiff's motion for attorneys' fees in connection with the settlement of the class' claims against Lowe's, which the Court will address in a separate order.